UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CRIMINAL ACTION NO. 1:21-CR-00013-GNS-HBB

UNITED STATES OF AMERICA                                                                                          PLAINTIFF

v.

MIRSAD RAMIC                                                                                                              DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motions to Dismiss (DN 53, 63), Defendant's Amended Motion to Dismiss (DN 55), Defendant's Motion for Revocation of Detention Order (DN 66), and Plaintiff's Motion for Leave to Seal (DN 72). The motions are ripe for adjudication.

### I.  BACKGROUND

In 2021, Defendant Mirsad Ramic ("Ramic") was indicted for allegedly conspiring to provide and providing material support to the Islamic State of Iraq and al-Sham ("ISIS"),[1] which has been designated as a foreign terrorist organization by Turkey and the United States, and receiving military-type training from ISIS, in violation of 18 U.S.C. §§ 2339B and 2339D. (Indictment 1-4, DN 7). Ramic has been detained pending trial. (*See* Order, DN 19).

Ramic moves to dismiss the Indictment pursuant to the Fifth Amendment's Due Process and Double Jeopardy Clauses. (Def.'s Am. Mot. Dismiss, DN 55; Def.'s Mot. Dismiss, DN 63).[2]

---

[1] In his motions, Ramic refers to ISIS as the "Islamic State in Iraq and the Levant" or ISIL. To be consistent with the Indictment, the Court will refer to the organization as ISIS.
[2] Ramic's Amended Motion to Dismiss (DN 55) makes only typographical revisions to his initial motion (DN 53). Accordingly, only the amended motion will be referenced in addressing the merits of these two motions.

In addition, the United States moves to seal a document filed in support of its response to one of Ramic's motions. (Pl.'s Mot. Leave Seal, DN 72). Finally, Ramic moves to revoke his detention pending trial. (Def.'s Mot. Revocation Detention Order, DN 66).

## II. DISCUSSION

### A. Defendants' Motion to Dismiss (DN 53, 55, 63)

Ramic asserts that his criminal prosecution in Turkey and subsequent prosecution in the United States for his alleged membership in ISIS violates the Fifth Amendment's Double Jeopardy Clause and Due Process Clause and warrants the dismissal of the charges in this action. (Def.'s Am. Mot. Dismiss 3-6; Def.'s Mot. Dismiss 3-9, DN 63). Under Fed. R. Crim. P. 12(b), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).

#### 1. *Procedural and Substantive Due Process*[3]

For his due process argument, Ramic contends that there is an insufficient nexus between his alleged criminal conduct and any national interest of the United States. (Def.'s Am. Mot. Dismiss 3-6). Thus, the application of 18 U.S.C. §§ 2339B and 2339D to Ramic's alleged actions

---

[3] As the Sixth Circuit has explained:

> Substantive due process "prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal quotation marks and citation omitted). Procedural due process requires that "[w]hen government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner."

*United States v. Green*, 654 F.3d 637, 652 (6th Cir. 2011) (alteration in original) (quoting *Salerno*, 481 U.S. at 746). While Ramic mentions the terms "substantive due process" and "procedural due process" when seeking to preclude his prosecution for the charged crimes, he does not make separate arguments for each type of due process. (Def.'s Am. Mot. Dismiss 1, 3).

outside of the United States violates the Due Process Clause.[4] (Def.'s Am. Mot. Dismiss 3-6). The United States argues that extraterritorial jurisdiction is proper under the facts of this case. (Pl.'s Resp. Def.'s Mot. Dismiss 4-8, DN 54). It also avers that Ramic is applying the wrong standard, but even if a sufficient nexus were required, such nexus exists in this case. (Pl.'s Resp. Def.'s Mot. Dismiss 4-8, DN 54).

### a. Extraterritorial Jurisdiction

"Congress has the authority to enforce its laws beyond the territorial boundaries of the United States. Whether Congress has in fact exercised that authority . . . is a matter of statutory construction." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (internal citations omitted). While there is a general presumption that statutes do not apply extraterritorially, this presumption is inapplicable to criminal statutes. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993); *United States v. Bowman*, 260 U.S. 94, 98 (1922). If the extraterritorial scope of a statute is not delineated, extraterritorial jurisdiction may "be inferred from the nature of the offense." *Bowman*, 260 U.S. at 98.

