UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CRIMINAL ACTION NO. 1:21-CR-00013-GNS-HBB

UNITED STATES OF AMERICA                                                                                PLAINTIFF

v.

MIRSAD RAMIC                                                                                                    DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motions to Dismiss (DN 83, 88, 120); Defendant's Motions for Leave to Seal (DN 100, 102); Defendant's Sealed Motion to Dismiss (DN 103); Plaintiff's Motion for Leave to File Sur-Reply (DN 104); and Defendant's Supplemental Motion to Dismiss (DN 121). The motions are ripe for adjudication.

### I.  BACKGROUND

In 2021, Defendant Mirsad Ramic ("Ramic") was indicted for conspiring to provide and providing material support to the Islamic State of Iraq and al-Sham ("ISIS"), which has been designated as a foreign terrorist organization by Turkey and the United States, and receiving military-type training from ISIS, in violation of 18 U.S.C. §§ 2339B and 2339D. (Indictment 1-4, DN 7). Ramic has been detained pending trial. (*See* Order, DN 19).

### II.  DISCUSSION

A.  **Defendant's Motions to Dismiss (DN 83, 88, 120)/Defendant's Seal Motion to Dismiss (DN 103)**

Under Fed. R. Crim. P. 12(b), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Courts are limited to addressing such motions without a trial if the motion "involves

1

questions of law instead of questions of fact on the merits of criminal liability." *United States v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997). Thus, "courts may ordinarily make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate factfinder." *Id*.

A defense raised in a motion to dismiss an indictment is "'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Jones*, 542 F.2d 661, 665 (6th Cir. 1976) (citing *United States v. Covington*, 395 U.S. 57, 60 (1969)). In ruling on the motion, "the [c]ourt must view the [i]ndictment's factual allegations as true, and must determine only whether the [i]ndictment is 'valid on its face.'" *United States v. Campbell*, No. 02-80863, 2006 WL 897436, at *2 (E.D. Mich. Apr. 6, 2006) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)).

### 1.   *Illegal Rendition (DN 83)*

In his first motion, Ramic seeks dismissal of the Indictment based on illegal rendition. (Def.'s Mot. Dismiss 1, DN 83). In particular, he contends that "he was forcibly kidnapped by the United States from Turkey in contravention of [an extradition] treaty and international law and illegally brought within the jurisdiction of the United States for purposes of this criminal prosecution." (Def.'s Mot. Dismiss 1, DN 83).

The parties do not dispute that there is an extradition treaty between the Republic of Turkey and the United States ("Turkey-U.S. Treaty"). *See* Treaty on Extradition and Mutual Assistance in Criminal Matters, Turk.-U.S., June 7, 1979, 32 U.S.T. 3111. Rather, they view differently the circumstances behind Ramic's departure from Turkey and arrival in the United States. (Def.'s Mot. Dismiss 2-4, DN 83; Pl.'s Resp. Def.'s Mot. Dismiss 7-8, DN 93; Def.'s Sealed Suppl. Mot. Dismiss 3-4, DN 101; Pl.'s Sur-Reply Def.'s Mot. Dismiss 1-2, DN 106).

2

Ramic contends that the Turkey-U.S. Treaty was violated because he was not extradited according to the treaty's terms and was instead forcibly removed from Turkey. (Def.'s Mot. Dismiss 2-4, DN 83; Def.'s Sealed Suppl. Mot. Dismiss 3-4, DN 101). He asserts that Turkey refused to extradite him in accordance with the Turkey-U.S. Treaty. (Def.'s Mot. Dismiss 2-4, DN 83; Def.'s Sealed Suppl. Mot. Dismiss 3-4, DN 101). U.S. Agents then entered a Turkish prison and forcefully removed him to the United States. (Def.'s Mot. Dismiss 2-4, DN 83; Def.'s Sealed Suppl. Mot. Dismiss 3-4, DN 101).[1]

The United States argues that Turkey initially declined to extradite Ramic pursuant to the Turkey-U.S. Treaty. (Pl.'s Resp. Def.'s Mot. Dismiss 7-8, DN 93; Pl.'s Sur-Reply Def.'s Mot. Dismiss 1-2, DN 106; Def.'s Reply Mot. Dismiss, Ex. A, at 2, DN 101-1). Nevertheless, Turkey eventually decided to deport him to the United States and voluntarily handed Ramic over to U.S. authorities. (Pl.'s Resp. Def.'s Mot. Dismiss 7-8, DN 93; Pl.'s Sur-Reply Def.'s Mot. Dismiss 1-2, DN 106).

