UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CRIMINAL ACTION NO. 1:21-CR-00013-GNS-HBB

UNITED STATES OF AMERICA                                         PLAINTIFF

v.

MIRSAD RAMIC                                                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motions in Limine (DN 155, 166, 167),

Plaintiff's Motions in Limine (DN 168, 170, 171, 172, 173, 174), and Plaintiff's Motion for a

Protective Order (DN 178).  The motions are ripe for adjudication.

### A.      Defendant's Motion in Limine– Dr. Lorenzo Vidino (DN 155)

By letter dated October 24, 2023, the United States disclosed to counsel for Defendant

Mirsad Ramic ("Ramic") that it intended to call certain witnesses at trial, including Dr. Lorenzo

Vidino ("Dr. Vidino").  (Def.'s Mot. Lim. Ex. A, at 9-13, DN 155-1).  In Ramic's motion to

exclude Dr. Vidino's testimony, he does not challenge Dr. Vidino's qualifications; rather, Ramic

asserts that Dr. Vidino's testimony is inadmissible under Fed. R. Evid. 401, 402, 403, 702, and

704.  (Def.'s Mot. Lim. 4-7, DN 155).

#### 1.      *Fed. R. Evid. 702 & 704*

Fed. R. Evid. 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if the proponent
demonstrates to the court that it is more likely than not that:
(a)      the expert's scientific, technical, or other specialized knowledge will help
the trier of fact to understand the evidence or to determine a fact in issue;
(b)      the testimony is based on sufficient facts or data;
(c)      the testimony is the product of reliable principles and methods; and

1

(d)      the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Dr. Vidino is the Director of the Program on Extremism at George Washington University.  (Def.'s Mot. Lim. Ex. A, at 9, DN 155-1).  The United States anticipates that Dr. Vidino will "testify regarding ISIS and its founding, history, structure, strategic goals, geographic location, recordskeeping [sic], training protocols, methods of recruitment, means and methods of operation, and jihadist terminology."  (Def.'s Mot. Lim. Ex. A, at 9, DN 155-1). While Ramic contends that this testimony will not aid the jury, Dr. Vidino's proposed testimony will assist the jury in understanding and evaluating the evidence, and determining factual issues in this case.  (Def.'s Mot. Lim. 5-6, DN 155).  Thus, this testimony is admissible under Fed. R. Evid. 702.  *See United States v. Saipov*, No. 17-CR-722 (VSB), 2023 WL 4199415, at *6 (S.D.N.Y. June 27, 2023) ("Dr. Zelin will explain the means and method of ISIS, including the use of the internet and social media to disseminate its message, radicalize individuals, and communicate with individuals about committing acts of terror wherever necessary.  He will also explain the words and phrases used by ISIS, including those used to entice individuals to become 'lone wolves' and provide a guide for those individuals to commit violent acts on behalf of ISIS to gain entry into ISIS.  This testimony will assist the Jury in understanding 'ISIS's enterprise status, the defendant's motive for committing his attack, and whether he provided material support to ISIS.'"  (internal citations omitted) (citation omitted)); *United States v. Shafi*, No. 1-CR-00582-WHO-1, 2018 WL 3159769, at *2-4 (N.D. Cal. June 28, 2018) (finding that Dr. Vidino's testimony would be helpful to the jury in accordance with Fed. R. Evid. 702).

Ramic also challenges Dr. Vidino's testimony based on Fed. R. Evid. 704.  Fed. R. Evid. 704 provides:

2

(a)      In General—Not Automatically Objectionable.   An opinion is not objectionable just because it embraces an ultimate issue.

(b)      Exception.  In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.

Fed. R. Evid. 704.  Ramic asserts that Dr. Vidino's "opinion that ISIS was designated as a foreign terrorist organization—an essential element of all three charges—is inadmissible as an opinion on an ultimate issue in violation of FRE 704."  (Def.'s Mot. Lim. 6, DN 155).  As noted in other pending motions, the United States has designated ISIS a foreign terrorist organization.  *See* 69 Fed. Reg. 61292 (Oct. 15, 2004); 79 Fed. Reg. 27972 (May 15, 2014); 80 Fed. Reg. 58804 (Sept. 30, 2015).  Accordingly, this objection is not well-taken.

### 2.      *Fed. R. Evid. 401-403*

"Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Relevant evidence is generally admissible.  *See* Fed. R. Evid. 402.  Fed. R. Evid. 403, however, provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

In terms of relevance, Dr. Vidino's proposed testimony—at least in part—appears to be relevant to the charges in this case under 18 U.S.C. §§ 2339B(a)(1) and 2339D(a).  *See United States v. Almadaoji*, No. 3:18-CR-158, 2021 WL 5002373, at *2-4 (S.D. Ohio Oct. 27, 2021) (noting that Dr. Vidino's testimony was relevant to the charges under 18 U.S.C. § 2339B(a)(1))  The Court, however, agrees in general with Ramic's contention that it may be necessary to limit Dr. Vidino's testimony depending on other evidence introduced—especially to the extent the

testimony is related to terrorist attacks or attempted attacks outside of Syria and Iraq.  (Def.'s Mot. Lim. 7, DN 155).  The motion is denied at this time, and if necessary, the Court will address this issue at trial.[1]

