UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                    CRIMINAL ACTION NO. 1:21-CR-13-GNS
*Electronically Filed*

MIRSAD RAMIC                                                DEFENDANT

### UNITED STATES' SENTENCING MEMORANDUM

The United States files this sentencing memorandum in support of its request that Mirsad Ramic ("Ramic") be sentenced to 50 years of incarceration at the sentencing hearing, currently scheduled for April 14, 2025, in Bowling Green, Kentucky. Ramic was convicted of some of the most significant federal terrorism crimes and, because of his extreme actions, the United States asserts that he should receive a concomitant sentence, first and foremost, to protect the public— not only the local Bowling Green community, but all the citizens of the United States from any further crimes of Ramic—but also, to deter others from joining, training, promoting, and fighting on the battlefield for ISIS or any other foreign terrorist organization, to declare stridently and clearly the seriousness of the offenses committed by Ramic, to encourage respect for the rule of law, and to provide appropriate, sensible, and justified punishment for his egregious conduct.

## I.    SUMMARY

On June 11, 2024, after a seven-day jury trial, defendant Ramic was convicted by a federal jury in Count 1 with providing material support and resources to a foreign terrorist organization, the Islamic State of Iraq and al-Sham ("ISIS"), in violation of Title 18, United States Code, Section 2339B(a)(1); in Count 2 with conspiring to provide material support to ISIS in violation of Title 18, United States Code, Section 2339B(a)(1); and in Count 3 with receiving military-type training from and on behalf of ISIS, in violation of Title 18, United States Code, Section 2339D(a). *See*

1

Presentence Investigation Report ("PSR"), DN 273 at 5. The combined statutory maximum sentence is 50 years of imprisonment with a minimum of 10 years of imprisonment. Ramic is a danger to the community and shows no remorse for his crimes. Therefore, the United States recommends a sentence of 50 years to protect the public, punish Ramic, and deter others who would seek to join violent terrorist organizations. The PSR calculated a Total Offense Level of 40 and a Criminal History Category of VI. His guideline range is 360 to life. Based on the statutory maximum penalty he faces a penalty of 360 to 600 months in prison. DN 273 at 18.

## II.    **BACKGROUND FACTS**[1]

In September 2009 Ramic, a Bosnian national, became a naturalized citizen of the United States. *See* United States Ex. 37. Almost immediately thereafter, in October 2009, Ramic, obtained his United States passport. *See* United States Ex. 47. In June 2010, Ramic attempted to travel to Yemen, supposedly to attend the Dar Al Mustafa school to study Arabic. Al Qaeda in the Arabian Peninsula, a designated foreign terrorist organization, was active in Yemen in 2010.[2] At trial, the United States introduced testimony and evidence that Ramic sought to travel to Yemen and Saudi Arabia to achieve his goal of engaging in radical jihad—a goal he steadily maintained from 2010 until he successfully traveled to join ISIS in June 2014.

Upon being turned away in Yemen and returning to the U.S., Ramic was interviewed on multiple occasions by FBI agents including FBI Special Agent ("SA") Christine Awender (July 1, 2010), FBI SA Michael Goodhue (August 25, 2010), and FBI SA Dennis Dvorjak (September 4, 2010). In each instance, Ramic denied traveling to participate in jihad, and denied any interest in traveling to join a foreign terrorist organization.

---

[1] The United States agrees and adopts herein the offense conduct stated in the PSR DN 237 at 5-11.
[2] While no specific FTO was targeted for his attempts to engage in jihad, there was testimony that AQAP and other foreign terrorist groups were active in the region.

The statements made by Ramic to the agents conflicted with information obtained by sources and undercover FBI employees in online chat rooms that Ramic frequented—platforms that were dedicated to jihadist rhetoric.  A confidential human source ("CHS") testifying at trial under the pseudonym "Jenna Torres" testified that she met an internet chat group user with the username "Malik Al Muthanna" in a Paltalk chat room entitled "Authentic Tawheed" belonging to Sheik Abdullah Al Faisal.[3]  Participants in the chat room discussed anti-Western rhetoric and jihad related conversations.  "Torres" testified that Malik Al Muthanna was one of a select few people in the chatroom who was authorized to raise funds from others for the Sheik.  "Torres" also testified that people printed transcripts of Sheik Abdullah's online lectures that were sanitized so as to omit any references to jihad, or Islamic holy war.  In September 2011, Ramic had online conversations with an FBI online covert employee ("OCE-1") testifying at trial under the pseudonym "Hassan Hodzic."  Ramic, using the username, Malik Al Muthanna, stated to "Hodzic" that he lied to interviewing authorities, including the FBI, regarding his reason for traveling to Yemen in June 2010.  "Hodzic" testified that he obtained an admission from Malik Al Muthanna about being deceptive with "non-believers" about his reasons for traveling: "[h]e said that you have to be careful not to give your intentions," adding that Al Muthanna told him that one should tell anyone asking that they were traveling to study the Arabic language.