---

[4] As a sister court observed, it is not clear whether "the Fifth Amendment limits Congressional authority to criminalize extraterritorial conduct . . . ." *United States v. Ologeanu*, No. 5:18-CR-18-REW-MAS, 2020 WL 1676802, at *11 (E.D. Ky. Apr. 4, 2020). The court further noted:

> A robust majority of Circuits have assumed that it does. However, neither the Sixth Circuit nor the Supreme Court has interpreted the Fifth Amendment to restrict congressional criminalization of extraterritorial conduct or the conferral of jurisdiction for such prosecutions. Despite the Circuit consensus (which the Court here follows), precedent provides some reason to doubt that the Supreme Court or Sixth Circuit would follow suit.

*Id.* at *12 n.34 (internal citations omitted).

Ramic has been charged with violating 18 U.S.C. § 2339B, which makes it a crime to provide material support or resources to a designated foreign terrorist organization. In the relevant part, the statute provides:

> (a) Prohibited activities.—
> (1) Unlawful conduct.—Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).
>
> . . .
>
> (d) Extraterritorial jurisdiction.—
> (1) In general.—There is jurisdiction over an offense under subsection (a) if—
>> (A) an offender is a national of the United States (as defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22))) or an alien lawfully admitted for permanent residence in the United States (as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)));
>> (B) an offender is a stateless person whose habitual residence is in the United States;
>> (C) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;
>> (D) the offense occurs in whole or in part within the United States;
>> (E) the offense occurs in or affects interstate or foreign commerce; or
>> (F) an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).
>
> (2) Extraterritorial jurisdiction.—There is extraterritorial Federal jurisdiction over an offense under this section.

18 U.S.C. § 2339B(a)(1), (d).[5]  From its language, it is clear that Congress expressly intended for Section 2339B to apply to criminal acts committed outside of the United States.  *See United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (noting that Section 2339B "contain[s] explicit provisions applying [it] extraterritorially."  (citations omitted)); *United States v. Ahmed*, 94 F. Supp. 3d 394, 411 (E.D.N.Y. 2015) (discussing the extraterritorial application of Section 2339B); *United States v. Mostafa*, 965 F. Supp. 2d 451, 455 n.5 (S.D.N.Y. Aug. 30, 2013) ("18 U.S.C. § 2339B makes it a criminal offense to provide material support or resources to designated foreign terrorist organizations.  Subpart (d) explicitly provides for extraterritorial jurisdiction.").

Similarly, 18 U.S.C. § 2339D provides, in relevant part:

> (a) Offense.—Whoever knowingly receives military-type training from or on behalf of any organization designated at the time of the training by the Secretary of State under section 219(a)(1) of the Immigration and Nationality Act as a foreign terrorist organization shall be fined under this title or imprisoned for ten years, or both.  To violate this subsection, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (c)(4)), that the organization has engaged or engages in terrorist activity (as defined in section 212 of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).
> (b) Extraterritorial jurisdiction.—There is extraterritorial Federal jurisdiction over an offense under this section.  There is jurisdiction over an offense under subsection (a) if—
>> (1) an offender is a national of the United States (as defined in [section] 101(a)(22) of the Immigration and Nationality Act) or an alien lawfully admitted for permanent residence in the United States (as defined in section 101(a)(20) of the Immigration and Nationality Act);
>> (2) an offender is a stateless person whose habitual residence is in the United States;
>> (3) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

---

[5] "The term 'national of the United States' means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States."  8 U.S.C. § 1101(a)(22).  The Criminal Complaint alleges that Ramic is a naturalized citizen of the United States.  (Crim. Compl. ¶ 8, DN 1).

>   (4)   the offense occurs in whole or in part within the United States;
>   (5)   the offense occurs in or affects interstate or foreign commerce; or
>   (6)   an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

18 U.S.C. § 2339D(a)-(b). Thus, like Section 2339B, Section 2339D reflects Congress' clear intent to exercise extraterritorial jurisdiction over the acts criminalized in this statute.