It is unnecessary to resolve any factual disputes about the circumstances behind Ramic's departure from Turkey and transport to the United States. The Supreme Court's decision in *Frisbie v. Collins*, 342 U.S. 519 (1952), squarely addresses the issues raised by this motion. As the Supreme Court stated (in what is now known as the "*Ker-Frisbie* doctrine"

> [T]he power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction." . . . [The cases applying this principle] rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in

---

[1] As part of his reply, Ramic provided an English translation of a document reflecting the Turkish government's decision declining to extradite him pursuant to the Turkey-U.S. Treaty. (Def.'s Reply Mot. Dismiss, Ex. A, at 2, DN 101-1). He filed this same exhibit in support of his motion to dismiss based upon on outrageous conduct. (Def.'s Mot. Dismiss Ex. A, DN 103-1). While this document seems to corroborate some of Ramic's allegations, it does not contradict the United States' assertions either.

3

> accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

*Id.* at 522 (internal footnote omitted) (discussing *Ker v. Illinois*, 119 U.S. 436 (1886), and subsequent cases applying that decision); *see also United States v. Pryor*, 842 F.3d 441, 448 (6th Cir. 2016) ("Federal courts have personal jurisdiction over criminal defendants before them, whether or not they are forcibly brought into court." (citations omitted)); *Mack v. Patterson*, 805 F.2d 1035, 1986 WL 18085, at *1 (6th Cir. Oct. 15, 1986)) ("Once appellant was brought within the custody of Michigan, the extradition process was no longer the proper subject of legal attack. The alleged use of illegal means to extradite appellant from Wyoming does not taint Michigan's authority to prosecute appellant." (internal citation omitted) (citations omitted)); *United States v. Amawi*, No. 3:06CR719, 2008 WL 820157, at *2 (N.D. Ohio Mar. 24, 2008) ("The Sixth Circuit 'has consistently reaffirmed the *Ker-Frisbie* Doctrine by application of the rule that the body or person of a defendant is never suppressible as a fruit of an unlawful police arrest or detention.' *United States v. Pelaez*, 930 F.2d 520, 525 (6th Cir. 1991) (internal quotation marks omitted) (citations omitted). What matters is that the defendant is before this court; regardless of how he comes to be here, he can be tried here.").

More recently, in *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), the Supreme Court upheld the exercise of jurisdiction over a Mexican national. *See id*. at 657. The trial court found that the United States was responsible for "forcibly kidnap[ping] [the defendant] from his medical office in Guadalajara, Mexico, to be flown by private plane to El Paso, Texas, where he was arrested by DEA officials." *Id*. at 657. The trial court dismissed the indictment based on the defendant's abduction, which was affirmed by the circuit court. *See id*. at 658. The Supreme

Court granted certiorari to determine whether the extradition treaty between the countries provided a defense to the United States' exercise of jurisdiction over the defendant. *See id.* at 657.

The Supreme Court first considered whether the defendant's removal from Mexico violated the extradition treaty between the countries. *See id*. at 662. In addressing the scope of one of the treaty's articles, the Court noted that the provision:

> does not purport to specify the only way in which one country may gain custody of a national of the other country for the purposes of prosecution. In the absence of an extradition treaty, nations are under no obligation to surrender those in their country to foreign authorities for prosecution.

*Id*. at 666 (citing *United States v. Rauscher*, 119 U.S. 407, 411-12 (1886); *Factor v. Laubenheimer*, 290 U.S. 276, 287 (1933)). The Court further stated that "to infer from this Treaty and its terms that it prohibits all means of gaining the presence of an individual outside of its terms goes beyond established precedent and practice." *Id*. at 668-69. Thus, the Supreme Court held the defendant's abduction did not violate the treaty, and that *Ker* precluded the defendant from obtaining dismissal of the indictment against the defendant on the basis of his abduction. *See id*. at 669-70.