**B.**  **Defendant's Motion in Limine & Objection - Fed. R. Evid. 404(b) Evidence (DN 166, 167)**

In two identical motions, Ramic moves to exclude certain evidence from trial pursuant to Fed. R. Evid. 404(b).  (Def.'s Mot. Lim., DN 166).[2]  According to Ramic, the United States intends to offer evidence at trial that:

> Ramic "traveled or attempted to travel to engage in radicalization and jihad by plans to travel (sic) Yemen in 2010 and Saudi Arabia in 2011/2012."  The purpose of the proffered evidence is to "show that Ramic held longstanding intent to radicalize, engage in jihad, and further education consistent with his belief in radical jihad."  Through this evidence, the United States openly admits that it hopes to show the jury defendant's "determination and persistence to engage in radicalization and violent jihad."

(Def.'s Mot. Lim. 1, DN 166 (internal citations omitted) (citation omitted)).  In its response, the United States contends Ramic is misstating the purpose for introducing such evidence, which the United States asserts is direct evidence of the *res gestae*.  (Pl.'s Resp. Def.'s Mot. Lim. 2, DN 180).  Alternatively, the United States argues that such evidence would be admissible to "show[] motive, opportunity, intent, preparation, and plan and notice."  (Pl.'s Resp. Def.'s Mot. Lim. 2, DN 180).

---

[1] The United States asserts that Ramic is impermissibly seeking to restrict of its ability to present its case.  (Pl.'s Resp. Def.'s Mot. Lim. 16-19, DN 159).  As the Supreme Court recognized, "the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it."  *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997); *see also United States v. Boyd*, 640 F.3d 657, 668 (6th Cir. 2011) (discussing and applying the holding in *Old Chief*).

[2] Because the motions are identical, citations will only be made to the first one.

1.     **Res Gestae**

One proposed use of this evidence is as *res gestae*.  The Sixth Circuit "has previously recognized the propriety of introducing 'background' evidence.  Such evidence, often referred to as '*res gestae*,' does not implicate Rule 404(b)."  *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (internal citations omitted) (citation omitted).  It further explained:

> Proper background evidence has a causal, temporal or spatial connection with the charged offense.  Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.

*Id.* (citation omitted).

In this instance, this background evidence proposed by the United States would provide the jury with relevant explanatory information, without which the jury may be left with questions as to why and how Ramic became involved with ISIS.  Therefore, this background information may facilitate the jury's understanding of the facts and events that led to the criminal charges in this matter.  This evidence is admissible as *res gestae*.

2.     ***Fed. R. Evid. 404(b)***

Ramic also opposes the introduction of this evidence pursuant to Fed. R. Evid. 404(b).  As the Sixth Circuit has noted, this rule "is a rule of inclusion, not exclusion . . . ."  *United States v. Myers*, 102 F.3d 227, 234 (citing *United States v. Bakke*, 942 F.2d 977, 981 (6th Cir. 1991); *United States v. Vance*, 871 F.2d 572, 575 (6th Cir. 1989)).  Generally, "[e]vidence of a crime, wrong, or other act is not admissible to prove" that a person has a propensity to act in a certain manner; but under Rule 404(b)(2), such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  Sixth Circuit precedent holds that courts

may admit prior act evidence under Rule 404(b)(2) if:  (1) there is sufficient evidence that the prior act occurred, (2) the proponent of the evidence offers it for a permissible purpose, and (3) the prejudicial effect of the evidence is not substantially outweighed by its probative value.  *See United States v. Joseph*, 270 F. App'x 399, 404 (6th Cir. 2008) (citation omitted); *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992); *see also United States v. Sumlin*, 956 F.3d 879, 889 (6th Cir. 2020) ("Such probative proof includes 'intrinsic acts' evidence that relates to those acts that 'were necessary preliminaries to the crime charged.'  *United States v. Daulton*, 266 F. App'x 381, 384 (6th Cir. 2008) (citation omitted).  Furthermore, even if the evidence at issue relates to a defendant's uncharged criminal conduct, the evidence still is admissible if the conduct 'arises from the same events as' and 'is directly probative of [defendant's] charged offense[.]'"  (alterations in original) (quoting *United States v. Clay*, 667 F.3d 689, 698 (6th Cir. 2012))).

As the United States explains in its response, it intends to offer evidence regarding Ramic's travel to Yemen and attempted travel to Saudi Arabia, which it contends are "admissible for the proper purposes of showing motive, opportunity, intent, preparation, and plan."  (Pl.'s Resp. Def.'s Mot. Lim. 7, DN 180).  According to the United States, Ramic planned and prepared for this travel for years and was motivated by his desire to join ISIS.  (Pl.'s Resp. Def.'s Mot. Lim. 7, DN 180).