In December 2011, the FBI conducted a court-authorized search of a hard drive of a Compaq Presario computer used by Ramic.  The FBI located information related to the Paltalk

---

[3] Abdullah Al Faisal (born Trevor William Forrest, also known as Abdullah al-Faisal, Sheikh Faisal, and Sheik Faisal) is a Jamaican Muslim cleric who preached in the United Kingdom until he was convicted on February 24, 2003 in the Central Criminal Court of England and Wales, London UK, of stirring up racial hatred and urging his followers to murder Jews, Hindus, Christians, Americans and other "unbelievers."  Al Faisal was sentenced to nine years in prison, of which he served four years before being deported to Jamaica in 2007.  In 2020, Al Faisal was extradited to New York City after being arrested in Jamaica in 2017. He was subsequently convicted in January 2023 in New York State Supreme Court in Manhattan on counts including soliciting or providing support for an act of terrorism. He was sentenced to 18 years in prison.  *See* https://en.wikipedia.org/wiki/Abdullah_el-Faisal.

program and folders with the usernames "Malik Al Muthana" and "Sunnah or Die." Also on the computer were images associated with the Authentic Tawheed chatroom and images of the ISIS flag and Osama Bin Laden. In addition, there was a document identified by the title "Requirements for Jihad" in the Internet Explorer daily history. Information related to the Paltalk program showed it had been run 160 times prior to December 1, 2011. In a later court-authorized search of an email an account associated with Ramic, Mirsaddawah@yahoo.com, the FBI discovered that Ramic had received sermons from Sheik Al Faisal. One of the sermons was the "Requirements of Jihad," dated May 1, 2012. That sermon discussed jihad and had quotes about manufacturing improvised explosive devices, or "IEDs." Exhibit 55 and Exhibit 56.

In June 2014, Ramic, together with two unindicted co-conspirators, Abdulah Mohamed Alnwfal ("Alnwfal") and Khalaf Fahad Alkhalaf ("Alkhalaf"), who both had attended Western Kentucky University in Bowling Green, Kentucky, departed the United States and traveled to Syria to join and fight for the terrorist organization known as ISIS. ISIS and its predecessors have been designated a foreign terrorist organization by the United States since October 15, 2004. ISIS has carried out numerous deadly terrorist attacks around the world, including within the United States. This travel was confirmed by airline travel records provided by Turkish Airlines and introduced at trial. *See* United States Exs. 40A and 40B.

When Ramic and his co-conspirators arrived in Syria to join ISIS, ISIS generated an autobiographical information form that was recorded in a "General Border Administration Mujahid Information Form." This form was one way in which ISIS attempted to accurately record and track the attributes of the tens of thousands of foreign fighters flooding its ranks. These forms, one each for Ramic, Alnwfal, and Alkhalaf, reflect that Ramic and his co-conspirators entered into

ISIS territory through the same port of entry, Tal Abyad, on the same day – June 11, 2014. *See* United States Exs. 10, 10A, 11, 11A, 12, 12A.

Ramic's border crossing record from ISIS confirmed he joined ISIS intending to become a fighter. The English translation of the General Border Crossing Administration records containing the Mujahid Information form indicated that the full name of the person in question was Ramish Mirsad [Bosnian variant: Ramic Mirsad] with a kunya[4] of Abu Hazim al-Bosnawi ["Abu Hazim the Bosnian"]. The date of birth provided was 1990 and the form indicated Ramish Mirsad was single and had a place of residence in Bosnia. The form indicated that Ramic had visited and spent time in Yemen. His point of entry was indicated as Tal Abyad, a border town with Turkey in Northern Syria. The form indicated Ramic's date of entry was June 11, 2014. The form indicated that from the listed choices of fighter, suicide bomber, or inghamasi (a suicide fighter), that "fighter" was checked. Finally, the form indicated that Ramic surrendered his passport to ISIS. Testimony at trial established that the biographical information contained on the form was consistent with the actual information regarding Ramic.

Ramic enlisted, trained, and fought for ISIS. A cooperating witness ("CW") using the pseudonym "Mohamed Das" also testified at trial. "Das" said that he met Ramic in an ISIS training camp near Al Taqba, Syria known as Abdullah Azzam. At the time, Ramic was using the kunya "Abu Hazim Al Bosnawi," (Abu Hazim the Bosnian), and "Das" also knew Ramic by the nickname "Kentucky." "Das" spent time with Ramic in Syria on at least two occasions. During his time with ISIS, "Das" maintained a notebook that was seized by the FBI upon "Das's" arrest, which contained the handwritten name "Abu Hazim Al Bosnawi" and indicated that "Abu Hazim Al Bosnawi" was part of the "Kademi" group, or ISIS training class, prior to the training that "Das"

---

[4] A kunya is a nickname or nom de guerre.

attended. The notebook also indicated that "Abu Hazim Al Bosnawi" was at camp A.A. (Abdullah Azam) and had a username on the social media platform "kik" of "Abuhazimi." "Das" testified that his phone had been damaged by Turkish Border Authorities, so he subsequently had to write individuals' contact information in a notebook along with military training lessons.