Notwithstanding the clear language conveying extraterritorial jurisdiction found in both statutes, Ramic contends that the exercise of such jurisdiction over him violates his due process rights. (Def.'s Am. Mot. Dismiss 3-6). He argues that the United States must show a sufficient nexus between him and the United States to satisfy due process requirements, while the United States asserts that no such showing is required for U.S. citizens. (Def.'s Am. Mot. Dismiss 3-6; Pl.'s Resp. Def.'s Mot. Dismiss 8-9, DN 54).

As the United States notes in its response, courts have held that the nexus requirement does not apply to U.S. citizens who have been prosecuted under other criminal statutes. (Pl.'s Resp. Def.'s Mot. Dismiss 9, DN 54 (citations omitted)).[6] For example, in *United States v. White*, 51 F. Supp. 2d 1008 (E.D. Cal. 1997), the court held that "where the government seeks to prosecute a United States citizen for acts occurring in foreign lands, due process does not require a demonstration of 'nexus.'" *Id*. at 1011 (citing *United States v. Juda*, 46 F.3d 961, 966-67 (9th Cir. 1995); *United States v. Caicedo*, 47 F.3d 370, 372 (9th Cir. 1995)). No court has subsequently cited *White* for this proposition, and that decision relied upon the Ninth Circuit's decision in *United States v. Juda*, which involved defendants charged with transporting drugs on a stateless vessel on

---

[6] While the United States cites *United States v. Greer*, 956 F. Supp. 531 (D. Vt. 1997), to support its position, the court held "that for exercise of jurisdiction over this offense to be reasonable under principles of international law, and to satisfy the requirements of the due process clause, a nexus between the criminal conduct alleged and the United States must be proved." *Id*. at 536.

the high seas. *See Juda*, 46 F.3d at 966-67. *Juda* is clearly factually distinguishable from the present case, and this Court declines to rely upon *White* despite the lack of any apparent Supreme Court or Sixth Circuit guidance.

Assuming *arguendo* that there is a nexus requirement and applying the approach advocated by Ramic,[7] "there must be a sufficient nexus between the defendant and the United States, so that [the extraterritorial] application [of the criminal statute] would not be arbitrary or fundamentally unfair." *Al Kassar*, 660 F.3d at 118 (internal quotation marks omitted) (quoting *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003)). Because Congress has expressed a clear intent to apply Sections 2339B and 2339D extraterritorially, "the 'burden is a heavy one' for a defendant seeking to show that extraterritorial application of the statute violates due process." *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016) (quoting *United States v. Ali*, 718 F.3d 929, 944 n.7 (D.C. Cir. 2013)).

Ramic is a naturalized U.S. citizen. In *Blackmer v. United States*, 284 U.S. 421 (1932), the Supreme Court stated that a U.S. citizen who violates United States law while abroad "continued to owe allegiance to the United States. By virtue of the obligations of citizenship, the United States retained its authority over him, and he was bound by its laws made applicable to him in a foreign country." *Id*. at 436. Courts have held that a defendant's U.S. citizenship is sufficient to satisfy this requirement. *See United States v. Clark*, 435 F.3d 1100, 1108-09 (9th Cir. 2006) ("Clark is correct that to comply with the Due Process Clause of the Fifth Amendment, extraterritorial application of federal criminal statutes requires the government to demonstrate a sufficient nexus

---

[7] Courts in different circuits have applied three standards in addressing due process challenges to the extraterritorial application of a federal criminal statute: "the international law approach, the nexus approach, and the fundamental fairness approach." *Ologeanu*, 2020 WL 1676802, at *11. Ramic argues that the nexus approach applies. (Def.'s Am. Mot. Dismiss 3-4).

between the defendant and the United States 'so that such application would not be arbitrary or fundamentally unfair.' [*United States v.*] *Davis*, 905 F.2d [245,] 248-49 [(9th Cir. 1990)]. . . . . This longstanding principle [in *Blackmer*] that citizenship alone is sufficient to satisfy Due Process concerns still has force. Citing *Blackmer,* we recently affirmed that "there is no doubt that the United States may exercise jurisdiction over American nationals living abroad, regardless of where the crime is committed." *United States v. Corey,* 232 F.3d 1166, 1179 n.9 (9th Cir. 2000). . . . Clark is a U.S. citizen, a bond that 'implies a duty of allegiance on the part of the member and a duty of protection on the part of the society. These are reciprocal obligations, one being a compensation for the other.' *Luria v. United States,* 231 U.S. 9, 22 (1913). Predicated on this imputed allegiance, application of § 2423(c) to Clark's extraterritorial conduct does not violate the Due Process Clause."), *superseded on other grounds as recognized in United States v. Pepe*, 895 F.3d 679, 681-82 (9th Cir. 2018).