In this instance, the Turkey-U.S. Treaty specifically applies to extraditions between the two countries. The Supreme Court has defined the term "extradition" as "the surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender." *Terlinden v. Ames*, 184 U.S. 270, 289 (1902). "Neither deportation nor surrender other than in response to a demand pursuant to [a treaty] constitutes extradition." *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1404 (9th Cir. 1988) (citing *Terlinden*, 184 U.S. at 289). While Ramic argues that the Turkey-U.S. Treaty provided the "exclusive means" by which the United States could have jurisdiction over him, the Turkey-U.S. Treaty only applies to extraditions and does not preclude the United States from using other means outside of the Treaty. (Def.'s

5

Sealed Suppl. Mot. Dismiss 4, DN 101). Ramic has not identified any other provision in the Turkey-U.S. Treaty to the contrary or any history of the Turkey-U.S. Treaty which would warrant a different conclusion. Accordingly, based on the holding in *Alvarez-Machain*, Ramic's removal from Turkey to the United States to the extent that it was accomplished through a means not addressed by the Turkey-U.S. Treaty would not provide grounds for dismissal of the Indictment.

While acknowledging the applicability of the Supreme Court's decision in *Alvarez-Machain*, Ramic asserts that the case was wrongly decided and urges the Court to follow the reasoning of the dissenting opinion penned by Justice Stevens. (Def.'s Mot. Dismiss 5-7, DN 83). This Court, however, is bound by Supreme Court precedent and cannot disregard the majority's holding in *Alvarez-Machain*. *See Shriber v. Ky. Dep't of Child Protective Servs.*, No. 4:21-CV-5-JHM, 2021 WL 1877808, at *4 (W.D. Ky. May 10, 2021) (citation omitted). Thus, based on that precedent, "[t]he fact of respondent's forcible abduction does not therefore prohibit his trial in a court in the United States for violations of the criminal laws of the United States." *Alvarez-Machain*, 504 U.S. at 670; *see also United States v. Pryor*, 842 F.3d 441, 448 (6th Cir. 2016) ("Federal courts have personal jurisdiction over criminal defendants before them, whether or not they are forcibly brought into court." (citing *Alvarez-Machain*, 504 U.S. at 660-62; *Frisbie*, 342 U.S. at 522)).

For these reasons, Ramic has failed to show that the Indictment should be dismissed due to illegal rendition. This motion is denied.

    **2.**     ***Selective Prosecution (DN 88)***

Ramic also moves to dismiss the Indictment due to selective prosecution. (Def.'s Mot. Dismiss 1, DN 88). He contends that the United States has singled him out based on his ethnicity,

and political and religious beliefs, which violates his equal protection and due process rights under the Fifth Amendment. (Def.'s Mot. Dismiss 1, DN 88).

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). In general, there is a "'strong presumption' that [prosecutors] [] have properly discharged their duties" in determining which cases to prosecute. *United States v. Baker*, 197 F.3d 211, 216 (6th Cir. 1999) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)); *United States v. Andrews*, 633 F.3d 449, 453 (6th Cir. 1980) ("[P]rosecutors have and need broad discretion to file charges where there is probable cause that someone has broken the law . . . .").

Notwithstanding that prosecutorial discretion, courts have recognized that there are certain forbidden reasons which support a claim for selective prosecution. These reasons include when a defendant is selected for prosecution based upon "a defendant's 'race, religion, or the desire to prevent the exercise of [the defendant's] constitutional rights.'" *United States v. Edwards*, 783 F. App'x 540, 546 (6th Cir. 2019) (alteration in original) (quoting *United States v. Hazel*, 696 F.2d 473, 474 (6th Cir. 1983)). As the Sixth Circuit has explained:

> Selective-prosecution occurs when impermissible considerations motivate the prosecution of an individual but otherwise "similarly situated individuals" who could have been charged "were not similarly prosecuted." Specifically, those impermissible considerations must be *unrelated* to the criminal acts for which the person was prosecuted. A valid selective-prosecution claim might arise, for example, if a group of individuals conspired to rob a bank but only the racial minority among them was prosecuted; or if a number of protestors were trespassing on private property but the only protestor who was prosecuted was known to be a vocal critic of the local police department.