This evidence is relevant to the United States' theory that the actions taken by Ramic evidenced efforts to travel outside of the United States to train with ISIS and to hide the true purpose for his travels.  This evidence appears to be probative of the crimes for which he is charged and is not unduly prejudicial.  *See Hinkle v. Ford Motor Co.*, No. 3:11-24-DCR, 2012 WL 4049477, at *1 (E.D. Ky. Sept. 13, 2012) ("Rule 403 is not concerned with 'the damage to

6

the defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis.'" (quoting *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986))).   Therefore, this evidence is not precluded by Fed. R. Evid. 404(b), and this motion is denied.

### C.   Plaintiff's Motion in Limine - Defendant's and ISIS Documents (DN 168)

The United States moves in limine to admit Ramic's and ISIS documents, which the United States contends are admissible under Fed. R. Evid. 801(d)(2)(E) and 803(6). (Pl.'s Mot. Lim. 25-30, DN 168). Ramic asserts that this motion is premature and should instead be addressed at trial. (Def.'s Resp. Pl.'s Mot. Lim. 1-2, DN 199).

At trial, the United States intends to offer photographs purportedly of Ramic taken at a Syrian ISIS training camp, email and social media communications of Ramic and his co-conspirators, and the testimony of two former ISIS co-conspirators. (Pl.'s Mot. Lim. 6-9, DN 168). In addition, the United States seeks to present the testimony of Dr. Vidino regarding the recordkeeping practices of ISIS, travel records for Ramic and his co-conspirators, and bank records of Ramic and his co-conspirators. (Pl.'s Mot. Lim. 9-12, DN 168).

According to the United States, it has obtained ISIS documents through a variety of means, and these documents are referred to as "Collected Exploitable Material" ("CEM"), which have been transferred to the Department of Defense's National Media Exploitation Center ("NMEC"). (Pl.'s Mot. Lim. 12, DN 168). The CEM has been analyzed by various federal agencies and are accessible through a Department of Defense database called "Harmony." (Pl.'s Mot. Lim. 12-13, DN 168). At trial, the United States intends to introduce four ISIS documents identified as follows:

      1.     The ISIS "General Border Administration Mujahid Information Form" for Mirsad Ramish, a/k/a Abu-Hazim al-Bosnawi (NMEC-2016-401561) and its certified English translation . . .;

      2.     The ISIS "General Border Administration Mujahid Information Form" for Abdallah Bin-Muhammad, a/k/a Abu-Hamzah al-Hashimi (NMEC-2016-401577) and its certified English translation . . . ;

      3.     The ISIS "General Border Administration Mujahid Information Form" for Khalaf BinFahd Bin-Khalaf, a/k/a Abu-Jahim al-Aslami (NMEC-2016-401557) and its certified English translation . . . ; and

      4.     The Microsoft Access Database table of information for more than 100 ISIS fighters, which includes an entry for a witness (hereafter, "Witness-1") anticipated to testify at trial (NMEC-2016-401225) and its certified English translation . . . .

(Pl.'s Mot. Lim. 2-3, DN 168).  As to the records in the Microsoft Access Database, the United States asserts that the records from that source "provide[] critical evidence of the charged conspiracy in that the records both establish the relationship between the co-conspirators and ISIS as a foreign terrorist organization, and the relationship between the specific co-conspirators . . . as well." (Pl.'s Mot. Lim. 19, DN 168).  The United States also provides information about the custody of these ISIS documents since at least December 17, 2015.  (Pl.'s Mot. Lim. 19-20, DN 168).

For these documents to be introduced into evidence at trial, the documents must be authenticated and admissible.  The United States asserts that these requirements can be met. (Pl.'s Mot. Lim. 25-32, DN 168).

      **1.**    *Authentication*

Fed. R. Evid. 901 provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901.  "Rule 901 does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is

what it purports to be." *Higgs v. Transp. Specialist Sanford*, No. 5:07CV-P77-R, 2009 WL 1939026, at *1 (W.D. Ky. July 6, 2009) (quoting *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001)). Fed. R. Evid. 901(b)(1) specifically recognizes that "[t]estimony that an item is what it is claimed to be" can satisfy the requirement for authentication. Fed. R. Evid. 901(b)(1). In this instance, the United States intends to rely upon the testimony of Dr. Vidino, two FBI agents, and two former ISIS members to authenticate the documents. (Pl.'s Mot. Lim. 25-26, DN 168).

In addition, United States intends to authenticate documents based on "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed R. Evid. 901(b)(4). "In fact, Rule 901(b)(4) is 'one of the most frequently used to authenticate email and other electronic records.'" *United States v. Bertram*, 259 F. Supp. 3d 638, 640 (E.D. Ky. 2017) (quoting *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 546 (D. Md. 2007)). As the United States explains in its motion:

> That information from those three individual documents is likewise consistent with the Access Database, reflecting the very type of information that a foreign terrorist organization needs to track (such as familiarity with sharia, prior jihadi experience, and whether or not someone wished to be a martyr). The fact that this information is largely consistent across the various documents shows that ISIS dependably tracked this data regarding its fighters. Moreover, the ISIS Documents were all recovered in December 2015, close in time to the period in which Ramic was an active ISIS member. Finally, the specific nature of the contents of the documents are corroborated by . . . Ramic, [] [the two co-conspirators], and Witness-1's own statements and information, including statements about their ISIS activities, and their biographical information such as known birthdates, aliases or kunyas, claimed nationalities, travel history, and employment.