At trial, the United States played a Rule 15 video deposition of another person who had witnessed firsthand Ramic's material support and military training for ISIS: a Bosnian man who testified under the pseudonym, "Ahmed Delic."[5] "Delic" testified that, as an ISIS soldier, his responsibilities included working at checkpoints and guarding borders into the territory where he was stationed near the Syrian city of Sarrin, as well as guarding locations containing grain and weapons. At trial, "Delic" identified several photos, including photos of Ramic in military gear, holding a firearm and standing with a black ISIS flag.

---

[5] Delic was brought to Syria by his family in 2013 at age 15, joining his father, who had arrived a few months earlier to fight for ISIS. Delic left Syria after turning 18, and was later arrested in Bosnia and convicted in a Bosnian court for crimes related to his ISIS membership. He was imprisoned in Bosnia for a separate robbery conviction. Both his father and brother were killed in Syria. "I'm testifying because I, as a former member of ISIS, have been convicted and I wouldn't want anything to happen to someone else that happened to me," "Delic" testified. "After coming from a large family, I have nobody by my side."



*See* United States Exs. 14 and 17.

"Delic" testified that Ramic told him an Arabic friend paid for Ramic's trip to Syria. "Delic" also testified that Ramic took part in training with automatic weapons. "We would go practice shooting at the range together in our free time," "Delic" said. Ramic told "Delic" he had received military training from ISIS before being assigned to the Bosnian Katibah under the command of notable Bosnian ISIS member Ramo Pazara. "Delic" testified that Ramic did not communicate much with the other soldiers in the unit, but he had an interest in sniper rifles and heavy machine guns, though "Delic" said he did not see Ramic fire those weapons.

Dr. Lorenzo Vidino, an expert witness who testified for the United States, discussed the ISIS battalion under the command of Ramo Pazara, the Bosnian man whom "Delic" had testified led the unit in which Ramic and Delic fought. Dr. Vidino testified that Pazara's unit fought some of the most pitched battles for ISIS, including the battle for the Syrian city of Kobani, which resulted in thousands of people being killed or displaced before U.S.-led coalition forces drove back the ISIS fighters.

In mid-September 2014, Ramic participated in the siege of Kobane which was launched to capture the city of Kobane and the surrounding villages (also known as Kobanê or Ayn al-Arab) in northern Syria. DN 273 at 10. "Delic" testified that he and Ramic conducted reconnaissance ahead of an attack on the Syrian city of Kobane in late 2014 against Kurdish militants. During the nighttime attack, Ramic was part of the first line of soldiers in the offensive, while "Delic" was a member of the support group that followed them. During one of the major battles in the fall of 2014, ISIS attacked and displaced the Kurdish people, resulting in the death of 100,000 people. DN 273 at 10. Evidence at trial showed that Ramic was an active, combat participant in the Battle of Kobane on behalf of ISIS. Atrocities against the Kurdish people were lauded in ISIS propaganda and widely reported in European and American news outlets.

While with ISIS, Ramic's prolific use of social media encouraged ISIS's terroristic activities and evidenced his efforts to influence or affect or retaliate against government conduct. Ramic under his kunya, Abu Hazim Al Bosnawi, threatened United States President Barack Obama, aspiring to sell Obama's then-minor daughters as slaves:



**Abu Hazim Al Bosnawi**
@abuhazimi

Follow

InšhaAllah a day will come when malia and nataša obama will be sold as sabaya in one of the local markets #IS #Kuffar

Reply   Retweet   Favorite   More

7:50 AM - 29 Aug 2014

*See* United States Ex. 57. Ramic also posted information regarding Kobane about coalition aircraft:





**Follow**

The planes are circling and drones hovering over ayn arab day and night #aynislam #islam

7:57 AM - 12 Oct 2014

*See* United States Ex. 58.  Ramic discussed the difference between bombs dropped by Syrian and American planes:



Search Twitter



**Follow**

There is huge diff of diamater hole bashar planes leave n us ones do, Alhamdulilah for everything. It comes with territory #Islam #aynislam

*Id*.  In February 2015, Ramic continued to post propaganda in support of ISIS including a photo of a pamphlet provided to the families of United States service members killed in the line of duty with an ISIS flag and multiple firearms in the background:



*See* United States Exhibit 58 at p. 17.  That same month, Ramic posted about the brutal beheading

of fifteen Coptic Christians by ISIS on a beach in Libya[6]:

> **Abu Hazim Al Bosnawi**@abuhazime  · Feb 23
>
> If jesus was alive today he would be with Islamic State, and behead
> #Copts for taking him as god besides Allah# #Egypt #Bible #Islam
>
> 1

*See* United States Ex. 58.  He also posted about putting dead bodies in a Chevy Caprice and that

Shia Muslims must convert to Sunni Islam or die.

---

[6] On February 12, 2015, ISIS released a report in its online magazine Dabiq showing photos of 21 Egyptian Christian construction workers that ISIS had kidnapped in the city of Sirte, Libya, and whom ISIS reported it had killed. The men had been kidnapped in Sirte in two separate attacks on December 27, 2014, and in January 2015. On  February 15th, ISIS released a video showing their murder.