Besides Ramic's citizenship, the nature of the acts criminalized in Sections 2339B and 2339D and Ramic's alleged activities abroad also establish a sufficient nexus to the United States. "There can be no dispute that combating international terrorism is a paramount interest of the United States: 'international terrorism is a serious and deadly problem that threatens the vital interests of the United States." *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 431 (E.D.N.Y. 2009) (quoting Antiterrorism & Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(a)(1), (7), 110 Stat. 1214, 1247. As the United States notes:

> Congress has legislated that the national interest is threatened by certain foreign terrorist organizations, *see generally* 18 U.S.C. Sections 2339A-B, and has delegated to the United States Secretary of State the responsibility to identify those foreign terrorist organization for the purpose of subjecting them to sanctions, *see* 8 U.S.C. Section 1189. . . . In this case, the Secretary of State has designated al Qa'ida in Iraq, ISIL (and its alias ISIS) as foreign terrorist organizations.

(Pl.'s Resp. Def.'s Mot. Dismiss 10, DN 54).[8]  Thus, because ISIS poses a threat of terrorism and Sections 2339B and 2339D implicate the United States' national interests, there is a sufficient nexus to satisfy the requirements of due process.  *See United States v. Naseer*, 38 F. Supp. 3d 269, 272-73 (E.D.N.Y. 2014) ("The provision of material support to designated terrorist organizations implicates U.S. interests, as courts in this Circuit have repeatedly found."); *Ahmed*, 2011 WL 5041456, at *2 (considering the foreign terrorist organization designation as a factor in determining whether there was a sufficient nexus).  Ramic's motions to dismiss will be denied on this basis.

### 2. *Double Jeopardy Clause*

The Fifth Amendment's Double Jeopardy Clause provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ."  U.S. Const. amend. V.  Ramic asserts that his criminal charges in this action are precluded by the Double Jeopardy Clause due to his prior conviction in Turkey.  (Def.'s Mot. Dismiss 3-9, DN 63).  In making that argument, he primarily relies on *Gamble v. United States*, 139 S. Ct. 1960 (2019), and a law review article discussing the future implications of *Gamble*.[9]

#### a. **Dual Sovereignty**

Ramic contends that the Supreme Court's 2019 decision in *Gamble* "extended the dual-sovereignty principle to 'a prosecution in this country for crimes committed abroad.'"  (Def.'s Mot. Dismiss 4, DN 63).  "For decades the Supreme Court has held that elementally identical

---

[8] "One of the required elements for the [foreign terrorist organization] designation by the Secretary of State is the finding that 'the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.'" *United States v. Ahmed*, No. 10 CR. 131(PKC), 2011 WL 5041456, at *2 (S.D.N.Y. Oct. 21, 2011) (quoting 8 U.S.C. § 1189(a)(1)(C)).

[9] Anthony J. Colangelo, Gamble*, Dual Sovereignty, and Due Process*, 2019 Cato Sup. Ct. Rev. 189.

offenses are nevertheless different for purposes of the Double Jeopardy Clause when they are charged by separate sovereigns. This 'dual sovereignty doctrine' is rooted in the common-law conception of crime as an offense against the sovereignty of a government." *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1360 (11th Cir. 1994) (internal citations omitted) (citing *Heath v. Alabama*, 474 U.S. 82, 88 (1985)) (defendants were prosecuted in the Bahamas and the United States). The Supreme Court has reasoned:

> When a defendant in a single act violates the "peace and dignity" of two sovereigns by breaking the laws of each, he has committed two distinct "offenses." . . . [W]hen the same act transgresses the laws of two sovereigns, "it cannot be truly averred that the offender has been twice punished for the same offense . . . ."

*Heath*, 474 U.S. at 88 (internal citation omitted) (quoting *Moore v. Illinois*, 55 U.S. (14 How.) 13, 19 (1852)).