*Id.* (internal citation omitted). "[T]he determination of the merits of a selective prosecution claim is essentially a factual inquiry . . . ." *United States v. Jones*, 159 F.3d 969, 976 (6th Cir. 1988) (citations omitted).

In his motion, Ramic requests discovery and an evidentiary hearing in support of the dismissal of the Indictment on this basis. (Def.'s Mot. Dismiss 1, DN 88). As the Sixth Circuit has explained:

> "[B]ecause a selective prosecution claim is not a defense to the merits of a criminal charge but, instead, an independent assertion of misconduct, discovery is not available pursuant to Fed. R. Crim. P. 16." *Jones*, 159 F.3d at 975 n.3 (citing *Armstrong*, 517 U.S. at 463). A defendant hoping to obtain discovery must therefore make a showing of "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468 (quotation marks omitted) (emphasis added). Although the "some evidence" standard is "rigorous," *id.*, it is still relatively light, because "[o]bviously, a defendant need not prove his case in order to justify discovery on an issue."

*United States v. Thorpe*, 471 F.3d 652, 657 (6th Cir. 2006) (second alteration in original) (quoting *Jones*, 159 F.3d at 978); *see also United States v. Hazel*, 696 F.2d 473, 474 (6th Cir. 1983) (a defendant makes a prima facie showing of selective prosecution by presenting sufficient evidence "(1) that while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent the exercise of his constitutional rights." (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974))). If Ramic makes such a showing and "has proven a 'colorable entitlement' to dismissal for selective prosecution," the Court may grant him an evidentiary hearing, which "is necessary only when the motion alleges sufficient facts to take the question past the frivolous state

and raises a reasonable doubt as to the prosecutor's purpose." *Hazel*, 696 F.2d at 475 (quoting *United States v. Larson*, 612 F.2d 1301, 1304-05 (8th Cir. 1980)).

### a. Similarly Situated Individuals

As a sister court has explained:

> [A] "similarly situated" person for selective prosecution purposes is "one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant."

*United States v. Henderson*, 485 F. Supp. 2d 831, 862 (S.D. Ohio 2007) (quoting *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)). Thus, "an individual is similarly situated only if '[t]he circumstances present no legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.'" *Id.* (alteration in original) (quoting *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996)).

In support of the first requirement of presenting evidence of similarly situated individuals, Ramic offers scant facts. He identifies one non-Muslim, Caucasian-male natural-born U.S. citizen who was the pastor of a church in Turkey. (Def.'s Mot. Dismiss 4, DN 88). This man was convicted in Turkey for aiding a terrorist organization but was not charged by U.S. authorities under 18 U.S.C. § 2339B for supporting a terrorist organization. (Def.'s Mot. Dismiss 4-5, DN 88). From the limited information provided, it is not clear, however, that this sole individual was similarly situated to satisfy this element.

In addition, Ramic points to a study relating to the prosecution for terrorism committed within the United States and notes:

> [F]rom 2002 to 2022[,] [the study] found 89% of the defendants to be Muslim, 9% to be of unknown religion, and only 2% non-Muslim. (See

9

>https://www.newamerica.org/international-security/reports/terrorism-in-america/whoare-the-terrorists). Admittedly, this study was for criminal prosecutions for actual acts of terrorism committed inside the United States, so may not be apropos to determining the religious/ethnic breakdown of prosecutions for giving material support to designated foreign terrorist organizations outside the United States under §§2339B and 2339D, such as the instant case.

(Def.'s Mot. Dismiss 5, DN 88). As Ramic concedes, however, the individuals included in the study are not similarly situated because they committed terrorism within the United States, not abroad like him.

Finally, Ramic asserts:

>Of the 68 groups currently designated as foreign terrorist organizations by the Department of State, 62 are Muslim, only 6 are not. (See https://www.state.gov/foreignterrorist-organizations). Of these 6 non-Muslim [foreign terrorist organizations ("FTOs")], counsel can find no reference to any prosecutions for materially supporting them. All prosecutions for violating 18 U.S.C. §§2339B and 2339D of which counsel is aware appear to only be against defendants supporting Muslim FTOs.