(Pl.'s Mot. Lim. 27, DN 168). Assuming that these representations are true, the United States may be able to authenticate these documents at trial.

2.      *Admissibility*

Besides the requirement of authentication, evidence must also be admissible.  The ISIS documents would be considered out-of-court statements, which are generally inadmissible as hearsay if offered to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(c); Fed. R. Evid. 802.

a.      **Co-Conspirator Statements**

The United States also intends to rely on a hearsay exclusion applicable when "[t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy."  (Pl.'s Mot. Lim. 27, DN 168); Fed. R. Evid. 801(d)(2)(E).  "To invoke this hearsay exclusion, the government must demonstrate by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the co-conspirator's statement was made in furtherance of the conspiracy."  *United States v. Musaibli*, 42 F.4th 603, 615 (6th Cir. 2022) (quoting *United States v. Bailey*, 973 F.3d 548, 560 (6th Cir. 2020)).  While United States may prove these elements by relying on the contents of a co-conspirator's statement, it "must also offer independent, corroborating evidence to that effect."  *Id.* (citing *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006)).

The Sixth Circuit's decision in *Musaibli* is instructive.  In that case, the court  addressed the admissibility of ISIS documents under, *inter alia*, Fed. R. Evid. 801(d)(2)(E) for a defendant who allegedly participated in a conspiracy in violation of 18 U.S.C. § 2339B.  *See id.* at 614-619.  These documents included rosters of members, payroll records, budget databases, the defendant's marriage certificate, and a spreadsheet containing personal details like the defendant's Arabic name and census number.  *See id.* at 609.  After considering the evidence

presented to the trial court, the Sixth Circuit held that the United States had met its burden to prove the existence of a conspiracy through witness testimony and exhibits presented—including the required corroborating evidence. *See id.* at 615-17.

In this case, Count 2 charges Ramic with conspiring to provide material resources or support to a terrorist organization in violation of 18 U.S.C. § 2339B(a)(1).  (Indictment 2-3, DN 7).  As the Sixth Circuit noted in *Musaibli*, the Indictment "provides an intuitive set of boundaries defining the conspiracy" because the United States must prove a conspiracy under Fed. R. Evid. 801(d)(2)(E) by the preponderance-of-the-evidence standard. *Musaibli*, 42 F.4th at 615.

Based on the United States' representations to the Court, it appears that the United States will be able to meet its burden, which warrants the admission of these documents under Fed. R. Evid. 801(d)(2)(E).  The Court will conditionally admit these documents pursuant to Fed. R. Evid. 801(d)(2)(E) over Ramic's objection, but subject to the United States meeting its burden of proof.  During trial, the Court will make a final ruling as to admissibility.

### b.    Business Records

The United States claims that the ISIS documents are also admissible as business records under Fed. R. Evid. 803(6).  (Pl.'s Mot. Lim. 31-32, DN 168).  As the Sixth Circuit has explained:

> Rule 803(6) permits business records to be admitted into evidence despite the normal bar against the introduction of hearsay as long as four requirements are met: (1) the records were "created in the course of a regularly conducted business activity;" (2) the records were "kept in the regular course of that business;" (3) the records resulted from a "regular practice of that business" to create such documents; and (4) the records were "created by a person with knowledge of the transaction or from information transmitted by a person with knowledge." *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1071-72 (6th Cir. 2014); Fed. R. Evid. 803(6).  The fulfillment of these conditions must be "shown by the testimony of the custodian or another qualified witness, or by a

certification that complies with Rule 902(11) or (12) or with a statute permitting certification." Fed. R. Evid. 803(6)(D).  Once these conditions have been shown to be satisfied, another party may challenge the veracity of the business records by showing "that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

*United States v. Ramer*, 883 F.3d 659, 677-78 (6th Cir. 2018) (quoting Fed. R. Evid. 803(6)(E)).

*see also United States v. Coffman*, 574 F. App'x 541, 556 (6th Cir. 2014) (permitting authentication through a government agent or other person outside the organization as long as the witness is familiar with the record keeping system).  As the Sixth Circuit noted in *Musaibli*, it may be unnecessary to consider Fed. R. Evid. 803(6) if the United States were to be able to prove the admissibility of the evidence under Fed R. Evid. 801 (d)(2)(E).[3]  *See Musaibli*, 42 F.4th at 614-15.

This motion is preliminarily granted, but a final determination of each document's authentication and admissibility must be made at trial.

**D.**      **Plaintiff's Motion in Limine - Co-Conspirator Statements (DN 170)**

The United States also moves in limine for admission of co-conspirator statements under Fed. R. Evid. 801(d)(2)(E) and 803(6).  (Pl.'s Mot. Lim., DN 170).  In his response to the motion, Ramic contends that "it is clearly premature to conclude that the charged conspiracy existed; that defendant participated in it; that the proffered statements were fact made; and that, if made, were made during and in furtherance of said conspiracy."  (Def.'s Resp. Pl.'s Mot. Lim. 1, DN 200).  Instead, Ramic believes the issues raised in this motion should be resolved at trial. (Def.'s Resp. Pl.'s Mot. Lim. 1, DN 200).