Abu Hazim Al Bosnawi @abuhazime · Feb 22
To rafidah/shia of #iraq you have two options Sunnah or Die

1

*Id*. He also bragged about his life changing from working for "non-believers to having slave girls clean his house:

Abu Hazim Al Bosnawi @abuhazime · Feb 16
You can never count the blessings of #Allah! We went from working for kuffar to having slave girls clean our houses. #Islam #Jihad #IS

3

*Id*. In addition, as shown at trial, Ramic used the name Abu Hazim Al Bosnawi to post the following tweets directly referencing the United States:

- "Could this be the reason why Kuffar don't want boots on the ground? #IS #US #UK". *See* United States Ex. 87 at p. 24. (September 12, 2014).

11

- "Are you ready for a joint mission? To make more of them fall #IS #Iraq #US" *Id*. at p. 23.



## III.     GUIDELINES CALCULATION

The United States agrees with the calculations contained in the PSR. Ramic's total offense level is 40; (DN 273 at 19). Ramic's Criminal History Category is VI. *Id*. This produces a guideline sentencing range of 360 months to life imprisonment. *Id*. Ramic's statutory maximum for the offenses is 50 years—20 years each for Counts One and Two (18 U.S.C. § 2339B) and 10 years for Count Three (18 U.S.C. § 2339D). The statutory mandatory minimum, due to Ramic's conviction under 18 U.S.C. 2339(D), is 10 years.

### A.   The terrorism enhancement under U.S.S.G. §3A1.4 is appropriately applied.

The terrorism enhancement in U.S.S.G. § 3A1.4(a) and (b) is a type of upward adjustment of a convicted defendant's offense level and criminal history category. *See United States v. Wright*,

747 F.3d 399, 407 (6th Cir. 2014). Where it applies, the sentencing court must increase the defendant's offense level by 12 levels, to at least level 32, while also setting the defendant's criminal history category as Category VI. Such an adjustment "reflect[s] Congress's considered judgment" that "terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." *United States v. Mumuni Saleh*, 946 F.3d 97, 113 (2d Cir. 2019).

The U.S.S.G. § 3A1.4 adjustment is applicable where the offense is a felony that "involved" or "intended to promote" certain terrorism offenses enumerated under 18 U.S.C. § 2332b(g)(5)(B). *Id*. Additionally, in order to qualify for the enhancement, the enumerated offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id*. (quoting 18 U.S.C. § 2332b(g)(5)(A)). "Application of the enhancement requires proof of the defendant's specific intent, i.e., proof that he acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind." *United States v. Stafford*, 782 F.3d 786, 792 (6th Cir. 2015) (internal quotation omitted); *see also United States v. Assi*, 428 F. App'x 570, 573 (6th Cir. 2011) (unpublished) ("[I]t is possible to be guilty of providing material support to a foreign terrorist organization but not qualify for the Terrorism Enhancement" if the material support lacked the requisite intent). The Sixth Circuit has found that the Government need only "show by a preponderance of the evidence that the two requirements of § 2332b have been met," *United States v. Wright*, 747 F.3d 399, 409 (6th Cir. 2014). Here, Ramic meets both the requirements for application of the terrorism enhancement.

First, Ramic's crimes are enumerated offenses listed in 18 U.S.C. § 2332b(g)(5)(B) – the first prong of the definition of "federal crime of terrorism."

Second, a preponderance of the evidence shows that Ramic's provision of material support to ISIS and his receipt of military-type training from ISIS was calculated to influence or affect or retaliate against government[7] conduct.  In 2010, Ramic attempted to travel to Yemen.  He returned and continued his radicalization by discussing jihad on Paltalk.  A CHS and FBI OCE confirmed his presence in the radical Paltalk chatroom and his discussions about lying about his true intentions to travel to Yemen in 2010.  Ramic also possessed materials like the "Requirements of Jihad" advocating for violent jihad and the creation and use of IEDs to fight the kufar.  Kufar means 'disbelief', 'unbelief', 'non-belief', 'to be thankless', 'to be faithless', or 'ingratitude'.  It is a term that ISIS applies to all who do not adhere to their beliefs.  Then in 2014, consistent with his previous conduct, Ramic traveled internationally for the purpose of joining ISIS and advancing its global political objectives on the battlefield.  Upon arriving in Syria, Ramic enlisted with ISIS as a fighter.  Ramic received training and took up arms on behalf of ISIS, including in Kobane where the United States military was supporting YPG forces.   On his Twitter account, he bragged about firing anti-aircraft weapons at planes in the fall of 2014.  He discussed American aircraft being present in the skies above Kobane during that time.  He threatened to enslave the daughters of the then President of the United States, President Obama.  He spouted propaganda on Twitter discussing the murder and beheading of Coptic Christians by ISIS in 2015.   His publicly available Twitter postings showed firearms, the ISIS flag, and a pamphlet provided to the families of killed United States servicemembers.  In an email and Twitter posting, Ramic posted a photograph of the pamphlet which was provided to families of U.S. servicemembers who died in combat or service.  In the tweet and email, Ramic advocated for "Are you ready for a joint mission?  To make more

---

[7] The word "government" as used in § 2332b(g)(5)(A) includes foreign governments and is not limited to the government of the United States. *United States v. DeAmaris*, 406 F. Supp. 2d 748, 751 (S.D. Tex. 2005).  As explained below, however, the proof at trial conclusively established Ramic's desire to strike at the United States in addition to the Syrian government.

of them fall #IS#Iraq#US."  The pamphlet was titled "A Joint Mission to Support the Families of Fallen Veterans."  Here, Ramic was playing on the language suggesting a "joint mission" and encouraged the murder of U.S. soldiers.  Ramic also acted as a propagandist on Twitter posting ISIS propaganda espousing violence against the United States and actively encouraging individuals to engage in ISIS's brand of violent jihad and martyrdom.