In considering whether the dual sovereignty doctrine applies to preclude a second prosecution, "the crucial determination is whether the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns. This determination turns on whether the two entities draw their authority to punish the offender from distinct sources of power." *United States v. Studabaker*, 578 F.3d 423, 430 (6th Cir. 2009) (internal quotation marks omitted) (quoting *Heath*, 474 U.S. at 88). In *Gamble,* the Supreme Court analyzed its precedent applying the Double Jeopardy Clause. *See Gamble*, 139 S. Ct. at 1966. In addressing the interests of foreign countries and the United States in criminal prosecutions, the Court noted:

> There are other reasons not to offload all prosecutions for crimes involving Americans abroad. We may lack confidence in the competence or honesty of the other country's legal system. Less cynically, we may think that special protection for U.S. nationals serves key national interests related to security, trade, commerce, or scholarship. Such interests might also give us a stake in punishing crimes committed *by* U.S. nationals abroad—especially crimes that might do harm to our national security or foreign relations. See, *e.g.*, § 2332a(b) (bombings). These examples reinforce the foundation laid in our antebellum cases: that a crime against

      two sovereigns constitutes two offenses because each sovereign has an interest to vindicate.

*Id.* at 1967.

      In this instance, Turkey and the United States are separate sovereigns.  In addition, as noted in *Gamble*, the United States has an interest in prosecuting crimes committed by U.S. nationals abroad involving acts harmful to its national security.  Accordingly, the Double Jeopardy Clause does not apply to bar Ramic's prosecution in the United States notwithstanding his prior conviction in Turkey.  *See Chua Han Mow v. United States*, 730 F.2d 1308, 1313 (9th Cir. 1984) ("This court [has] clearly held that 'prosecution by a foreign sovereign does not preclude the United States from bringing criminal charges.'" (quoting *United States v. Richardson*, 580 F.2d 946, 947 (9th Cir. 1978))); *United States v. Rezaq*, 134 F.3d 1121, 1128 (D.C. Cir. 1998) ("[T]hat clause does not prohibit sequential trials by different sovereigns." (citing *United States v. Wheeler*, 435 U.S. 313, 317 (1978); *Richardson*, 580 F.2d at 947)).

      **b.**      **Exception**

      In *Bartkus v. Illinois*, 359 U.S. 121 (1959), the Supreme Court articulated what has been characterized as a limited exception to dual sovereignty, which may or may not exist.  *See id.* at 123; *see also United States v. Djoumessi*, 538 F.3d 547, 550 (6th Cir. 2008) ("To start, the *Bartkus* sham-prosecution exception is a narrow one and, so far as this circuit is concerned, it is an exception that has yet to affect the outcome of a single case.  'Since *Bartkus* was decided in 1959, this Circuit has never ruled that a prosecution violated double jeopardy protections under [*Bartkus*'] "sham prosecution" theory.'  *United States v. Clark*, 254 F. App'x 528, 533 (6th Cir. Nov. 19, 2007).  As this track record suggests, there is some room for debate over whether the *Bartkus* exception is just narrow or whether it is indeed real." (alteration in original) (citations omitted)); *United States v. Rankin*, 664 F. App'x 435, 441 (6th Cir. 2016) (Clay, J., concurring)

11

("[T]he *Bartkus* sham-prosecution exception is a narrow one, and it is fair to wonder whether *Bartkus* is effectively limited to its facts." (citing *Djoumessi*, 538 F.3d at 550)). Under this possible "sham prosecution" exception, a second prosecution by another sovereign would be barred because the sovereign was "merely a tool" of the sovereign that brought the initial prosecution. *Bartkus*, 359 U.S. at 123-14. In a recent decision, the Supreme Court expressed its reservation about the holding in *Bartkus* and this potential exception. *See Denezpi v. United States*, 142 S. Ct. 1838, 1848 (2022) ("*Bartkus* does not give Denezpi much to go on—as Denezpi himself recognizes. See Brief for Petitioner 16-17 (*Bartkus* 'suggest[s]' that the dual-sovereignty doctrine will not apply if 'a second prosecution by an apparently separate sovereign is "in essential fact" just a "cover" for a second prosecution by the first sovereign'). At most, *Bartkus* acknowledged that a successive federal prosecution would raise a double jeopardy question. Yet it did not begin to analyze, much less answer, that question." (alteration in original)).