(Def.'s Mot. Dismiss 5, DN 88). As Ramic acknowledges, the Department of State designates foreign terrorist organizations, not the Department of Justice. Nevertheless, Ramic cites no data relating to the prosecution of other criminal defendants for supporting Muslim FTOs. Thus, there are no persons to whom he could be compared in determining whether they are similarly situated.

While not squarely addressing the issue in *United States v. Bass*, 536 U.S. 862 (2002), the Supreme Court expressed reservations about relying on nationwide prosecutorial decisions in making such comparisons. *See id*. at 863-64 ("Even assuming that the *Armstrong* requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*."). To the extent that a nationwide comparison is improper, it is not clear from the limited data provided whether any of the cases were or could have been filed in this Court and therefore necessarily involved the same persons

making prosecutorial decisions. *See United States v. Alexander*, No. 1:14 CR 341, 2015 WL 1523910, at *7 (N.D. Ohio Apr. 3, 2015) ("[T]he statistics offered by defendants regarding the Illinois cases have no bearing on whether the decisionmakers in defendants' case acted with discriminatory purpose. Defendants can only point to the fact that the one other case in this district involved African-Americans. This, however, falls far short of providing 'some evidence' that either the ATF agents or the prosecutors acted with a discriminatory purpose in this case."). Thus, the compared persons are not similarly situated in that regard.

Overall, Ramic has not met his initial burden of showing the existence of similarly situated individuals to entitle him to discovery on his claim of selective prosecution. *See also Thorpe*, 471 F.3d at 659 ("[M]erely demonstrating that better evidence cannot be obtained without discovery does not suddenly render otherwise insufficient evidence sufficient." (quoting *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1071 (9th Cir. 2003))). Thus, Ramic is not entitled to discovery, and this motion will be denied on this basis.

        **b.**     **Discriminatory Selection**

Even if Ramic had shown that there are similarly situated individuals who were not prosecuted, he would also have to show discriminatory intent by prosecutors. In particular, he "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *United States v. Lawrence*, 735 F.3d 385, 439 (6th Cir. 2013) (quoting *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)). "[G]eneral statistics, without more, are insufficient to show discriminatory intent." *Thorpe*, 471 F.3d at 660 (citing *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)).

For the same reasons outlined above, Ramic has failed to meet his burden of showing discriminatory intent. His attempts to rely on nationwide statistics are unavailing. *See Lawrence*, 735 F.3d at 439 ("[E]ven if the statistics were viewed as evidencing a racially discriminatory effect

11

in the government's charging practices nationwide, Lawrence has undisputedly not shown that the government prosecuted *him* with discriminatory purpose. Lawrence has adduced no evidence that decisionmakers in his case acted with discriminatory purpose or that similarly situated individuals of a different race were not prosecuted in federal court."). The limited statistical information provided by Ramic does not sufficiently reflect a discriminatory intent directed towards him by prosecutors. As the Supreme Court noted in *Armstrong*, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *Armstrong*, 517 U.S. at 464 (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)). The motion is denied for these additional reasons.

### 3. *Outrageous Conduct (DN 103)*

Ramic separately moves for dismissal based on outrageous conduct by the United States relating to his removal from Turkey. (Def.'s Sealed Mot. Dismiss 3-7, DN 103). While reiterating prior arguments raised in support of his claim of illegal rendition, Ramic also relies upon a translation of the Turkish government's written decision denying the U.S.'s request for Ramic's extradition. (Def.'s Sealed Mot. Dismiss 2-3, DN 103 (citing Def.'s Sealed Mot. Dismiss Ex. A, DN 103-1).