While Ramic encourages the Court to defer addressing this motion, the Sixth Circuit has "long recognized the trial court's prerogative to conditionally admit co-conspirator statements

---

[3] Because the United States may be able to admit the documents under Fed. R. Evid. 801 or 803, the Court declines to address the residual exception in Fed. R. Evid. 807(a).

subject to a later demonstration of their admissibility by a preponderance of the evidence." *United States v. Perkins*, No. 12-11-DLB-EB, 2014 WL 3436074, at *12 (E.D. Ky. July 11, 2014) (quoting *United States v. Robinson*, 390 F.3d 853, 867 (6th Cir. 2004)).   For the reasons discussed above regarding the ISIS documents, it appears that the United State can meet  its burden to satisfy Fed. R. Evid. 801(d)(2)(E).   The Court will conditionally admit these co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E) over Ramic's objection, subject to the United States meeting its burden of proof.  During trial, the Court will make a final ruling as to admissibility.

### E.       **Plaintiff's Motion in Limine - Charging Decisions (DN 171)**

The United States moves in limine to exclude any arguments regarding charging decisions and selective prosecution.  (Pl.'s Mot. Lim. 1, DN 171).  The Court previously denied Ramic's motion to dismiss the Indictment on this basis.  (Mem. Op. & Order 6-12, DN 139).  While Ramic disagrees with the Court's prior ruling, he acknowledges that he cannot raise that issue at trial unless it becomes relevant at trial.  (Def.'s Resp. Pl.'s Mot. Lim. 1, DN 197).  This motion is granted.

### F.       **Plaintiff's Motion in Limine - Rendition (DN 172)**

The United States moves in limine to preclude any evidence or argument of illegal rendition.  (Pl.'s Mot. Lim. 1, DN 172).  The Court previously denied Ramic's motion to dismiss the Indictment on this basis.  (Mem. Op. & Order 2-6, DN 139).  While Ramic disagrees with the Court's prior ruling, he acknowledges that he cannot raise that issue at trial unless it becomes relevant at trial.  (Def.'s Resp. Pl.'s Mot. Lim. 1, DN 196).  Accordingly, this motion is granted.

### G.     Plaintiff's Motion in Limine - Withdrawal from Conspiracy (DN 173)

The United States moves in limine to preclude Ramic from presenting evidence or making arguments that he withdrew from any conspiracy to provide material support to ISIS. (Pl.'s Mot. Lim. 1, DN 173).  The United States contends that any such evidence or argument is irrelevant.  (Pl.'s Mot. Lim. 1, DN 173).   Ramic acknowledges that "withdrawal from a conspiracy charged under 18 U.S.C. § 2339B(a)(1) is not an affirmative defense since the statute does not require an overt act as an element of the offense."  (Def.'s Resp. Pl.'s Mot. Lim. 1, DN 201).  Instead, he contends that such evidence is:

> most certainly relevant, material, and admissible for other purposes, e.g., 1) defendant's abandonment of ISIS in September, 2015, counters the government's argument or evidence that he may have remained or perhaps still remains committed to, supportive of, or perhaps even a member of the organization; 2) the fact that he abandoned ISIS is probative of his intent to join it in the first place; and 3) the fact that he abandoned ISIS is probative of his intent to engage in the alleged conspiracy.

(Def.'s Resp. Pl.'s Mot. Lim. 2, DN 201).

At this time, the Court grants this motion because evidence or arguments relating to a withdrawal from the conspiracy appears irrelevant and likely to confuse the jury.  Because it is possible that there may be circumstances where such evidence may be admissible, the Court may revisit this issue, if necessary, at trial.

### H.     Plaintiff's Motion in Limine - Double Jeopardy & References to Punishment (DN 174)

The United States seeks to exclude any argument regarding double jeopardy and the potential punishment that may be imposed if Ramic were convicted.  (Pl.'s Mot. Lim. 1-3, DN 174).  While Ramic disagrees with the Court's prior ruling, he acknowledges that he cannot raise the double jeopardy or punishment issues at trial.  (Def.'s Resp. Pl.'s Mot. Lim. 2-3, DN 198).

14

Ramic contends, however, that this motion is too broad and that he is entitled to argue or mention his prosecution and punishment in Turkey. (Def.'s Resp. Pl.'s Mot. Lim. 2-3, DN 198). He asserts:

> [T]he jury will be left in the dark and free to speculate not only about that issue but about why there was such a large gap between the end of the alleged conspiracy in September, 2015, and defendant's arrest and appearance in this case on December 17, 2021. Was he still a member of ISIS during this six year gap? Did he continue to fight for ISIS, not just for one year as alleged in the indictment but for seven years until his arrest? What were the circumstances of his arrest? Was he captured on the battlefield? Had he been engaging in other acts of terrorism in the interim? The jury is entitled to know all of the facts in context, not just the ones cherry picked by the United States, leaving the rest to the jury's speculation and conjecture.