Ramic's Twitter and email statements, and his actions in joining and fighting for ISIS in Syria, are proof that Ramic's actions were "calculated to influence" and "retaliate against" the U.S. government and other governments in the anti-ISIS coalition.  Even without the direct proof of Ramic's personal motivation from his tweets and emails, the terrorism enhancement should still apply based upon the evidence establishing that Ramic understood ISIS's political objectives at the same time as he trained and fought for ISIS.  *See United States v. Awan*, 607 F.3d 306, 317-18 (2d Cir. 2010) (the defendant need not be "personally motivated by a desire to influence or affect the conduct of government" in order to satisfy the "calculation" requirement.).  As Dr. Vidino testified without opposition or contradiction, ISIS's goals are calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  Dr.  Vidino further testified that ISIS had the goal of destroying all governments and forcing everyone to join its "Caliphate," and that ISIS attacked the "West" out of its perceived notion that the West purposefully attacked Muslims and was at war with Islam.  Ramic's statements and actions show that he willingly joined ISIS, had knowledge of its purpose and aims, and his rabid support of ISIS shows, at the very least, that by a preponderance of the evidence, he shared ISIS's goals when joined and fought for ISIS in Syria.

**B.  Ramic should not receive credit for his foreign sentence in Turkey**

Generally, district courts should not credit at sentencing for time served abroad. See *Mercedes v. United States*, Crim No. 03-697, 2015 U.S. Dist. LEXIS 29897 (D.N.J. Mar. 11, 2015); *Ajala v. United States Parole Comm'n*, 997 F.2d 651, 656 (9th Cir. 1993); *Vasquez v. United States*, No. 2:21-cv-07120-CAS-KES, 2022 U.S. Dist. LEXIS 82665 (C.D. Cal. Apr. 18, 2022).  Ramic was not held or prosecuted in Turkey on behalf of the United States.  The Ninth Circuit, in agreement with the Tenth Circuit, has upheld that the calculation and award of foreign credits is neither a matter for federal courts nor the United States Parole Commission. *Ajala v. United States Parole Comm'n*, 997 F.2d 651, 656 (9th Cir. 1993).  In *Ajala*, the Ninth Circuit denied the defendant's appeal for the court to credit her for time incarcerated in England. *Id*. at 652.  There, the court recognized that it lacked jurisdiction over such a determination. *Id*. at 653. Similarly, in *Mercedes*, counsel raised the issue of giving the defendant credit for time served in France.  But like the Ninth and Tenth Circuits, the District Court within the Third Circuit stated that it was "not in a position to make the determination." 2015 U.S. Dist. LEXIS 29897 at *11.

Moreover, 18 U.S.C. § 3585(b) precludes Ramic from receiving credit for his Turkish imprisonment against his federal sentence in the United States. The language of section 3585(b) is straightforward. *Hughes v. Slade*, 347 F. Supp. 2d 821, 827 (C.D. Cal. 2004). It provides, in pertinent part, that a prisoner shall be given credit for time that has *not* been credited against another sentence. 18 U.S.C. § 3585(b). This means that time which has been credited toward service of one sentence may not be double counted against another sentence. *Walker*, 2017 U.S. Dist. LEXIS 1232, at *9 (citing *United States v. Lytle*, 565 F. App'x 386, 392 (6th Cir. 2014)). This includes foreign sentences. *See United States v. Arellano-Felix,* No. 97-CR-2520-LAB-1, 2023 WL 1487293, at *3 (S.D. Cal. Jan. 31, 2023) ("Federal appellate case law has long held that

16

even when the identical criminal 'acts' formed the basis for both a federal offense and a foreign offense, a prisoner is not entitled to credit against a federal sentence for time spent serving a prior foreign sentence."); *Marks v. Clark*, 61 F.3d 906, 906 (7th Cir. 1995) (federal inmate's prior custody for violating U.K. law was not creditable toward his federal sentence pursuant to 18 U.S.C. § 3585(b)); *Kendrick v. Carlson*, 995 F.2d 1440, 1445–46 (8th Cir. 1993) (no credit for incarceration in the Netherlands for related conduct).

In this case, it is on the record that Ramic's time served in Turkey was credited toward another sentence—his Turkish sentence. DN 198 Page ID # 1506-07. Ramic admits that he was convicted in a Turkish court in Kilis and subsequently sentenced and imprisoned. DN 83 at 2. It was during his time serving the Turkish sentence that Ramic was charged by the United States. *Id*. Ramic's situation is no different than the cases cited above, and his foreign sentence should not be credited against any sentence he receives in this case.