In his motion, however, Ramic does not address the sham exception. Rather, he argues that *Gamble* has recognized a different exception to the dual sovereignty doctrine. (Def.'s Mot. Dismiss 3, DN 63). As a sister court has noted, however, *Gamble* "affirmed the vitality of the dual-sovereignty doctrine . . . , thereby continuing to permit different sovereigns to pursue violations of their respective laws for the same conduct." *United States v. Beckham*, No. 3:18-CR-00075-1, 2019 WL 2869189, at *9 (M.D. Tenn. July 3, 2019) (citing *Gamble*, 139 S. Ct. at 1964; *see also United States v. Stafford*, No. 19-3833, 2021 WL 6061764, at *5 (3d Cir. Dec. 20, 2021) ("Contrary to the assertion by Stafford, . . . *Gamble* merely reaffirmed the dual sovereignty doctrine . . . ." (citing *Gamble*, 139 S. Ct. at 1966, 1980)); *United States v. Reese*, 789 F. App'x 112, 116 (11th Cir. 2019) ("[T]he 'longstanding interpretation of the Double Jeopardy Clause of the Fifth Amendment' that allows parallel prosecution remains valid, so the error that Reese alleges

12

cannot be plain." (quoting *Gamble*, 139 S. Ct. at 1963)). Based on *Gamble*, it does not appear that the Supreme Court has created a new exception to the dual-sovereignty doctrine.

Accordingly, Ramic is not entitled to relief based on the dual sovereignty doctrine or the potential sham exception. His motion is therefore denied.

B. **Defendant's Motion for Revocation of Detention Order**

In addition, Ramic challenges the Magistrate Judge's order directing that he be detained pending trial. (Def.'s Mot. Revocation Detention Order 7-15). Ramic contends that he is not a flight risk, and while the Magistrate Judge did not consider whether he is a danger to the community, Ramic asserts that he is not.[10] (Def.'s Mot. Revocation Detention Order 7-15).

The Bail Reform Act governs review of detention orders and provides that "[i]f a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). This Court reviews a defendant's appeal of a detention order *de novo*. *See United States v. Yamini*, 91 F. Supp. 2d 1125, 1127 (S.D. Ohio 2000) (explaining that, although the Sixth Circuit has not mandated a particular standard of review, "[t]he majority view appears to favor . . . *de novo* review of detention orders . . . ." (citations omitted)). As the Magistrate Judge correctly determined and Ramic conceded, the presumption against release under 18 U.S.C. § 3142(e) applies in this case. (Order 3).

---

[10] While Ramic requests a *de novo* hearing as to whether he is a danger to the community, he has not identified what additional evidence would be presented at a second hearing, and such a hearing is not required. *See United States v. Taylor*, No. 5:19-192-KKC, 2020 WL 4529810, at *2 (E.D. Ky. June 24, 2020). Because the evidence presented reflects that Ramic is a flight risk, a second hearing on the issue of dangerousness is unnecessary. *See United States v. Baker*, No. 6:21-CR-32-CHB, 2021 WL 2744512, at *3 (E.D. Ky. July 1, 2021) ("[T]he district court may, at its discretion, conduct an additional evidentiary hearing." (citations omitted)).

In denying Ramic's motion, the Magistrate Judge found that Ramic is a flight risk, thereby rendering unnecessary a determination whether Ramic posed a risk of danger to the community. (Order 6, DN 64). Ramic contends that he is neither a flight risk nor a danger to the community and should be released pending trial. (Def.'s Mot. Revocation Detention Order 7-15). In ruling on Ramic's motion, the Court reviews the Magistrate Judge's decision *de novo*. *See Yamini*, 91 F. Supp. 2d at, 1127 n.5 ("A number of district courts in other circuits have held that *de novo* review is proper. The courts based this conclusion on the statutory language of § 3145(b) and the similarity of that language to the predecessor statute, § 3147 of the Bail Reform Act of 1966, 18 U.S.C. § 3147, where *de novo* review was proper." (citations omitted)).