Like his assertion of illegal rendition, this motion requires the Court to consider: (i) whether there is an exception to the *Ker-Frisbie* doctrine which would permit the dismissal of the Indictment due to the claimed outrageous conduct by the government; and (ii) if so, whether such an exception applies to Ramic. Courts outside of the Sixth Circuit have recognized this potential exception to the doctrine. *See, e.g.*, *United States v. Anderson*, 472 F.3d 662, 667 (9th Cir. 2006); *see also United States v. Struckman*, 611 F.3d 560, 571 (9th Cir. 2010) (citing *Anderson*, 472 F.3d at 666). It appears that the Second Circuit is the only court to have ever relied upon this exception

12

in remanding a case to determine whether the indictment should be dismissed due to outrageous government conduct. *See United States v. Toscanino*, 500 F.2d 267, 280 (2d Cir. 1974); *see also United States v. Pelaez*, 930 F.2d 520, 525 (6th Cir. 1991) (noting that "[t]he Fifth, Seventh, and Eleventh Circuits have refused to adopt a '*Toscanino* exception' to the *Ker-Frisbie* doctrine.") (citations omitted). Ramic, however, cites to no Sixth Circuit precedent recognizing or applying such an exception.

Instead, Ramic again cites Justice Stevens' dissent in *Alvarez-Machain*. (Def.'s Sealed Mot. Dismiss 4-5, DN 103). As discussed above, the majority decision in *Alvarez-Machain* does not support Ramic's request for dismissal due to outrageous conduct.

Ramic also relies on the Supreme Court's decision in *Rochin v. California*, 342 U.S. 165 (1952). (Def.'s Sealed Mot. Dismiss 6-7, DN 103). In *Rochin*, law enforcement entered a house without a warrant and forced entry into a second-floor room occupied by the defendant who police believed was selling narcotics. *See Rochin*, 342 U.S. at 166. There were two capsules sitting on a nightstand, which the defendant grabbed and put into his mouth, and the police unsuccessfully tried to extract the pills. *See id.* The defendant was later taken to a hospital, and at the direction of police, his stomach was pumped, causing him to vomit and expel two capsules containing morphine. *See id.* Following his conviction, the defendant challenged the constitutionality of the officers' actions. *See id.* at 166-67.

The Supreme Court held that the actions of law enforcement shocked the conscience and violated the Fourth Amendment. *See id.* at 172. In reversing the conviction, the Court stated:

> Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

13

*Id.*

Notable factual distinctions between *Rochin* and the present case aside, the Supreme Court's subsequent decision in *Alvarez-Machain* is clearly more akin factually and is binding precedent. Like in *Alvarez-Machain*, the United States allegedly forcibly removed Ramic from another country and transported him to his country. Based on the holding in *Alvarez-Machain*, such conduct is not so outrageous to arise to a constitutional violation.[2] *See Pryor*, 842 F.3d at 448 (citing *Alvarez-Machain*, 504 U.S. at 660-62; *Frisbie*, 342 U.S. at 522); *Amawi*, 2008 WL 820157, at *2; *Pelaez*, 930 F.2d at 525. Therefore, the motion to dismiss for outrageous conduct is denied.

    **4.**    ***Turkey's Violation of Ramic's Rights***

Finally, Ramic moves to dismiss the Indictment for violations of his rights under the Vienna Convention on Consular Relations and Optional Protocol on Disputes ("Vienna Convention"). (Def.'s Mot. Dismiss 3-4, DN 120). In particular, he claims that his rights under Article 36 of the Vienna Convention were violated because "he was never informed by Turkey of his right to have the United States and/or BiH consulates notified of his detention and to communicate with the consular representatives of the United States and/or BiH." (Def.'s Mot. Dismiss 2, DN 120).

Article 36 provides:

> 1.    With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
>     (a)    consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State

---

[2] Ramic's purported proof that Turkey refused to extradite him in accordance with the Turkey-U.S. Treaty is not definitive proof that the United States engaged in outrageous conduct to bring him before this Court when there are other plausible, legal means by which the United States may have obtained custody over him and returned him to this country.

> shall have the same freedom with respect to communication with and access to consular officers of the sending State;
> (b)    if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
> (c)    consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.
> 2.    The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

Vienna Convention on Consular Relations and Optional Protocol on Disputes, art. 26, 21 U.S.T. 77, 596 U.N.T.S. 261. Contrary to Ramic's assertion of a violation of his rights, the Sixth Circuit has held:

> As a general rule, international treaties do not create rights that are privately enforceable in federal courts. The Supreme Court, however, has left this issue open as it relates to Article 36(1)(b), stating that its provisions "arguably" create individual rights. We need not decide this issue definitively since we join our colleagues in the First, Ninth, and Eleventh Circuits in concluding that although some judicial remedies may exist, there is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of Article 36.