(Def.'s Resp. Pl.'s Mot. Lim. 3, DN 198). It is not uncommon for a criminal prosecution to occur several years after the alleged criminal acts occurred. At this stage, a gap in the period of time between Ramic's alleged participation in the conspiracy and his prosecution in the United States does not appear relevant at trial as necessary.

The Court's preliminary ruling is that this motion is granted but maybe be revisited at trial.

## I.     Plaintiff's Motion for Protective Order (DN 178)

Finally, the United States moves for the entry of a protective order to conceal the identifies of an FBI covert employee ("OCE"), FBI confidential human sources ("CHSs"), and cooperating witnesses ("CWs") who are expected to testify at trial. (Pl.'s Mot. Protective Order 4, DN 178). Ramic opposes the motion as violating his constitutional rights to a public trial and to confront witnesses against him. (Def.'s Resp. Pl.'s Mot. Protective Order 1-5, DN 183).

### 1.     *Right to Public Trial*

The Supreme Court has recognized that "[t]he public has a right to be present [at a criminal trial] whether or not any party has asserted the right." *Presley v. Georgia*, 558 U.S.

209, 214 (2010).  As a result, "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials."  *Id.* at 215.  In *Waller v. Georgia*, 467 U.S. 39 (1984), the Supreme Court articulated a movant's burden as follows:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48.  "'Both partial and total closures [of the courtroom] burden the defendant's constitutional rights,' but 'the impact of [a partial] closure is not as great, and not as deserving of such a rigorous level of constitutional scrutiny.'"  *United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) (second alteration in original) (quoting *Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001)).

The parties disagree as to whether the United States is requesting a partial or total closure.  As the Sixth Circuit has explained:

> "Whether a closure is total or partial . . . depends not on how long a trial is closed, but rather who is excluded during the period of time in question."  *United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013).  In other words, a total closure involves excluding all persons from the courtroom for some period while a partial closure involves excluding one or more, but not all, individuals for some period.

*Simmons*, 797 F.3d at 413 (citing *Judd*, 250 F.3d at 1316).  Subsequently, in *United States v. Hendricks*, 950 F.3d 348 (6th Cir. 2020), the Sixth Circuit characterized the following restrictions on the testimony of one witness as involving only a partial closure:

> Jane is an undercover FBI agent who conducts counterterrorism investigations. Prior to trial, the district court entered a protective order governing Jane's testimony.  The protective order provided, *inter alia*, that Jane could testify using an "undercover pseudonym," wear a "light disguise," enter the courthouse using a nonpublic entrance, and seat himself on the witness stand "outside the presence of the jury and defendant."  The order also directed that the public be moved to a different room with real-time audio and display of exhibits but no video or images of the witness.

16

*Id.* at 355 (internal citation omitted).   The Sixth Circuit's characterization of the closure in *Hendricks* as a partial closure is in direct conflict with the explanation of what constitutes a total closure in *Simmons*.   Given this apparent inconsistency in Sixth Circuit precedent, this Court prefers to err on the side of caution and treat the United States' request as a total closure of the courtroom during the testimony of CHE and CHSs because it is seeking to exclude any spectator from the courtroom during their testimony—not just specific individuals.   To determine whether to grant the request, this Court must consider the following four factors:

> [(1)] the party seeking to close a public hearing must advance an overriding interest that is likely to be prejudiced, [(2)] the closure must be no broader than necessary to protect that interest, [(3)] the trial court must consider reasonable alternatives to closing the proceeding, and [(4)] it must make findings adequate to support the closure.

*Id.* (citing *Waller*, 467 U.S. at 48).

### a.   Overriding Interest & Prejudice

Under the first factor, the Court must consider whether the United States has articulated an overriding interest for the total closure without which it is likely to be prejudiced. "Unsurprisingly, courts have [] recognized that the need to protect the safety of witnesses and to prevent intimidation satisfies the higher 'overriding interest' requirement in the standard *Waller* test." *Simmons*, 797 F.3d at 414; *see also Nolan v. Money*, 534 F. App'x 373, 380 (6th Cir. 2013) ("[C]ourts have held that the need to protect a witness from intimidation justifies closure of the courtroom.").   "Certain interests (such as national security) may be so compelling that prohibiting the public's observation of some or all of the proceedings may be warranted." *United States v. Allen*, 34 F.4th 789, 800 (9th Cir. 2022) (citing *Waller*, 467 U.S at 45).

The United States contends that the closure is necessary for the testimony of the OCE and CHSs to protect the ability of the United States to investigate threats to national security in future

cases.  (Pl.'s Reply Mot. Protective Order 3, DN 190; Pl.'s Mot. Protective Order 6, DN 178).

The United States raises concerns about the safety of these witnesses and preventing witness

intimidation during their testimony.  (Pl.'s Mot. Protective Order 7, DN 178).  As the United

States notes in its motion, ISIS has a history of targeting specific individuals for murders, and in

the past, ISIS has released the names, addresses, and photos U.S. military personnel.  (Pl.'s Mot.

Protective Order 3, DN 178).  According to the United States, Ramic expressed his desire to

publicly identify a witness during the trial deposition recently taken in this matter.  (Pl.'s Reply

Mot. Protective Order 8, DN 190).