## IV.    INTERVIEW AND PSYCHOLOGICAL REPORT

In support of his sentencing memorandum, Ramic filed an "Interview and Psychological Evaluation of Mirsad Ramic" (DN 291-1) on January 6, 2015. The report was authored by Dr. Patti van Eys, a psychologist, who was presumably compensated for her time and report.

The Court should give little, if any, weight to the opinions contained in Dr. van Eys' report for at least two reasons: First, the report is a blatant attempt to include Ramic's self-serving statements through the guise of an expert opinion and report. Ramic seeks to provide the Court an uncorroborated, carefully tailored version of his hearsay testimony under the guise of Dr. van Eys simply providing the Court with the information upon which she relied in forming her expert opinion.

Second, in many instances throughout the report, the unsworn testimony from Ramic, upon which Dr. van Eys bases her opinion, is demonstrably false. Here are just a few examples:

The report claims that "*His sister moved out when he was 15 and he has never been close to her since.*" DN 291-1 at p. 6. However, his sister, Mirnesa, has visited him over 80 times in jail as documented by jail visitor logs from January 1, 2022, to the present. In addition, there were approximately 627 jail phone calls from January 1, 2022, to the present between Ramic and his sister. Mirnesa even testified on his behalf during his detention hearing on January 18, 2023. See DN 65 (Exhibit and Witness List) and DN 67 (Transcript of Detention Hearing).

Ramic also complains of his transition to living in the United States and his disillusionment while here. The report claims that: "*Of great negative impact was loss of his quality of life in Bosnia where he was "free" and had friends; where he belonged; and where he had his one attachment caregiver (his grandmother).*" DN 291-1 at p. 6. In reality, however, Ramic maintained dual citizenship and at any time could have returned to Bosnia to live near his grandmother. He was offered land in Bosnia by his family and his mother encouraged him to return. Ramic's mother was interviewed on April 13, 2015, and stated that Ramic convinced her to purchase him land in Bosnia where he said he would build a house. His mother sent $20,000 to Bosnia to purchase land for Ramic. Ramic said he wanted to move there because he did not like the U.S. Rather than choosing to fly to Bosnia in 2010 or 2014, Ramic instead purchased a ticket for Yemen and later Syria in 2014 and ultimately joined ISIS.

Dr. van Eys' report states that "*Mirsad did not seek this sheik [Sheik Abdullah el-Faisal] out.*" DN 291-1 at p. 10. The Court heard testimony at trial regarding Ramic's interaction with Sheik Abdullah Al Faisal. This Court heard how Al Faisal felt comfortable asking Ramic to post surahs (verses) of the Quran into the chat relevant to the topic of the lecture, not trusted to all users.

18

In addition, Ramic's email account, mirsaddawah@yahoo.com contained numerous lecture notes from Al Faisal's list serve at shaikh_faisals_notes@yahoo.com.

Dr. van Eys' report references "*years of near total FBI surveillance, which found no evidence of Islamic extremism*." This statement is flatly contradicted by the evidence at trial. This Court heard testimony regarding Ramic's obsessive engagement on Paltalk with chatrooms dedicated to jihad and his consumption of jihadist material from Al Faisal. This Court also heard testimony regarding Ramic's conversations with FBI online covert employee "Hassan Hodzic" regarding misleading FBI agents and discussions of jihad. And in the ultimate act of extremism, Ramic traveled to Syria and joined and fought for ISIS.

Dr. van Eys' report claims Ramic "*risked his life to abandon ISIS due to his observation of its corruption.*" Later, Ramic wanted out when he "*realized the hypocrisy of ISIS.*" DN 291-1 at p. 11. Pages 9-11 of Dr. Van Eyes report outlines ways in which Ramic was disillusioned with Syria under ISIS. Ramic complained of transgender parks, alcohol shops, stores not closing for prayers, people not washing themselves properly for prayers. Ramic bemoans the "hypocrisy: that ISIS did not live up to its ideals—ideals that he thought meant punishing sinners and living under Sharia law. In other words, he quit not because he thought ISIS was gross and violent – he quit because they were not consistent in punishing the "right" people harshly enough.

Dr. van Eys' report claims that Ramic was charged in "*violation of the U.S.-Turkish Extradition Treaty*" and that "*FBI agents 'kidnapped' him from Turkey and forcibly returned him to the U.S.*". DN 291-1 at p. 16. This too is demonstrably false. This Court denied Ramic's request to dismiss the case based on this very same claim of illegal rendition. DN 139. As he has continued to do throughout this case, Ramic offers no evidence beyond his own unsupported, unsworn, self-serving statement that he was illegally "forcibly kidnapped" by the United States in

the course of his transfer from Turkish custody. His statement to Dr. van Eys is simply more of the same.

With all due respect to Dr. van Eys, at best her report is a good faith effort to diagnose an individual who provided hearsay testimony rife with half-truths, exaggerations, inconsistencies and lies, without any ability to corroborate or fact-check the information upon which she based her report. By contrast, the Court heard hours of testimony from witness after witness—under oath and subject to cross examination—at trial, and the Court was able to observe Ramic's behavior during trial.