The Magistrate Judge found that Ramic had presented sufficient evidence to rebut the presumption of detention as to the risk of flight. (Order 7). Because Ramic made a sufficient showing, it then became the United States' burden to prove by a preponderance of the evidence that Ramic is a flight risk. *See United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004) (citation omitted).

Based on the evidence presented to the Magistrate Judge, United States has met its burden. Ramic appears to have made conscious efforts to hide his plan to travel to Syria to join ISIS, and in traveling to Turkey, Ramic attempted to obtain Turkish identification documents by providing fraudulent Syrian identification documents. These same efforts indicate that Ramic may use his knowledge and experience in traveling to flee prosecution in this case. *See United States v. Musaibli*, No. 18-20495, 2022 WL 1695765, at *11 (E.D. Mich. May 26, 2022) ("The record supplies no good grounds for any sound assurance that the defendant would not employ any means at his disposal to flee the jurisdiction if released."); *see also United States v. Anderson*, 384 F. Supp. 2d 32, 36-38 (D.D.C. 2005) (noting that the defendant was a flight risk because of

connections overseas, the potential for a lengthy sentence weighed in favor of pretrial detention, and apparent efforts to obtain fraudulent identification documents).

In addition, Ramic appears to lack allegiance to the United States and expressed his preference to have died rather than return to this country. *See United States v. Salim*, No. 18-3155, 2018 U.S. App. LEXIS 11143, at *3 (6th Cir. Apr. 30, 2018) (noting that the defendant's loose ties to state where he proposed to live pending trial and the United States, as well as the defendant's significant connections to foreign countries supporting a finding, *inter alia*, that the defendant was a flight risk). If convicted at trial, Ramic faces a mandatory minimum sentence of at least ten years in prison and a statutory maximum sentence of fifty years. Thus, the length of sentence coupled with Ramic's travel and alleged acts abroad support a finding that he is a serious flight risk. *See United States v. Mehanna*, 669 F. Supp. 2d 160, 165 (D. Mass. 2009) (finding that the defendant is a serious flight risk and noting that "Mehanna faces a very lengthy prison sentence that may well exceed in years his present age of 27. He has expressed both a strong desire to leave the United States and a strong desire to live in a different part of the world.").

Like the Magistrate Judge, the Court also finds that Ramic's sister, his proposed custodian, would not effectively serve to reduce the serious flight risk. Ramic does not appear to have a close relationship with his sister as reflected by the fact that Ramic and his sister have not had any contact approximately fifteen years. Besides the information provided by the Federal Bureau of Investigation, Ramic's sister lacked any information about his alleged activities abroad or any intent to join ISIS. Given the lack of any close relationship between Ramic and his sister, the Court finds that the record does not reflect that she or her husband would exercise any meaningful authority to prevent Ramic from fleeing. *See United States v. Mohammad*, No. 3:15-CR-358, 2018 WL 1185249, at *4 (N.D. Ohio Mar. 7, 2018) (noting that the Magistrate Judge "was unconvinced

that Mohammad's wife and father-in-law 'would take the necessary steps to control [Mohammad] and his activities.'" (alteration in original) (citation omitted)).

For these reasons, the United States has established by a preponderance of the evidence that Ramic would pose a flight risk if released. Like the Magistrate Judge, the Court finds it unnecessary to address the element of dangerousness because there is a risk of flight and no condition or combination of conditions will reasonably assure Ramic's appearance in this matter. Accordingly, Ramic's motion is denied, and he shall remain in custody pending trial.

### C. Plaintiff's Motion for Leave to Seal (DN 72)

The United States moves to seal Exhibit B (DN 73) to its response to one of Ramic's motions. (Pl.'s Mot. Leave Seal 1). Because Exhibit B is covered by an agreed protective order, contains sensitive information, and may contain personal identifying information relating to Ramic, the motion is granted. (*See* Protective Order, DN 31).

### III. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. Defendant's Motions to Dismiss (DN 53, 63) and Defendant's Amended Motion to Dismiss (DN 55) are **DENIED**.

2. Defendant's Motion for Revocation of Detention Order (DN 66) is **DENIED**.

3. Plaintiff's Motion for Leave to Seal (DN 72) is **GRANTED**.

Greg N. Stivers, Chief Judge
United States District Court

May 16, 2023

cc: counsel of record