*United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000) (internal citations omitted) (citing *United States v. Li*, 206 F.3d 56 (1st Cir. 2000); *United States v. Lombera-Camorlinga*, 206 F.3d 882 (9th Cir. 2000); *United States v. Cordoba-Mosquera*, 212 F.3d 1194 (11th Cir. 2000)). Thus, "the Vienna Convention does not create a right for a detained foreign national to consult with the diplomatic representatives of his nation that the federal courts can enforce." *United States v.*

*Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001). Likewise, the Sixth Circuit has held that there is no judicial remedy for any violation of the Vienna Convention in the absence of a constitutional violation. *See Page*, 232 F.3d at 540-41.

The only cases cited by Ramic are the Ninth Circuit's decisions in *United States v. Lombera-Camorlinga*, 170 F.3d 1241 (9th Cir. 1999), and *United States v. Esparza-Ponce*, 193 F.3d 1133 (9th Cir. 1999). (Def.'s Mot. Dismiss 4, DN 120). The *Lombera-Camorlinga* decision cited by Ramic was subsequently withdrawn by the Ninth Circuit. *See United States v. Lombera-Camorlinga*, 188 F.3d 1177, 1177-78 (9th Cir. 1999). On rehearing, the Ninth Circuit, sitting en banc, held that the failure to inform a criminal defendant of his rights under the Vienna Convention or contact his home country's consular post did not provide a basis to suppress evidence later obtained against that defendant and used in obtaining his conviction. *See Lombera-Camorlinga*, 206 F.3d at 888 (en banc). This decision does not support Ramic's motion.

*Esparza-Ponce* also relied on the withdrawn decision in *Lombera-Camorlinga*. *See Esparza-Ponce*, 193 F.3d at 1138-39 (citing *Lombera-Camorlinga*, 170 F.3d at 1243-44). Nevertheless, the Ninth Circuit held that the defendant failed to show any prejudice from the denial of his rights under the Vienna Convention. *See id*. ("[Esparza-Ponce] has not established, nor even alleged, that the consul would have done anything to help him and, if the consul had, it would have been anything that his attorney has not already done." (alteration in original)). Thus, this decision likewise does not support Ramic's motion—especially in light of the decision's reliance on a withdrawn Ninth Circuit decision and the Sixth Circuit's binding decision in *Emuegbunam*.

Based on the Sixth Circuit's decisions in *Emuegbunam* and *Page*, Ramic cannot rely on the Vienna Treaty seeking dismissal of the Indictment due to any alleged failure of Turkey to notify him of his rights. This motion is denied.

### C.     Defendant's Motions for Leave to Seal (DN 100, 102)

Ramic moves to seal one of his motions to dismiss and its exhibit (DN 101), and the supplement to his motion to dismiss (DN 103). (Def.'s Mot. Leave Seal 1, DN 100; Def.'s Mot. Leave Seal 1, DN 102). These court filings contain sensitive information, and the United States has not objected. The Court being sufficiently advised, the motions are granted.

### D.     Plaintiff's Motion for Leave to File Sur-Reply (DN 104)

Finally, the United States moves for leave to file a sur-reply (DN 106) to Defendant's Sealed Supplement to Defendant's Motion to Dismiss (DN 103). (Pl.'s Mot. Leave File Sur-Reply 1, DN 104). Ramic does not oppose the motion, and the Court being sufficiently advised, this motion is granted.

### III.     CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. Defendant's Motions to Dismiss (DN 83, 88, 120), Defendant's Sealed Motion to Dismiss (DN 103), and Defendant's Supplemental Motion to Dismiss (DN 121) are **DENIED**.

2. Defendant's Motions for Leave to Seal (DN 100, 102) are **GRANTED**, and DN 101 and 103 shall be sealed.

3. Plaintiff's Motion for Leave to File Sur-Reply (DN 104) is **GRANTED**.

Greg N. Stivers, Chief Judge
United States District Court

December 5, 2023

cc:     counsel of record