The United States has sufficiently articulated why the public disclosure of the identities

of the OCE and the CHSs would potentially place those witnesses in peril.  Under these

circumstances, the Court finds that the United States has satisfied its burden of showing

overriding interests for closure of the courtroom during the testimony of the OCE and CHSs.

Failing to close the courtroom during the testimony of these witnesses would prejudice the

ability of the United States to conduct other investigations implicating national security, put the

safety of these witnesses at risk, and potentially subject these witnesses to intimidation.

### b.    Scope of Closure

A second consideration is the scope of the proposed closure, which must be no broader

than necessary to address the reasons for the closure.  The United States has proposed that "only

the Court, essential courtroom personnel, the jury, defendant and his counsel, and the United

States' trial team shall be present in the courtroom" for the testimony of the OCE and CHSs.

(Pl.'s Mot. Protective Order 2, DN 178).  In lieu of in-person public attendance, the United

States has proposed as follows:

> The United States shall provide a contemporaneous audio broadcast of the
> courtroom proceeding for the public in a separate room while these witnesses

> testify.  The United States will also make available transcripts of the testimony of
> the OCE and the CHSs as soon as is feasible after their testimony is complete.

(Pl.'s Mot. Protective Order 2, DN 178).

The proposed scope of the closure appears to be no broader than necessary.  It only applies to three witnesses, and the proposed measures would allow the public to listen to the live testimony of these witnesses with a transcript of the testimony to be released as soon as feasible.  This proposal is less restrictive than in other cases where courts have authorized only providing the transcript of the testimony.  *See United States v. Hernandez*, No. S1 12 Cr. 809(PKC), 2013 WL 3936185, at *2 (S.D.N.Y. July 29, 2013) ("The courtroom will only be closed during the testimony of one witness, the Agent, and the Government has agreed to make the transcript of the Agent's testimony available to the public through the court reporter's office at the end of the trial day."  (citation omitted)).  Accordingly, the Court finds that the proposed closure is narrowly tailored to address the United States' overriding interests in protecting the identities of OCE and CHSs.

### c.     Reasonable Alternatives

Finally, the United States has recognized and identified challenges to other alternatives to the closure.  One of the biggest challenges or limitations is the layout of the courtroom.  (Pl.'s Mot. Protective Order 9-10, DN 178).  For example, a screen or barrier could theoretically be used to shield these witnesses from public view.  Such an alternative is likely impractical given the location of the witness stand.  Any screen or barrier would likely impede the ability of at least part of the jury to observe the witness, as well as Ramic and his counsel.  As the United States notes, allowing these witnesses only to testify from outside the witness stand may unnecessarily draw attention to these witnesses.  There is also a risk that any screening or shielding efforts may not be completely effective to prevent a member of the public from

observing these witnesses when they testify.  It is also significant that the United States' request only relates to three witnesses and is not an overbroad request to close the entire trial.  The Court finds that there are no reasonable alternatives, and this factor supports the closure of the courtroom during the testimony of the OCE and CHSs.

For these reasons, the United States has met its burden, and the Court will order the closure of the courtroom during the testimony of the OCE and CHSs, but the public will be able to listen to the live testimony of these witness and a transcript will be provided following the testimony.

### 2.    *Confrontation Clause*

The United States' motion also raises Sixth Amendment Confrontation Clause issues. "Although the Confrontation Clause of the Sixth Amendment guarantees criminal defendants the right to cross-examine adverse witnesses, this right is not absolute, and a trial court has broad discretion to restrict cross-examination "based on concerns about, among other things . . . the witness's safety." *Hernandez*, 2013 WL 3936185, at *3 (internal citation omitted) (citation omitted).  In its motion, the proposed measures to protect the testimony of specific testifying witnesses are:  (i) the public will listen to the testimony of OCE and CHSs from another room, as discussed above; and (ii) the OCE, CHSs, and CWs will use pseudonyms.  Ramic contends that the confrontation issue is the "paramount consideration" raised by the United States' motion and opposes the proposed measures.  (Def.'s Resp. Pl.' Mot. Protective Order 1-5, DN 183).

### a.    Limitations on the Presentation of Testimony

As discussed above, the public will not present during the testimony of the OCE and CHSs, but the public will still be able to listen to the testimony and be provided access to the transcript following the testimony.  More importantly, however, Ramic will be present in the courtroom during the testimony of these witnesses and will have an unobstructed view.  As a

result, the proposed closure does not impede Ramic's confrontation right.  *See Maryland v. Craig*, 497 U.S. 836, 846 (1990) ("The combined effect of these elements of confrontation— physical presence, oath, cross-examination, and observation of demeanor by the trier of fact— serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings."  (citations omitted)).

### b.    Use of Pseudonyms

Ramic also opposes the use of pseudonyms for the OCE, CHSs, and CWs.  (Def.'s Resp. Pl.' Mot. Lim. 4, DN 183).  The United States notes that Ramic "has never met the OCE and one of the CHSs in person, having had only electronic contact with them, and has never known their true names or any of their personally identifying information."  (Pl.'s Reply Mot. Protective Order 4, DN 190).  It further notes that Ramic "has met two of [the CWs] in person and had only electronic contact with one, and no contact with the last one, as that CW was contacted by a co-conspirator."  (Pl.'s Reply Mot. Protective Order 5, DN 190).