Ramic's accounts are largely grievances on societal expectations based on his religious beliefs and the realities he faced when American society did not meet his expectations. What the report really amounts to is a letter of support for Ramic at sentencing by a person who was paid to meet with him three times after Ramic was convicted. The fact of the matter is that there are many people from disadvantaged and challenged backgrounds who lead productive and successful lives that do not abandon the United States and join a foreign terrorist organization such as ISIS. Ramic made the choice to join ISIS, a terrorist organization, and he should be held accountable for that choice. The Court should disregard Dr. van Eys' diagnoses and report entirely.

## V. SENTENCING FACTORS UNDER 18 U.S.C. 3553(a).

This Court must ultimately affix a sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). Title 18, United States Code, Section 3553(a) guides the Court regarding factors to consider when imposing a sentence. That section directs courts to consider the following:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for--

(A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
. . .

(5)    any pertinent policy statement--
. . .

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

It is the position of the United States that the requested sentence of 50 years of imprisonment is necessary to accomplish the sentencing purposes of 3553(a).

The nature and circumstances of Ramic's case show not only a dedication to achieving his goal of joining ISIS after years of planning and several attempts, but a concerning level of skill and ability in achieving those aims. The Court heard evidence that Ramic hid his intentions to travel by lying about them to the FBI, conspired with and traveled internationally with others, enlisted in ISIS, received lethal training from ISIS, and ultimately fought on behalf of ISIS in Syria. It is documented fact that Ramic fought in northern Syria in Kobane as a terrorist soldier. These circumstances are only exacerbated by the incendiary social media posts and emails in which Ramic discussed death and threatened others on behalf of ISIS—thereby serving as another mouthpiece through which ISIS was able to push its propaganda out into the world. The seriousness of Ramic's act of joining and fighting for a terrorist organization cannot be overstated. Such serious and offensive criminal conduct demands an appropriately stringent sentence.

21

Ramic's history and characteristics support a 50-year sentence. Ramic has shown no remorse for his crimes against the United States or any individuals impacted by his crimes. His "psychological report" does little to mitigate his circumstances. In fact, Ramic's case is one of a constellation of aggravating factors. In many cases, aspiring foreign terrorist fighters are apprehended before achieving their goal. In this case, Ramic completed his stated goals of joining, training, and fighting for ISIS. It is with these aggravated facts that Ramic presents himself after a trial and guilty verdicts on all counts to this Court. There is nothing about Ramic's behavior or anything in reports presented on his behalf that with any degree of confidence demonstrate Ramic has changed. To this day, Ramic has refused to accept responsibility for his actions and his actions in this case are reflective of his character.

Each of the factors under § 3553(a)(2)(A) weigh in favor of a lengthy, 50-year sentence. The offense in this case was serious. Ramic engaged in combat as an ISIS member. He was an ISIS soldier and took up arms on behalf of a terrorist organization. He used social media to perpetuate and further the objectives of ISIS by posting violent propaganda, including propaganda directed at the United States. His communications between his co-conspirators revealed his mindset dedicated to violent jihad and death to those who disagree with his version of religion. His behavior from radicalization, recruitment, travel, and training demonstrates his dangerousness and focus to become a terrorist fighter. It is striking that the facts of this case are absolutely devoid of any rehabilitation or remorse from Ramic before or after his federal conviction. A sentence of 50 years is "of the type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense." *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010) (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

A lengthy sentence is necessary to protect the community and the public from Ramic, a man who is driven by radical ideologies and left the United States to join a terrorist group to fight and, under § 3553(a)(2)(C), his sentence must be designed to mitigate that risk. For an undeterrable offender such as Ramic, the threat he continues to pose to the community if released is hardly measurable. Simply put, a 50-year sentence is necessary to protect the public from Ramic.

The United States' requested sentence of 50 years is consistent with § 3553(a)(6) and avoids unwanted disparities among defendants convicted of similar crimes. Ramic is distinguishable as a foreign fighter who traveled from the United States to the war front in Syria and actually fought in an offensive on behalf of ISIS. A review of several sentences of similarly situated defendants supports the United States' requested sentence.

**United States v. Mohammed Khalifa**

On July 29, 2022, in the Eastern District of Virginia, Mohammed Khalifa ("Khalifa") was sentenced to life imprisonment. On December 10, 2021, Khalifa entered a guilty plea to one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, resulting in death. Khalifa is a thirty-nine-year-old Canadian citizen who was captured by the Syrian Democratic Forces ("SDF") in January 2019. Khalifa traveled from Canada to Syria in 2013 to join ISIS as a fighter. Khalifa was appointed to ISIS's central media bureau in April 2014 and attained a key role in the bureau due to his proficiency in Arabic and English. The al-Furqan Foundation for Media Production ("al-Furqan") and the al-Hayat Media Center ("al-Hayat") were prominent elements of the media operation. Al-Furqan released graphic videos displaying violence and executions, including the deaths of a number of individuals taken hostage by ISIS, three of whom were U.S. citizens. Khalifa also became the leader of the English Media Section

and oversaw the work of online supporter networks that were critical to ISIS's ability to produce and disseminate propaganda in multiple languages.