The Supreme Court recognized the right of a defendant to cross-examine an adverse witness.  *See Smith v. Illinois*, 390 U.S. 129, 133 (1968).  The Supreme Court has held, however, that trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is

effective in whatever way, and to whatever extent, the defense might wish." (citing *Ohio v. Roberts*, 448 U.S. 56, 73 n.12 (1980))).

*Smith* specifically involved the failure to disclose a witness's real name and address. *See Smith*, 390 U.S. at 131. The Sixth Circuit, however, has recognized the limit of the holding in *Smith* because "there apparently was no reason offered for not requiring the witness to reveal his name and address. *See Miller v. United States*, 28 F.3d 1213, 1994 WL 329537, at *9 (6th Cir. July 8, 1994) (citing *Smith*, 390 U.S. at 134 (White, J., concurring)). In *Miller*, the Sixth Circuit held that a witness's safety was a legitimate reason for limiting cross-examination by prohibiting the disclosure of the witness' name. *See id.*; *Martin v. Tate*, 96 F.3d 1448, 1996 WL 506503, at *5 (6th Cir. Sept. 5, 1996) ("[T]here is no absolute right for a defendant to have a jury hear the true names and addresses of witnesses where the trial court determines there are legitimate concerns for the safety of a witness." (citing *Clark v. Ricketts*, 958 F.2d 851, 855 (9th Cir. 1992))). In considering whether to limit cross-examination, courts have applied "an appropriate balancing of interests in the relevant case-specific context" based on Supreme Court precedent. *United States v. Celis*, 608 F.3d 818, 833 (D.C. Cir. 2010).

The United States has articulated specific legitimate concerns relating to the safety of all of these witnesses and their families, and the impact of ongoing investigations if the identities of the OCE and the CHSs were disclosed during trial. *See United States v. Alimehmeti*, 284 F. Supp. 3d 477, 490-91 (S.D.N.Y. 2018) (permitting undercover officers to testifying using pseudonyms in a terrorism trial to protect their safety and to conduct future undercover work); *Hernandez*, 2013 WL 3936185, at *3 ("The risk that the Agent's safety and efficacy might be compromised is heightened if the Agent's real name is publicly disclosed."); *United States v. Ramos-Cruz*, 667 F.3d 487, 500-01 (4th Cir. 2012) (allowing the government to use pseudonyms

22

for witnesses at risk for gang violence arising from their trial testimony).  As the United States acknowledges, it still has the obligation to provide any *Giglio*/impeachment information and will provide Jencks Act statements.  (Pl.'s Mot. Protective Order 12, DN 178).

After balancing Ramic's constitutional right with the legitimate concerns articulated by the United States, the Court finds that the proposed limitation is reasonable under these circumstances, and the OCE, CHSs, and CWs will be permitted to testify using pseudonyms. This motion is granted.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.      Defendant's Motions in Limine (DN 155, 166, 167) are **DENIED**.

2.      Plaintiff's Motion in Limine (DN 168, 170, 171, 172, 173, 174) are **GRANTED**.

3.      Plaintiff's Motion for a Protective Order to Conceal the Identities of an FBI Covert Employee, FBI Confidential Human Sources, and Cooperating Witnesses (DN 178) is **GRANTED**, and the following protective measures shall be used to protect the identities of an FBI Covert Employee ("OCE"), FBI Confidential Human Sources ("CHSs"), and Cooperating Witnesses ("CWs") at trial:

        a.      The OCE, the CHSs, and the CWs may testify using a pseudonym when testifying at trial, without disclosing publicly the true identity of the OCE, the CHSs, or the CWs;

        b.      The defense shall be prohibited from asking any questions seeking personal identifying information from the OCE, the CHSs, or the CWs;

        c.      When the OCE and the CHSs testify, only the Court, essential courtroom personnel, the jury, defendant and his counsel, and the United States' trial team shall be present in the courtroom.  The United States shall provide a contemporaneous audio

broadcast of the courtroom proceeding for the public in a separate room while these witnesses testify.  The United States will also make available transcripts of the testimony of the OCE and the CHSs as soon as is feasible after their testimony is complete.

   d.      No public disclosure of any audio or video recording, or similar reproduction of the voice or visual image of the OCE, the CHSs or the CWs, while testifying, shall be permitted.

   e.      The OCE, the CHSs, and the CWs shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom, shall be permitted to enter the courtroom and sit in the witness chair outside the presence of the jury and defendant, and shall be permitted to remain seated when sworn in;

   f.      All non-official recording devices, including courtroom sketch pads, shall be prohibited from being in the courtroom, or the audio feed broadcast room, while the OCE, the CHSs, and the CWs testify.

   g.      These protective measures may only be modified through a written superseding order issued by this Court.

Greg N. Stivers, Chief Judge
United States District Court

May 20, 2024

cc:     counsel of record

24