**United States v. Kandic**

On July 14, 2023, in the Eastern District of New York, Mirsad Kandic ("Kandic") was sentenced to life in prison.  On May 24, 2022, Kandic was convicted, after a three-week jury trial, of one count of conspiring to provide material support and resources to a designated foreign terrorist organization resulting in death, in violation of 18 U.S.C. § 2339B(a)(1), and five counts of attempting to provide and providing material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1), including one count resulting in death.  Kandic faced life imprisonment for the two counts of 18 U.S.C. § 2339B(a)(1) resulting in death, and 20 years imprisonment for the other four counts of 18 U.S.C. § 2339B(a)(1).  Kandic was a citizen and national of Kosovo, and a legal permanent resident of the United States.  After multiple attempts to travel to the battlefield from the United States, Kandic and a co-conspirator traveled to Turkey and entered Syria to join ISIS.  Kandic joined a brigade of foreign fighters and fought in at least one battle on behalf of ISIS.  Kandic operated dozens of Twitter accounts for the purpose of disseminating ISIS propaganda and recruitment.  Kandic also used numerous social media application and messaging platforms to seek out ISIS recruits and then advise them on how best to make their hijra to the various ISIS territories to which he trafficked aspiring members. Kandic also procured warfighting equipment for ISIS and facilitated the transfer of funds for the benefit of ISIS.

**United States v. Maalik Jones**

On May 29, 2018, in the Southern District of New York, Maalik A. Jones ("Jones") was sentenced to 35 years' imprisonment. On September 8, 2017, Jones pled guilty to three counts of

a superseding information charging him with: conspiracy to provide material support to al-Shabaab, a foreign terrorist organization, from at least in or about July 2011 up to and including in or about May 2015, in violation of 18 U.S.C. § 2339B; conspiracy to receive military-type training from al-Shabaab, in violation of 18 U.S.C. § 2339D; and using and carrying a firearm (an AK-47 automatic assault rifle) in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). Jones, a United States citizen, traveled via commercial aircraft from New York to Kenya, with stopovers in Morocco and the United Arab Emirates. After arriving in Kenya, Jones traveled by land from Kenya to Somalia where he trained, worked, and fought with al-Shabaab. Among other things, Jones received military training at an al-Shabaab training camp, where he learned to operate an AK-47 assault rifle and rocket-propelled grenades. Jones also became a member of al-Shabaab's specialized fighting force, Jaysh Ayman, and participated in combat against soldiers of the Kenyan government on behalf of al-Shabaab. Jones appeared with other al-Shabaab fighters in at least two videos that were recovered from an al-Shabaab fighter. In one of the videos, Jones possessed a firearm, and is seen with several al-Shabaab fighters who, on June 14, 2015, participated in an attack on a Kenyan Defense Force base in Lamu County, Kenya, during which two Kenyan soldiers were killed.

**United States v. Augustine**

On April 6, 2022, in the Eastern District of New York, Bernard Augustine ("Augustine") was sentenced after a jury trial to 20 years in prison and lifetime supervised release. He was found guilty of one count of attempting to provide material support and resources in the form of personnel to the Islamic State of Iraq and al-Sham ("ISIS"). Augustine traveled to Tunisia in February 2016. Upon his arrival in Tunisia, Augustine attempted to travel to Libya to enter ISIS-controlled territory. He was arrested in Tunisia before he was able to travel into Libya.

Understandably, no two cases are exactly alike. But the facts and circumstances along with the outcomes of the cases listed above demonstrate that a 50-year sentence for defendant Ramic would comport with 18 U.S.C. § 3553(a)(6) and operate to avoid unwanted disparities among defendants who are convicted of similar crimes.

## VI.    CONCLUSION

The United States recommends a sentence 50 years in prison, a sentence that is within the sentencing guidelines range, in order to protect the public, punish Ramic, and deter others who would seek to join violent terrorist organizations.

<table>
<tr><td>SUE BAI<br>SUPERVISORY OFFICIAL PERFORMING<br>THE DUTIES OF THE ASSISTANT<br>ATTORNEY GENERAL FOR THE<br>NATIONAL SECURITY DIVISION</td><td>MICHAEL A. BENNETT<br>UNITED STATES ATTORNEY</td></tr>
</table>

By:    */s/ Kevin C. Nunnally*
    Kevin C. Nunnally
    Trial Attorney
    National Security Division
    Department of Justice
    950 Pennsylvania Avenue
    Washington, DC 20530
    Telephone: (202) 514-2007

By:    */s/ Joshua D. Judd*
    Joshua D. Judd
    Christopher Tieke
    Assistant United States Attorneys
    U.S. Attorney's Office
    Western District of Kentucky
    717 West Broadway
    Louisville, KY 40202
    Telephone: (502) 582-5911

## CERTIFICATE OF SERVICE

On April 2, 2025, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel for the Defendants.

    */s/ Joshua D. Judd*
    Joshua D. Judd
    Assistant United States Attorney