**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT BOWLING GREEN**
**(Filed Electronically)**


**CRIMINAL ACTION NO. 1:21CR-13-GNS**
**UNITED STATES OF AMERICA,**                                            **PLAINTIFF,**


**vs.**


**MIRSAD RAMIC,**                                                        **DEFENDANT.**


### SENTENCING MEMORANDUM OF DEFENDANT


**May it please the Court:**

#### Interview and Evaluation of Defendant

Throughout this sentencing memorandum, reference will be made to the interview and psychological evaluation of defendant conducted by Dr. Patti van Eys, Ph.D. Although said interview and evaluation, as well as Dr. van Eys's curriculum vitae, were filed in the record herein on January 6, 2025 (Interview and Evaluation, DN 291), both are attached hereto as Exhibit A and Exhibit B and incorporated herein by reference for the convenience of the Court. Exhibit A will hereinafter be referred to as "Interview and Evaluation".

#### Summary

For the reasons stated below, the 12 level enhancement in offense level and the fixed criminal history category of VI required by U.S.S.G. §3A1.4 do not apply to defendant because his offense was not calculated to and did not influence or affect the conduct of a

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

government within the meaning of U.S.S.G. §3A1.4. Without the application of U.S.S.G. §3A1.4, defendant's total offense level is 28 instead of 40 and his criminal history category I instead of VI, for an advisory guideline sentencing range of 78 to 97 months. As suggested by the presentence report, the Court should downward depart or vary *at least 68 months* from this sentencing range pursuant to either U.S.S.G. §5K2.23 or §5K2.0(a)(2) to adjust Mr. Ramic's sentence for the discharged term of imprisonment he has already served for related offenses in Turkey.[1] (Presentence Report, DN 297 [hereinafter referred to as "PSR"] ¶¶104-106). This will make his effective guideline range 10 to 29 months, which is substantially less than the jail credit due him for his approximately 40 months (39 months and 29 days) pre-trial and pre-sentencing detention by the United States as of April 14, 2025, the scheduled day of sentencing herein. Accordingly, the Court should sentence defendant to a total term of time served to be followed by a life term of supervised release. Upon his release from custody, the defendant's naturalized citizenship will be revoked pursuant to 8 U.S.C. §§1424 and 1451; and he will be summarily deported to his native Bosnia-Herzegovina with denial of any re-entry into the United States.

As required by 18 U.S.C. §§3553(a)(1) and (a)(2), this recommended sentence properly takes into consideration the nature and circumstances of the offense; the history and characteristics of the defendant; and the need of the sentence to 1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for his offenses; 2) afford adequate deterrence to criminal conduct; 3) protect the public from further crimes

---

[1] As argued more fully below, 68 months is the *minimum* amount by which Mr. Ramic's sentence should be adjusted downward by reason of his imprisonment in Turkey for conduct related to the instant federal offense.

Office of the Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

of the defendant; and 4) provide needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. A higher custodial sentence will not satisfy to any greater degree the statutory purposes of sentencing set forth in 18 U.S.C. §3553(a)(2). Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. §3553.

### The Charges of Conviction

Defendant has been convicted of three felony counts arising out of his joining and receiving military-type training from "the Islamic State of Iraq and al-Sham ('ISIS')" wholly within the territory of Syria from June 11, 2014, to September 6, 2015, specifically 1) Providing Material Support to a Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339B(a)(1); 2) Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339B(a)(1); and 3) Receiving Military-Type Training from a Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339D(a).

18 U.S.C. §§2339B (Counts 1 and 2) prohibits "knowingly" providing "material support or resources to a foreign terrorist organization" or conspiring to do so. 18 U.S.C. §2339D (Count 3) prohibits "knowingly" receiving "military-type training from or on behalf of any organization designated at the time of the training by the Secretary of State . . . as a foreign terrorist organization". To violate either statute "a person must have knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism. . . ." 18 U.S.C. §§2339B(a)(1) and 2339D(a).

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

3

Of fundamental significance to the sentencing in this case is the fact that each of the charged offenses required the jury to find beyond a reasonable doubt that in supporting, conspiring to support, or receiving training from "the Islamic State of Iraq and al-Sham", defendant must have had

> knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism. . . .

18 U.S.C. §§2339B(a)(1) and 2339D(a). The Court correctly instructed the jury that at least one of these three alternative specific intent elements had to be unanimously found in order for it to convict.

> The government must also prove that the defendant had one or more of the following three types of knowledge: (A) knowledge that ISIS had been designated by the Secretary of State as a foreign terrorist organization, or (B) knowledge that ISIS engaged in or engages in "terrorist activity," or (C) knowledge that ISIS engaged in or engages in "terrorism.

(Jury Instructions, DN 261, PageID #4032, #4039, and #4042). The United States alleged and initially argued at trial all three theories of specific knowledge. However, as the evidence developed, it became obvious from cross-examination of the government's own expert witness, Dr. Lorenzo Vidino, that defendant could not have known that the Secretary of State had designated the Islamic State of Iraq and al-Sham to be a foreign terrorist organization.

> Q.    How does an organization become a designated foreign terrorist organization in the United States?
>
> A.    It's a process run by the state department which makes an assessment based on intelligence, on evidence, and if certain legal requirements are met, it designates an organization as such, and it publishes its finding in the Federal Register.

Office of the Federal Defender 200 Theatre Building 629 Fourth Avenue Louisville, KY 40202

Tel (502) 584-0525 Fax (502) 584-2808

4

Q.    And what is the Federal Register?

A.    It's sort of the publications of records of the US government, where laws, announcements are made by the federal government.

Q.    So the Secretary of State, by law, is authorized to, on his or her own, make that determination that this organization is or is not a foreign terrorist organization, correct?

A.    It's a process done together with the -- with intelligence agencies, obviously, with the White House, but it's led by the state department.

Q.    Oh, sure. Sure. Oh, sure. But by law, it's the Secretary of State's job to make that designation?

A.    Correct.

Q.    And once the Secretary of State makes that designation, how does he go about -- or she go about informing people, "I have made this determination"? The Federal Register, correct?

A.    Federal Register, and it's published on the state department's website.

Q.    Eventually.

A.    Yeah.

Q.    But it really doesn't become effective until it's in the Federal Register?

A.    Correct.

Q.    And then later, it might appear in a press release or on the state department website or something of that nature, but the official way you tell people, "This is a federal terrorist organization," is through the Federal Register, isn't it?

A.    Correct.

MR. WENDELSDORF:    Your Honor, at this time, I'll offer into evidence Defendant's Exhibit 5, which is a copy of Volume 79, Number 94 of the Federal Register dated May 15th, 2014, and I'd like to ask the witness, if Your Honor accepts it, about one page of that document.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

5

MR. JUDD:  No objection.

THE COURT:  All right. It will be admitted.

(Defendant's Exhibit 5 admitted in evidence.)

. . . .

BY MR. WENDELSDORF:

Q.      I show you the Federal Register, Volume 79, Number 94, dated Thursday, May 15th, 2014. Notices, page 27972, and in there, you will see the public notice of the Secretary of State  concerning his designation of foreign terrorist organizations.

        And included in that -- there we go. Included in that is, "Therefore, pursuant to section 219(b) of the INA, as amended, 8 USC 1189(b), I hereby amend the designation of al-Qaida in Iraq as a foreign terrorist organization to include the following new aliases: Islamic state of Iraq and the Levant, and also known as Islamic state of Iraq and al-Sham."

        This was the notice that the Islamic State of Iraq and al-Sham, which is what the defendant is accused of supporting and taking military training from is a foreign terrorist organization, you would agree with that?

A.      Well, yes and no. I mean, it updates. It simply follows the name change.

Q.      I agree. And you went into that, I believe. Al-Qaeda and Iraq morphed into these other forms and these aliases, but if an individual is looking to find whether or not the Islamic State of Iraq and al-Sham is a foreign terrorist organization, this is where they would have to have come to get the official notice. You would agree with that?

A.      Yes.

Q.      And that was published on May 15th, 2014, in the Federal Register, correct?
A.      Correct.

Q.      The government is alleging that the defendant left for Syria to join the Islamic state of Iraq and al-Sham on Sep -- on June 3rd, 2014, approximately

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

6

two weeks later. Any other official notice that you're aware of that the state department gives? Official notice.

A.     No.

(Transcript of Cross-Examination of Lorenzo Vidino, pp. 30-33 (DN 279, PageID #4242-#4245). *The government eventually conceded that it had no evidence that defendant was aware of—i.e., had the required specific knowledge of—the Secretary of State's designation of the Islamic State of Iraq and al-Sham as a foreign terrorist organization.* The United States explicitly abandoned the allegation in its closing argument, asking the jury instead to consider *only the other two types of specific knowledge* in determining defendant's guilt.

> As part of the jury instructions, we have to prove knowledge, that Mr. Ramic had knowledge that ISIS engaged in or engages in terrorist activity and that he had -- or, alternatively, that he had knowledge that ISIS had engaged in or engages in terrorism activity.
>
> This first one here[2], we're not going to ask you to find him guilty on that. It requires us to prove that somebody knew something was a designated foreign terrorist organization. That's put into a Federal Register. It's probably 600-plus long. We don't expect people to read that.

(DN 292 PageID #4503-#4504).

The jury instructions were given prior to the government's abandonment of the "designated foreign terrorist organization" knowledge element and contained no interrogatories. Nevertheless, for sentencing purposes, the Court should conclude, as did the government and, presumably, the jury itself, that defendant has been convicted of acting

---

[2] The Court will recall that the government used a PowerPoint slide during its closing argument listing the three types of specific knowledge mentioned in the jury instructions: (A) knowledge that ISIS had been designated by the Secretary of State as a foreign terrorist organization, or (B) knowledge that ISIS engaged in or engages in "terrorist activity," or (C) knowledge that ISIS engaged in or engages in "terrorism.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

7

only with the specific knowledge that the Islamic State of Iraq and al-Sham engaged in "terrorist activity" and/or the specific knowledge that it engaged in "terrorism", but <u>not</u> the specific knowledge that it had been designated by the Secretary of State as a foreign terrorist organization.

## The Statutory Penalties

The material support and conspiracy charges each carry a maximum sentence of 20 years imprisonment, a maximum fine of $250,000, and up to a life term of supervised release. The charge of receiving military-style training carries a maximum sentence of 10 years imprisonment, a maximum fine of $250,000, and up to a life term of supervised release. None of the charges carries a mandatory minimum sentence.

## The Offense Conduct

Defendant has been found guilty of joining and receiving military-type training from "the Islamic State of Iraq and al-Sham", knowing that it "engaged in or engages in 'terrorist activity'" and/or that it "engaged in or engages in 'terrorism'". While the government initially alleged that defendant also knew that the Islamic State of Iraq and al-Sham "had been designated by the Secretary of State as a 'foreign terrorist organization'", it abandoned this allegation at trial and asked the jury to disregard it in light of evidence elicited from its own expert witness that the only notice of this designation by the Secretary of State—official or otherwise—was an obscure "public notice" buried on page number 27,972 of the Federal Register of May 15, 2014, of which the government could offer no proof that defendant had knowledge. (DN 292 PageID #4503-#4504).

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

8

The proof at trial showed that defendant went to Syria and joined the Islamic State of Iraq and al-Sham. The evidence showed and the PSR correctly acknowledges that defendant did not join the organization until he was actually in Syria. (PSR ¶22). While a member of the Islamic State of Iraq and al-Sham—and wholly within Syria—he received military-type training from the organization and participated in combat operations in the Syrian civil war against forces aligned with the now deposed and exiled war criminal Bashar al-Assad[3] "and against the Kurdistan Worker's Party (PKK), a separatist militant organization designated as a Foreign Terrorist Organization by the U.S. government." (PSR ¶¶23, 49).

Disillusioned by the hypocrisy, lies, and corruption he found in Syria, defendant renounced the Islamic State of Iraq and al-Sham and its leaders, was branded a traitor by the organization, and risked his life to escape Syria, fleeing to Turkey on September 6, 2015, where he was immediately arrested, tried, convicted, and imprisoned for five years and seven months by Turkey for his support of the Islamic State of Iraq and al-Sham while in Syria, clearly offense conduct related to the instant charges of conviction. (PSR ¶¶102-104).

### The Presentence Report Guideline Calculations

The PSR groups all three offenses of conviction into a single group for guideline calculation purposes. (PSR ¶47). The base offense level for the group is deemed to be 26

---

[3] Assad fled Syria in December, 2024, and is now living in Russia under the protection of its equally vile leader, Vladimir Putin. There are two outstanding arrest warrants against Assad for war crimes (see https://www.reuters.com/world/france-issues-new-arrest-warrant-syrias-assad-source-2025-01-22/) and he is under investigation for war crimes by the International Court of Justice. (See https://www.nytimes.com/2023/10/11/world/middleeast/icj-syria-torture-human-rights-case.html).

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

9

pursuant to U.S.S.G. §2M5.3. (PSR ¶48). To this are added two levels pursuant to U.S.S.G. §2M5.3(b)(1) on the grounds that defendant intended to engage in combat while in Syria (PSR ¶49) and 12 levels pursuant to U.S.S.G. §3A1.4(a) on the grounds that defendant's actions while a member of the Islamic State of Iraq and al-Sham in Syria were "calculated to influence or effect (sic) the conduct of a foreign government (Syria) by intimidation or coercion". (PSR ¶50). No other government is identified by the PSR as having been affected, a finding to which the United States has not filed or made any objection. This makes the total offense level according to the PSR 40. (PSR ¶56).

Defendant has 1 criminal history point by virtue of a 25 year old traffic offense and would ordinarily be deemed a criminal history category I. (PSR ¶¶61-62 ). However, the PSR deems him to be a criminal history category VI pursuant to the fixed criminal history category mandated by U.S.S.G. §3A1.4(b). (PSR ¶62).

A total offense level of 40 and a criminal history category of VI results in an advisory guideline sentencing range of 360 months to life, Zone D, subject to the statutory maximum sentence of 50 years. (PSR ¶85). The Sentencing Commission's Judiciary Sentencing Information (JSIN) data shows that for similarly situated defendants "the average length of imprisonment imposed was 220 months and the median length of imprisonment imposed was 168 months. (PSR ¶87).

The PSR correctly notes that "defendant was imprisoned in a foreign country for at or near 5 years and 7 months (67 months) for conduct related to the instant federal offenses" and suggests that a downward departure pursuant to either U.S.S.G. §5K2.23 or

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

10

§5K2.0(a)(2) for this "discharged term of foreign imprisonment" may be considered by the Court. (PSR ¶¶104-105).

Lastly, the PSR acknowledges receipt and review of the interview and psychological evaluation of defendant conducted by Dr. Patti van Eys, Ph.D. (DN 291, attached hereto as Exhibit A and Exhibit B) and incorporates a summary of same. (PSR ¶¶73-74).

### Objections to the Presentence Report

Defendant filed timely objections to the preliminary Presentence Report. (DN 285) and reiterates same.

Defendant's primary objection to the Presentence Report is the application of the 12 level terrorism enhancement of U.S.S.G. §3A1.4 and the fixed criminal history category of VI that section requires. (PSR ¶¶49-50). The Probation Officer's response to this objection merely states that "courts across the United States have routinely held the enhancement applies to defendants convicted of providing material support to *designated foreign terrorist organizations*". (PSR, Addendum, p.3) (emphasis added).  Two points in response.

First, as conclusively established *supra* at pp. 4-7, **defendant was not convicted of providing material support to an organization knowing that it was a "designated foreign terrorist organization"**. The evidence at trial clearly showed *and the United States conceded* that Mr. Ramic could not have had the requisite specific knowledge that the Islamic State of Iraq and al-Sham was a "designated foreign terrorist organization"—an essential element of the offense—even going so far as to actually tell the jury in no uncertain terms that it could not and should not convict the defendant on those grounds, but should

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

11

restrict its deliberations only to *the other two types of specific knowledge* in determining defendant's guilt. (DN 292 PageID #4503-#4504)

Second, the Probation Officer's response is inapposite to the issue raised herein. Each of the defendants in the cases cited by the PSR intended to and did influence or affect the conduct of a specific government or retaliate against the conduct of a specific government. The sole "government" identified by the PSR and the United States that was affected by defendant's offense conduct was the so-called "Syrian government led by President Bashar al-Assad" (PSR ¶¶23, 49-50), and that is insufficient to trigger application of §3A1.4 for the simple reason that there was no "Syrian government led by President Bashar al-Assad" because it was not recognized as such by the United States. Accordingly, the terrorism enhancement does not apply to defendant's case.

### I.
### U.S.S.G. §3A1.4 Does Not Apply to Defendant's Case

To apply the enhanced offense level and fixed criminal history category of U.S.S.G. §3A1.4, the guideline requires that defendant's violations of 18 U.S.C. §§2339B and 2339D were "calculated to influence, or affect the conduct, of government by intimidation or coercion". The <u>sole</u> reason given by the PSR for assessing the enhancement in this case is its finding that defendant fought "against military forces under the government led by Syrian president Bashar al-Assad" (PSR ¶23) and that, therefore, "[t]he defendant's offenses were calculated to influence or effect (sic) the conduct of a foreign government (Syria) by intimidation or coercion". (PSR ¶50). *No "government" other than Syria is identified by*

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

*the PSR or by the United States as having been influenced or affected by defendant's offense conduct.*

This is significant for the reason that in 2014 and 2015, there was, in fact, no "government led by Syrian president Bashar al-Assad" because the United States did not recognize the Assad regime as the "government" of Syria; and only entities recognized as governments by the United States are "governments" within the meaning of  U.S.S.G. §3A1.4. Accordingly, the enhancement does not and cannot apply to Mr. Ramic.

## A. The Necessary Elements of §3A1.4

U.S.S.G. §3A1.4 provides in pertinent part that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels" and that "[i]n each such case, the defendant's criminal history category . . . shall be Category VI". U.S.S.G. §§3A1.4(a) and (b). What is important here—vital, in fact—is the definition of "federal crime of terrorism". The guideline provides in Application Note No. 1 that "[f]or purposes of this guideline, **'federal crime of terrorism'** has the meaning given that term in 18 U.S.C. §2332b(g)(5)". 18 U.S.S.G. §3A1.4, Application Note 1 (emphasis in the original). The referenced 18 U.S.C. §2332b(g)(5) defines "federal crime of terrorism" in pertinent part as follows:

(5) the term "federal crime of terrorism" means an offense that—

> (A) is calculated to influence, or affect the conduct, of government by intimidation or coercion, or to retaliate against government conduct; ***and***
>
> (B) is a violation of—

OFFICE OF THE
FEDERAL DEFENDER
200 THEATRE BUILDING
629 FOURTH AVENUE
LOUISVILLE, KY 40202

TEL (502) 584-0525
FAX (502) 584-2808

> (I) section . . . 2339B (relating to providing material support to terrorist organizations) . . . 2339D (relating to military-style training from a foreign terrorist organization . . . .

18 U.S.C. 2332(b)(g)(5) (emphasis added).

In short, to be a "federal crime of terrorism" for purposes of U.S.S.G. §3A1.4, it is not enough that an offense constitute one of the enumerated violations standing alone. The offense conduct must also be done "with specific intent . . . calculated to influence, or affect the conduct, of government by intimidation or coercion, or to retaliate against government conduct". United States v. Away, 607 F.3d 306, 317 (2nd Cir. 2010) (citing 18 U.S.C. §2332(b)(g)(5)(A)); *Cf.* United States v. Noble, 246 F.3d 946, 953 (7th Cir. 2001), United States v. Sarks, 309 F.3d 1017, 1026 (7th Cir. 2002).

Three requirements, then*, all three of which must be met before the enhancement applies*:

1. The offense conduct must have been one of the enumerated offenses; *and*

2. The offense conduct must have influenced or affected a government; *and*

3. The motive of the defendant must have been to influence or affect that government.

Clearly, defendant meets the first requirement. His offense conduct was a violation of enumerated offenses, i.e., 18 U.S.C. §2339B and 18 U.S.C. §2339D. However, he does <u>not</u> meet either of the remaining two requirements. Accordingly, the §3A1.4 enhancement and mandatory criminal history category do not apply to Mr. Ramic's case.

**B. Defendant's Offense Conduct Did Not and Was Not Intended to Influence or Affect a "Government" Within the Meaning of §3A1.4**

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

14

Without any objection or additions by the United States or the probation officer—timely or otherwise—the Presentence Report identifies only two entities as allegedly having had their conduct influenced or affected by the defendant's offense conduct—Syria and the Kurdistan Worker's Party (PKK). As the PSR itself put it:

> At the time of his arrival, Syria was in the throes of civil war amongst several belligerents. ISIS fought a war against two enemies on two fronts: against military forces under the government led by Syrian president Bashar al-Assad; and against the Kurdistan Worker's Party (PKK), a separatist militant organization designated as Foreign Terrorist Organization by the U.S. Government.

(PSR ¶23). Clearly, the PKK was not a "government" for purposes of §3A1.4, as evidenced by the Court's taking judicial notice that at all times relevant to the case the PKK was just another designated foreign terrorist organization like the Islamic State of Iraq and al-Sham. The sole "government" which defendant allegedly calculated to influence or affect the conduct of is Syria. Id.

> The defendant's offenses were calculated to influence or effect the conduct of a foreign government (Syria) by intimidation or coercion.

PSR ¶50.

The problem is that there was in fact no "government led by Syrian president Bashar al-Assad" as claimed by the Presentence Report. Indeed, Assad's regime was not a government at all. For the Assad regime to be considered a "government" for purposes of §3A1.4, it must have been recognized as the government of Syria by the United States. And it was not.

Determining what is or is not a government is not within the province of courts—or probation officers. It is exclusively for the Executive Branch of government to determine

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

what foreign powers, regimes, groups, or movements will be recognized or not recognized as legitimate governments, and these determinations are "conclusive on the judicial department". <u>Zivotofsky v. Kerry</u>, 576 U.S. 1 (2015). Accordingly, this Court must look to whether from June 11, 2014, to September 6, 2015, the Executive Branch, i.e., the President, recognized the Assad regime as the "government" of Syria. As the Supreme Court has held:

> Recognition is a "formal acknowledgment" that a particular "entity possesses the qualifications for statehood" or "that a particular regime is the effective government of a state." Restatement (Third) of Foreign Relations Law of the United States §203, Comment a, p. 84 (1986). It may also involve the determination of a state's territorial bounds. See 2 M. Whiteman, Digest of International Law § 1, p. 1 (1963) (Whiteman) ("[S]tates may recognize or decline to recognize territory as belonging to, or under the sovereignty of, or having been acquired or lost by, other states"). Recognition is often effected by an express "written or oral declaration." 1 J. Moore, Digest of International Law § 27, p. 73 (1906) (Moore). It may also be implied—for example, by concluding a bilateral treaty or by sending or receiving diplomatic agents. Ibid.; I. Brownlie, Principles of Public International Law 93 (7th ed. 2008) (Brownlie).
> . . . .
> [T]he President since the founding has exercised this unilateral power to recognize new states—and the Court has endorsed the practice. See *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Pink, supra*, at 229, 62 S.Ct. 552; *Williams v. Suffolk Ins. Co.*, 13 Pet. 415, 420, 10 L.Ed. 226 (1839). Texts and treatises on international law treat the President's word as the final word on recognition. *See, e.g.*, Restatement (Third) of Foreign Relations Law §204, at 89 ("Under the Constitution of the United States the President has exclusive authority to recognize or not to recognize a foreign state or government") . . . .

<u>Id</u>, at pp. 11, 15. Derecognition is effected when a government recognizes another regime as the government of a state. Restatement (Third) of Foreign Relations Law of the United States §203, Comment f (1986).

There can be no doubt whatsoever that during the times relevant to this case—2014 to 2015—the Assad regime was not recognized by the United States as the government of

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

16

Syria. Specifically, on December 11, 2012, the United States followed the actions of France, Britain, Turkey, and the Gulf States a month before in derecognizing the Assad regime as the legitimate government of Syria and recognizing the Syrian National Opposition Coalition (SNOC) in its place as the legitimate government of the country. As President Obama declared at the time:

> We've made a decision that the Syrian opposition coalition is now inclusive enough, is reflective and representative enough of the Syrian population that we consider them the legitimate representative of the Syrian people in opposition to the Assad regime . . . .[4]

No longer being considered the "government" of Syria, the Assad regime's former embassy in the United States was closed and "shuttered"[5] and the SNOC was allowed to open a "foreign mission" or embassy in the United States in its place.[6]

So, prior to defendant traveling to Syria and joining the Islamic State of Iraq and al-Sham and at all times that he was a member of that organization in Syria and fought against the regime of Bashar al-Assad in Syria, that regime was not a "government" recognized as such by the United States. The President had explicitly declared that the United States "no

---

[4] See https://web.archive.org/web/20230725095557/https://www.reuters.com/article/us-syria- usa-obama-idUSBRE8BA1GU20121212. See also USA Today, which reported that "President Obama announced Tuesday that he was recognizing the new Syrian opposition council as the sole legitimate representative of the Syrian people. Found at https://web.archive.org/web/20230119094916/https://www.usatoday.com/story/news/world/2012/12/11/al-nusra-designated-terrorists/1760755/.

[5] See https://web.archive.org/web/20201021042357/https://www.thenationalnews.com/world/syrian-opposition-offices-get-us-diplomatic-recognition-1.244878.

[6] "State Department spokeswoman Marie Harf said the representative offices of the coalition would now be considered a "foreign mission" under U.S. law." https://www.reuters.com/article/world/us-recognizes-syria-opposition-offices-as-foreign-mission-idUSBREA440R2/.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

17

longer recognized the Assad regime as the legitimate government of the Syrian people". The President also fulfilled the second requirement of the Restatement by recognizing the SNOC as the government of Syria, and then permitting the SNOC to establish a diplomatic mission in Washington, D.C. Taken together, these actions fulfilled the requirements of the Restatement for derecognition by the United States of the Assad regime as the government of Syria. This Court is bound by that determination of the Executive Branch of government and must find that at the times relevant to this case, the Assad regime was not a "government" within the meaning of U.S.S.G. §3A1.4. Indeed, it was just another non-governmental foreign terrorist organization, like the PKK.

In sum, the Presentence Report correctly concludes—and the United States has not objected to the finding—that the only entities that Mr. Ramic calculated to influence or affect by joining the Islamic State of Iraq and al-Sham were "the military forces under the government led by Syrian president Bashar al-Assad" (PSR ¶¶23) and that Assad's regime was the *only* alleged "government" that defendant's "offenses were calculated to influence or effect (sic) the conduct of . . . by intimidation or coercion". (PSR ¶¶49-50). Neither the PSR nor the prosecution identifies any other "government" Mr. Ramic's actions influenced or affected other than Assad's regime in Syria. And it is too late in the day—some 10 months after trial, some 7 months past the deadline for objecting to the preliminary PSR, and some 2½ months after the filing of the final PSR—for either to challenge this fact.

Where the Presentence Report errs, however, is in its conclusion that the Assad regime was a "government" for purposes of §3A1.4. As conclusively established above, the Assad regime was not a "government" because it was not recognized as such by the United

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

18

States. The only legitimate government in the territory of Syria, according to the President, was "the Syrian National Opposition Coalition" which was also fighting against Assad's non-recognized regime and against which defendant took no action. Therefore, actions against the Assad regime in Syria did not implicate a governmental interest necessary for imposition of the terrorism enhancement.

In sum, as the Presentence Report correctly concludes—and the United States has not objected to that finding—the only entity that Mr. Ramic calculated to influence or affect by joining the Islamic State of Iraq and al-Sham was Assad's regime in Syria (PSR ¶¶23, 49-50), and that regime was not a government for purposes of §3A1.4 because it was not recognized as such by the United States. The only legitimate government in the territory of Syria, according to the President and the Secretary of State, was "the Syrian National Opposition Coalition". Accordingly, the enhancement of U.S.S.G. §3A1.4 does not apply to Mr. Ramic's case.

## II.
## Criminal History Category[7]

As established above, defendant's criminal history category should be I, since the fixed criminal history category of VI required by U.S.S.G. §3A1.4 does not apply to defendant's case. Another independent and separate reason that a criminal history category of VI should not apply to defendant is that a CHC VI "substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will

---

[7] Note: Consideration of this departure will not be necessary if the Court sustains, as it should,  defendant's objection to application of the terrorism enhancement of U.S.S.G. §3A1.4.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

19

commit other crimes.". U.S.S.G. §4A1.3(b)(1). Mr. Ramic's criminal history consists entirely of a single 16 year old misdemeanor conviction for traffic offenses. (PSR ¶61). Even if §3A1.4 were to apply to defendant—which it demonstrably does not—a departure to a criminal history category I is compelled by an examination of the purpose and methodology behind the Guideline's criminal history calculations.

But for the arbitrary and erroneous assignment of a criminal history category VI to Mr. Ramic, he would be a criminal history category I and be deemed a low risk of re-offending. He has only one criminal history point. What does that mean? The Sentencing Commission's criminal history category is not just an arbitrary ranking system pulled out of thin air. Rather, the purpose and methodology of the Sentencing Commission's criminal history category calculation are to accurately assess the true seriousness of a defendant's criminal history and, more importantly, *the likelihood that he or she will commit other crimes in the future*.

> To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation.

U.S.S.C. Guidelines Manual, Chapter Four-Criminal History and Criminal Livelihood, Part A-Criminal History, Introductory Commentary. The factors relied upon by the Commission for the assignment of criminal history points to a particular conviction (i.e., the nature of the offense, the severity of the sentence, and the length of time that has passed since the conviction or release from imprisonment) and the aggregation of those points into a criminal history category for sentencing purposes are not arbitrary. They are based on "extant

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

20

empirical research assessing correlates of recidivism and patterns of career criminal behavior". (Id.). Applying this "extant empirical research", the Sentencing Commission deems those in criminal history category I—and thus Mr. Ramic—to be the lowest risk of re-offending.

The arbitrary assignment by U.S.S.G. §3A1.4 of a criminal history category VI in every case defenestrates the whole rationale and methodology behind criminal history category calculations. What is the "extant empirical research assessing correlates of recidivism and patterns of career criminal behavior" that went into the knee-jerk assignment of a criminal history category VI to every defendant convicted of a terrorism offense? In a word, none. It is nothing more than a groundless assumption that foreign fighters returning to the United States are likely to commit new acts of terrorism, i.e., recidivism. Reliable studies of returning so-called jihadist travelers like defendant by none other than the George Washington University Program on Extremism, of which the government's own expert witness, Dr. Lorenzo Vidino, is the Director, puts the lie to the assumption.

> [T]he risk of returned travelers being engaged in terrorist attacks has, to date, been limited. There have been 22 jihadist attacks from 2011 to 2017; none of them were committed by a perpetrator who was known to have traveled to Syria and Iraq to join jihadist groups. Thus, "homegrown" extremists currently appear to be more likely to commit domestic jihadist attacks than returning travelers.

The Travelers, American Jihadists in Syria and Iraq, February, 2018, Program on Extremism, George Washington University, p. 2.

Plus, the proof is in the pudding. Literally for years before he fled the United States for Syria, Mr. Ramic was under continuous, invasive, and intensive surveillance by the FBI.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

21

The Court will recall the testimony at trial by FBI agents which revealed multiple interviews and interrogations, surreptitious searches of defendant's residence and computer, monitoring of his social media activity, monitored telephone conversations, searches of his mail, review of bank records, monitoring of associates, physical surveillance of a trip to North Carolina, paid informants providing reports of his on-line activity, paid informants befriending him in an effort to extract information, monitoring of books checked out or read by him at the library, following his mother and sister and reporting on their activities, continuous physical surveillance of his apartment, and even installation of a pole camera outside his home to monitor his activities from June 11, 2012 through October 7, 2012, and again from February 12, 2013 thru August 30, 2013. All of this, *and not the first evidence of illegal conduct of any kind.* The only evidence of criminal conduct by Mr. Ramic in this record is his 16 year old conviction for misdemeanor driving on a suspended license, failing to maintain insurance, and disregarding a traffic light. Criminal history category VI, indeed! The Court should deem him a criminal history category I.

### The Appropriate Guideline Calculation

For the reasons set forth above, the Court should deem defendant to have a total offense level of 28 and a criminal history category of I, for an advisory guideline sentencing range of 78 to 97 months, Zone D. From this range, the Court should subtract—at the very minimum—five years and eight months pursuant to either U.S.S.G. §5K2.23 or §5K2.0(a)(2) as suggested in PSR ¶¶102-104 for defendant's discharged term of imprisonment in Turkey for conduct related to the instant federal offenses. This would make defendant's final advisory sentencing range 10 to 29 months. Five years and eight months

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

22

is the *minimum* amount by which Mr. Ramic's sentence should be adjusted downward by reason of his imprisonment in Turkey for conduct related to the instant federal offenses. That term was served at the infamous Kirikkale Prison[8] and involved torture, inhumane treatment, and gross physical and emotional deprivation in violation of the minimum standards that would have been afforded him had the term been served in the United States or any other civilized country. See Interview and Evaluation, pp. 14-16.[9] The inhumane

---

[8] Kirikkale Prison is an F-Type Turkish prison. These are high security prisons used for the execution of sentences such as defendant's. Amnesty International has issued several reports documenting atrocities in F-Type prisons. See, for example, International Europe and Central Asia Summary of Amnesty International's Concerns in the Region July-December 2006, pp. 84-85, *found at https://www.amnesty.org/en/ documents/eur44/ 001/2008/en/,* which included the following:

"Six years on from the opening of the F-type prisons, serious complaints about the regime in these prisons continued... Prisoners, their lawyers and human rights groups continued to raise concerns about harsh and arbitrary disciplinary punishments meted out to prisoners in F-type prisons and reported treatment of prisoners which, in some cases, AI would consider as amounting to term cruel, inhuman and degrading."

[9] See also "Torture, Inhuman Treatment and Conditions in Turkish Prisons: 2023 in Review" from the Stockholm Center for Freedom, found at *https://stockholmcf.org/ torture-inhuman-treatment-and-conditions-in-turkish-prisons-2023-in-review/.* As the report concludes concerning prison conditions during the period of defendant's incarceration:

"Turkey has experienced a marked resurgence of torture and ill-treatment in custody over the past seven years and especially since a coup attempt on July 15, 2016. Lack of condemnation from higher officials and a readiness to cover up allegations rather than investigate them have resulted in widespread impunity for the security forces.

"The enormous gulf between Turkey's constitutional provisions for the protection of human rights and the grim reality on the ground continued to grow during the year. Several reports from rights groups addressed the issue of torture and other cruel, inhuman or degrading treatment and underlined the fact that some police officers, prison authorities and military and intelligence units employed these practices."

OFFICE OF THE
FEDERAL DEFENDER
200 THEATRE BUILDING
629 FOURTH AVENUE
LOUISVILLE, KY 40202

TEL (502) 584-0525
FAX (502) 584-2808

hardships endured by Mr. Ramic during his imprisonment in Kirikkale Prison included routine torture and beatings, daily deprivation and humiliation, untreated physical injuries, mock executions, forced consumption of urine, extreme and unsafe environmental conditions, lack of food for extended periods, and unsanitary conditions. Id. In fashioning a total sentence that constitutes "just punishment" as required by 18 U.S.C. §3553(a)(2)(A), the Court should consider the five years and eight months served in Turkey to be a greater and much more severe punishment than would have been the same term served in the United States. Accordingly, the departure for this discharged term of imprisonment should be significantly greater than five years and eight months in order to achieve a reasonable total punishment for his offense conduct.

### Determining the Appropriate Sentence

Whatever offense level, criminal history category, and resulting advisory sentencing range the Court deems appropriate under the Federal Sentencing Guidelines, that range is not binding on the Court, but is only one of the many sentencing factors to be considered by the Court in crafting an appropriate sentence.

The Sentencing Reform Act, 18 U.S.C. §3553, not the Federal Sentencing Guidelines, control sentencing. While 18 U.S.C. §3553(a)(4) requires the Court to consider the guidelines in imposing sentence, the guidelines must not be treated as mandatory or even presumptively correct. Gall v. United States, 552 U.S. 38, 49, 51 (2007); Nelson v. United States, 555 U.S. 350, 352 (2009). Under 18 U.S.C. §3553(a), the advisory guideline sentencing range is only "one factor among several" to be considered in imposing an appropriate sentence. Kimbrough v. United States, 552 U.S. 85, 90 (2007). The other

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

co-equal factors a sentencing court must consider in addition to the guidelines are the nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. §3553(a)(1)); the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. §3553(a)(6)); and the need of the sentence 1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 2) to afford adequate deterrence to criminal conduct; 3) to protect the public from further crimes of the defendant; and 4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2). The Court must "consider all of the §3553(a) factors", "make an individualized assessment based on the facts presented", Gall, 552 U.S. at 49-50, and explain how the facts relate to the statutory purposes of sentencing. Id., at 53-60; Pepper v. United States, 562 U.S. 476, 491- 494 (2011).

In determining what sentence should be imposed for crime, prosecutors, probation officers, and the guidelines themselves focus almost exclusively on just one of the many §3553(a)(2) factors—punishment—to the exclusion of all of the others. But in enacting the Sentencing Reform Act, Congress did "not favor [ ] one purpose of sentencing over another". See S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case". Id., at 68. In choosing what kind of sentence to impose, the Court "must consider" all of the purposes and factors set forth in §3553(a), not just punishment or the advisory guideline sentence. Id., at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

25

after balancing all the relevant considerations." Id. Presumably, that directive applies to determining the length and type of a sentence as well.

After considering all of the factors set forth in §3553(a)—not just the advisory Federal Sentencing Guidelines—the Court must impose a sentence that is "sufficient but not greater than necessary" to satisfy all of the statutory purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation of the defendant in the most effective manner. 18 U.S.C. §3553(a). This so-called "parsimony provision" represents the "overarching" command of the Sentencing Reform Act. Kimbrough, 552 U.S., at 101.

### The Appropriate Sentence

The Court should conclude, as argued above, that defendant's total offense level is 28 and his criminal history category is I for an advisory guideline sentencing range of 78 to 97 months, Zone D.  As suggested by PSR ¶¶102-103, the Court, pursuant to either U.S.S.G. §5K2.23 or §5K2.0(a)(2), should downward vary or depart *at least* five years and eight months to adjust Mr. Ramic's sentence in this case for the term of imprisonment he served in Turkey under barbaric conditions for related offenses. This would result in an effective sentencing range of no more than 10 to 29 months. As of the currently scheduled day of sentencing herein, defendant will be entitled to jail credit of approximately 40 months (39 months and 29 days) for pre-trial and pre-sentencing detention by the United States. Accordingly, the Court should sentence defendant to a total term of time served to be followed by a life term of supervised release. Upon his release from custody, the defendant's naturalized citizenship will be revoked pursuant to 8 U.S.C. §§1424 and 1451; and he will

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

26

be summarily deported to his native Bosnia-Herzegovina with denial of any re-entry into the United States.

This sentence; his discharged term of imprisonment in Turkey; his revocation of citizenship and deportation; and the strict controls, conditions, and sanctions attendant to supervised release will be sufficient, but not greater than necessary, to satisfy the requirements of the Sentencing Reform Act. 18 U.S.C. §§3553(a)(1) and (a)(2). It properly takes into consideration the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to 1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for his offenses; 2) afford adequate deterrence to criminal conduct; 3) protect the public from further crimes of the defendant; and 4) provide needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. A higher custodial sentence will not satisfy to any greater degree the statutory purposes of sentencing set forth in 18 U.S.C. §3553(a)(2). Accordingly, the recommended sentence is "sufficient, but not greater than necessary", to satisfy the requirements of 18 U.S.C. §3553.

## I.
### Nature and Circumstances of the Offense and History and Characteristics of the Defendant

As discussed above, federal sentencing stands on two pillars—consideration of the statutory sentencing factors of 18 U.S.C. §3553(a)(2) to be sure, but also the equally important consideration of the nature and circumstances of the offense and the history and characteristics of the defendant as required by 18 U.S.C. §3553(a)(1).

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

**Mr. Ramic's Formative Years**
**(Interview and Evaluation pp. 1-3)**

Mirsad Ramic was born on January 10, 1990, in Rovasi, a rural village close to Srebenica in the eastern part of the Socialist Republic of Bosnia-Herzegovina. At the time, Bosnia-Herzegovina was one of the constituent republics making up the country of Yugoslavia. It was populated primarily by Muslim Bosniaks, Orthodox Christian Serbs, and Catholic Croats. Mirsad's family were Muslim "village people" with long and deep historical roots in the area

Yugoslavia broke apart in 1991. In 1992, following the secessions of the Slovenian and Croatian republics, the Socialist Republic of Bosnia and Herzegovina passed an independence referendum, but the Serbs boycotted the referendum and refused to accept the outcome. Instead, the Serbs adopted their own separate constitution in an attempt to create a Serbian Republic of Bosnia and Herzegovina and seized ethnic Serb territory within what was now the independent country of Bosnia-Herzegovina. A civil war ensued, marked by Serbian ethnic cleansing and genocide of Muslims. The Serbs rounded up Muslims and separated the men from their families. Ramic's father, a non-combatant civilian, was forcibly separated from his family during one of those roundups when they were living in Srebenica, leaving Mirsad's paternal grandparents to take care of him, his sister, and his mother. His father was later murdered by Serbian army and paramilitary forces.

> The Bosnian War occurred in Bosnia and Herzegovina from about April 1992 to December 1995. The sectarian conflict was marked by acts of ethnic cleansing and war crimes on behalf of military forces or paramilitary groups against civilians. These war crimes included genocide, mass rape, and the forceful removal of ethnic minorities such as Bosnian Muslims (Bosniaks) and persons of other religious or ethnic backgrounds at the hands of military

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

forces or those of paramilitary groups. Upon information and belief, Ramic's father, a Bosniak, died in an event named the Srebrenica massacre in mid-1993. He was among more than 8,000 men or boys killed in the massacre.

(PSR ¶12). A long period of transiency followed during which the remaining family moved from Srebrenica to Tuluza where they had to live and sleep rough in an open stadium, then to an abandoned school in Tuluza where they lived with a maternal grandmother and 11 others, then to Banovici when Mirsad was 5 or 6 years old where they stayed with other abandoned refugee families. Desperate deprivation and tragedy at the hands of the Orthodox Christian Serbs was the rule. Every day, Mr. Ramic's mother sent him and his sister, Mirnesa, to beg for food house to house and in the streets. He was ostracized for being a refugee who did not belong. He witnessed firsthand family members blown up by mines as they were walking to get necessary water for survival. Serb snipers were everywhere. One of his aunts and her daughter were killed by Serb mortar fire while they and Mr. Ramic were going to fetch water. Another aunt had her legs blown off by the mortar fire. Mirsad actually saw his grandfather collecting their body parts and putting them in a blanket for burial.

Mirsad's longest time in a refugee camp was in Lukavac, where all of the refugees were in one place. He and his family were in housed in one room with 20 other people. While it, too, was dangerous, for the first time, Mr. Ramic felt that he "belonged". It is a place he remembers having friends and not being stigmatized.

After Lukavac and the end of the civil war, Mr. Ramic's family was separated from other extended family members and moved into an abandoned house the Bosnian government had re-purposed for refugees where they lived in a single room with two other families. But they were in a section of the town consisting primarily of refugees like himself

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

29

and like in Lukavac, he finally felt accepted. He and his sister started going to school. He and friends played soccer, went fishing, hunting, etc. He had friends and freedom. He told Dr. Van Eys, "I loved the freedom. I could go anywhere".

Unfortunately, not everything was for the better. In school, he was once again the outcast, the refugee, the other. He was subjected to physical abuse from approximately the third to the fifth grade doled out by teachers, all former Communists, who trained children by hitting them with various objects.

In 2001, he, his sister, and mother were involuntarily emigrated to Kansas City. This greatly affect Mirsad in a negative way. In Bosnia, he was "free", he had friends. He belonged. Things were much different here.

### The American Experience
### (Interview and Evaluation, pp. 3-7)

What Mr. Ramic was told about his and his families forced re-settlement did not pan out. They were assured that they would be taught English, have jobs, decent housing. None of this happened.

His assimilation into the American culture never materialized. He was further alienated from his mother who had to take a night job in a factory, leaving him alone during the day and restricted to the home because it was not safe to go outside. He greatly missed the freedom he had finally come to experience in Bosnia and told Dr. Van Eys that he felt "like he was in prison". They had to live with his heroin-addicted aunt in a squalid neighborhood that was exceptionally violent and dominated by immigrants from Mexico who openly engaged in illegal drug and gun use, even to the point of shooting at his aunt on

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

30

one occasion because she had parked her car in a spot they considered belonged to them. There were no English classes, and while he eventually learned English, his mother never did. Unlike at home, there was no Bosnian community to speak of.

The schools in Kansas City further contributed to his lack of assimilation and ostracism as an "other" that did not belong. His regular neighborhood school was an English-only school, and there were no teachers for English as a Second Language (ESL), so he, his sister, and one other Bosnian child had to be bused long distances everyday to the only school with ESL, requiring long days from early morning to late afternoon. Further contributing to his failure to assimilate was the fact that all of the other children in the ESL school spoke Spanish. He was the only Bosnian in his class and the only Caucasian. He had what he described to Dr. Van Eys as a "double difference". He was "foreign", but not the right kind of "foreign" due to his religion and language. He was "white", so didn't fit in with the "brown" kids; but *not the right kind of "white"* to fit in with the white or black American kids. In short, he didn't fit in with any of the other children, American or immigrant.  Not being able to communicate exacerbated his feeling "out of place".

The schools in Bowling Green were also non-supportive and adverse to assimilation. Two teachers, in particular, who taught history regularly denigrated Mirsad for being an immigrant refugee. One in Middle School told him, "You need to get on a plane and go back to your country". Another in High School made negative comments about him such as, "You Bosnians need to be rounded up and flown back to your country" and "Go back to your country." In addition to teacher comments, Mirsad was the victim of constant bullying and

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

harassment by other students, constantly hearing things like, "Go back to where you came from"; "Fuckin' Bosnians", etc.

Because of the inevitable fights over these and other episodes of bullying and harassment, Mirsad was eventually sent to "alternative" schools, resulting in serial displacement that further worked against finding a supportive community of belonging.

As Dr. van Eys summarizes in her report, Mirsad had no protective factors like mentors, a mosque community, school sports, extracurricular activities, or invested teachers; no consistent school to "claim" him since he kept going to various "alternative" schools; no continuity. He was always an "outsider" in the school context and struggled with the bullying and harassment and with the fighting these provoked. From the start and over the course of matriculation, Mirsad was not provided a viable learning environment, giving him limited opportunity to "hook" into learning and take advantage of free and public education.

As he got older into his late teens and 20s, Mirsad wanted to re-capture that sense of belonging that he enjoyed in Bosnia before it was ripped from him by the Serbs and that was, for him, absent in America. He began a search for identity beginning in late high school and after. He began to explore and learn about his Muslim religion and heritage. He began attending the local mosque; learned Arabic; studied the Koran; wore a kufi; grew a beard and long hair, i.e., he began practicing his faith as a Muslim in a purist way. As Dr. van Eys puts it, "He was, in an impassioned and naïve manner, trying on being Muslim". Interview and Evaluation, p. 7. He wanted to study in a Muslim country or region, so ended up selling his car and going to Yemen to study. However, he was naïve to think that he

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

32

could just travel to another country. He made a number of mistakes obtaining a visa and was denied entry, ultimately becoming entangled with the FBI in Germany who accused him of trying to join Al Qaida, which he denied. He was put on a no-fly list preventing his return to the United States and ended up visiting Bosnia where he learned his grandmother had passed away. He told Dr. van Eys that he spent three nights in a mosque there, but felt that he no longer belonged in Bosnia, saying "we [my people] had been cleansed out". He didn't have a job. His remaining family in Bosnia was an uncle who had made no effort to help him and his family when they were refugees and now only disrespected and insulted him. Eventually, his mother convinced him to try again to return to the United States, which he was finally able to do. Upon his return, the FBI began their draconian surveillance and unremitting harassment, described *supra* at pp. 23-24.

**The Siren Call of Isis and Defendant's Particular Susceptibility to it**
**(Interview and Evaluation pp. 7-9 and Dr. Vidino's Cross Examination)**

It was at this point in Mr. Ramic's life that the Syrian civil war gave rise to ISIS and its offshoots like the Islamic State of Iraq and al-Sham. Sunni Muslim ISIS, alongside other Sunni Muslim rebel groups, were battling the Shiite Muslim forces of Bashar al-Assad and other non-Muslim combatants such as the Kurdistan Workers Party (PKK) for control of Syria. ISIS embarked on a prolific, intensive, and spectacularly successful propaganda campaign to recruit other Sunni Muslims to come to Syria to battle the Shiites and others who, they claimed, were murdering and displacing Sunnis—to Mr. Ramic, a historical replay of the Serb genocide of Muslims in Bosnia. No less than the government's own expert witness, Dr. Lorenzo Vidino, agrees that this was successful in engendering a "deep

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

sense of empathy" in Muslims all over the world and motivating them to come to Syria to defend Islam.

> One of the triggers, cynically exploited by the propaganda of IS and other jihadist groups, is a deep sense of empathy. Compassion appears to have played an important role in initially motivating the first wave young Americans who became interested and invested in the Syrian conflict. Many were outraged by the appalling violence Bashar al-Assad's regime used to suppress the Syrian rebellion and the subsequent inaction on the part of the international community. Pictures and videos capturing the aftermath of civilian massacres perpetrated by the regime, displayed widely in both social and mainstream media, rocked the consciences of many—from those with a preexisting strong Sunni identity to those who were not Muslim—and led some to take the first steps to militancy.

> A major shift began as the anti-regime rebellion in Syria came to be increasingly dominated by militant groups. By the time IS formally declared its caliphate in June 2014, the motivations of recruits appeared to revolve more around fulfilling perceived religious obligations. Unquestionably, the primary one is that of living in a perfect Islamic society under the world's only authentic Islamic government, as its supporters believe the caliphate declared by Abu Bakr al Baghdadi to be.

Inside the Mind of ISIS: Understanding Its Goals and Ideology to Better Protect the Homeland, Hearing before the U.S. Committee on Homeland Security and Governmental Affairs, January 20, 2016, Dr. Lorenzo Vidino, Director, Program on Extremism, The George Washington University, p. 4. His actual sworn testimony before the Homeland Security Committee in 2016 underscores his view.

> The current mobilization of Americans attracted to the Islamic State is unprecedented in size. It is also astonishingly diverse. It includes men and women, teenagers and men in their 40s, university students and petty criminals, people born into Islam and converts, and people born in America and recent immigrants. There is absolutely no such thing as a typical Islamic State sympathizer in America.

> Individuals with such diverse backgrounds are unlikely to be motivated by the same factors. Radicalization is a highly complex and individualized process,

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

often shaped by a poorly understood mix of a variety of factors which are overlapping. One of them, which is cynically exploited by the propaganda of ISIS, is a deep sense of empathy for the suffering of the Syrian people, and that was true particularly at the beginning of the Syrian conflict. But by the time ISIS formally declared its caliphate in June 2014, the motivations of recruits appear to revolve more around fulfilling perceived religious obligations. Unquestionably, the main motivation today is that of living in a perfect Islamic society under the world's only authentic Islamic government, as its supporters believe the caliphate declared by Abu Bakr al-Baghdadi to be. Whether in online conversations or in interrogations with authorities following their arrest, the appeal of living in this utopian Islamic society is cited by the vast majority of American ISIS sympathizers.

. . . .

. . . . A search for belonging, meaning, and identity appear to be crucial motivators for many Americans who embrace ISIS's ideology.

Hearing Before the Committee on Homeland Security and Governmental Affairs of the U.S. Senate, January 20, 2016, Dr. Lorenzo Vidino, Director, Program on Extremism, The George Washington University, pp. 7-8. Dr. Vidino is not alone in his views. As his colleague from the Brookings Institution, Dr. Alberto M Fernandez, wrote in a study *specifically endorse and validated by Dr. Vidino in his trial testimony*:

How would one then summarize hundreds of hours of ISIS propaganda videos in a few short words? The first theme is urgency: the (Sunni Arab) Muslims are being slaughtered now. Syria's children are being killed by the *rafida* apostates now. There is a plot now by the Shiites in Iraq, Syria, and elsewhere to utterly destroy the Sunni Muslims. The Shiites have already taken the Sunnis' dignity and political power, and are now on the march to take everything else. This is why events in Syria and the extreme sectarianism of an unrestrained Al-Maliki regime were so consequential: they provided the perfect frame for ISIS's claim to be the defender of Sunni Arab Muslims. But this urgent call builds on a deeply embedded, broader litany of perceived outrages perpetrated against the "true" Muslims by outside enemies: the Crusaders, the Jews, the infidels (*kuffar*) and their tyrannical (*tawagheet*) puppet regimes.

The second concept is agency: it is up to you, the Muslim viewer, to do something now to save the Muslims. Like a Bible-belt preacher exhorting a flock, it is about the immediate decision an individual Muslim needs to make

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

35

in fulfillment of his religious duty. As Thomas Hegghammer wrote, "a growing number of micro-level studies of jihadi recruitment downplays the role of doctrine and emphasizes proximate incentives involving emotions: the pleasure of agency, the thrill of adventurism, the joy of camaraderie, and the sense of living an 'authentic Islamic life." The individual Muslim is called to ask himself if he is one of the "suitable bricks" for the "blessed structure" which is the Islamic State. Rather than advocating institutional violence, such as that of the nation state, the ISIS call—especially to Western Muslims—advocates violence as an individual decision and civic duty.

Themes in Islamic Messaging, Here to stay and growing: Combating ISIS propaganda networks, October, 2015, Brookings Institution, Dr. Alberto M. Fernandez. P. 11. Dr. Vidino's trial testimony at trial endorsed and was consistent with these views. See Transcript of Cross-Examination of Lorenzo Vidino, pp. 4-13 (DN 289, PageID #4216-#4225).

Defendant was the perfect target for ISIS propaganda and vessel for its lies. Because of his personal history and characteristics, he was particularly susceptible to its call to come to Syria, defend fellow Muslims, and live in peace in an ideal Muslim society. This is what motivated him, not any animosity toward or hatred of the United States. As Dr. van Eys concludes in her report, Mr. Ramic's motivations to leave and travel to Syria were the harassment of the FBI, his desire to "rescue civilians with whom he identified", and his desire to live in an "idyllic (utopian) society that was promised in internet images and ISIS propaganda." Interview and Examination, pp. 7-9.

> Mirsad's main motivation was to rescue civilians with whom he identified. He remembered the terror of his own childhood, the deaths, the dislocation from homes and communities, his border village being targeted, his father killed by Serbs, lying on the ground so as not to be killed by snipers, being always wary of land mines, seeing others not "make it" around the bombs, watching his grandfather collect body parts of family members, the sense of absolute helplessness. Mirsad was influenced greatly by portrayals in the media of the

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

conflict in Syria. He said, "I was watching the news regarding the civil war in Syria. I was feeling so bad. I was feeling obligated to help those people. I saw civilians getting slaughtered and felt obligated to help. I'd seen it for three years". A "famous video" he described seeing before he went to Syria highlighted a person with half of their face blown off who stayed alive for 5 hours. Mirsad said, "you could see his one eye—the other [eye] was missing". He described another influential video wherein someone was "buried alive". Further, he saw a video of an 11-year-old child being burned by gasoline and another of a man with his hands up and crying, "where are you Muslims?" Mirsad said, "I felt so bad. I'm eating and drinking and privileged [in the U.S.]". Mirsad remembers being on a Maverick Helicopter Tour over Las Vegas and thinking, "I'm in luxury while people are being killed". He began to wonder, "Why not me? I can help these people who are like I was as a kid. Innocent people being slaughtered". It seemed incumbent upon him to do his part and answer this call for all Sunnis to come to Syria and free the people from the Assad regime.

. . . .

The idyllic (utopian) society that was also promised in internet images and ISIS propaganda was a main second influence for Mirsad. Mirsad expected a promised "better culture" through ISIS. This did not pan out. This was an experience similar to his coming to the U.S. when a "promised better culture" also did not result for him. He saw social media propaganda images of scenes that drew him in such as "people putting their hands together as one body, pledging assistance—Syrian civilians were praising the Islamic State. The videos showed that the Syrian people would invite you to their house and partner with you."

Mirsad believed that in the promised Islamic State that "everything is nice". He believed that there would be people like him who would live in purity and within the culture of traditional Islamic beliefs. He said, "I wanted to go back to my community of Islamic culture. It's too fast here [in the U.S.]. The tempo of life here is too fast."

Mirsad thought he could start a new life, a new family, in a new society, and that "the whole tempo of life" would be different. He envisioned working hours that catered to the Muslim faith and were slower paced, Islamic holy days observed for the faithful, people always stopping to make prayers. Mirsad had begun to think about how life in the U.S. was "too fast". He began to envision life structured around his religion with others who were as faithful to the religion as he was. He said, "there would be no one judging you; everyone would look like you". He mentioned that "you don't look strange [there]. At a truck stop you can pray without explaining" (referring to his job in the U.S. as a truck driver).

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

Interview and Evaluation, pp. 7-9. Can we be reasonably certain that these were in fact Mr. Ramic's motives? Again, the proof is in the pudding. Mr. Ramic's actions were wholly consistent with these relatively benign motives and totally inconsistent with any more sinister motive to harm the United States or its citizens. As Dr. Vidino pointed out, *supra*, the danger to America from Muslim extremism comes not from those who travel abroad, but is primarily from domestic converts to ISIS whose goal it is to harm America and Americans right here, like the New Orleans ISIS convert Shadsud-Din Jabbar, a Texas-born U.S. citizen and military veteran who embraced ISIS and on its behalf recently injured 57 and killed 14 on Bourbon Street in New Orleans on January 1 of this year by shooting them and running them down with his car.[10] If that is your goal, you do not travel to the Syrian desert to be anonymously slaughtered in the sand by Assad or a PKK fighter. You commit your crimes right here in America against Americans. Mr. Ramic is not like Shadsud-Din Jabbar. He lived in this country for some 13 years without committing any crime more serious than nine year old minor traffic offenses.

**The Experience in Syria and Quitting the Islamic State in Iraq and al-Sham (Interview and Evaluation, pp. 8-11)**

Once Mr. Ramic got to Syria and joined the Islamic State in Iraq and al-Sham, he quickly learned that all of the ISIS propaganda had been a lie. His revelations are detailed in Interview and Evaluation, pp. 8-11. Despite the propaganda portraying Syrians as united against Assad, praising the Islamic State, and being warm toward and appreciative of the foreign fighters who had come to fight for and protect them, he found that the Syrian people

---

[10] See https://www.nytimes.com/2025/01/02/briefing/new-orleans-new-year-attack.html.

Office of the Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

hated foreigners like him, "slaughtered" them and exploited them. They did not practice the Muslim faith at all; were illiterate; tolerated transgender parks, alcohol shops, and brothels; and did not have Islamic customs or adhere to Islamic morals. No one was "like him who would live in purity and within the culture of traditional Islamic beliefs". He found that the leadership of ISIS was thoroughly corrupt and self-serving, consumed by in-fighting, making money from kickbacks, bribes, and criminal dealings with the "enemies of Islam". Once again, he felt betrayed.

Realizing the hypocrisy of ISIS, he risked his life to escape to Turkey where he was arrested, charged, tried, convicted and imprisoned in horrific conditions for 68 months. He was branded a traitor to ISIS for his abandonment of the organization and his total denunciation of it and it's leaders.[11] "Revolutions", he told Dr. van Eys, "are planned and started by the smart, fought by the brave, and then taken over by cowards . . . . I disagree with the Islamic State theologically and ideologically". Interview and Evaluation, p. 11. Today, Mr. Ramic still adheres to his Muslim faith, but without the trappings of ISIS and jihad. Interview and Evaluation, p. 10.

Mr. Ramic's motives in leaving America to join the Islamic State of Iraq and al-Sham, his experiences in Syria, his realization that the propaganda that enticed him had all been a lie, his life-threatening escape from the clutches of the Islamic State of Iraq and al-Sham, and his repudiation of radical Islam parallel those of another government trial

---

[11] Intercepted communications USA-018786 and USA-018832. These are described in Exhibit C attached hereto. Said exhibit is filed under seal due to the protective order entered by the Court.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

witness, Muhammad Das.[12] Das was featured prominently in the 2018 study of Americans who, like Mr. Ramic, left America to fight in Syria and Iraq undertaken by the Program on Extremism of the George Washington University, of which Dr. Vidino was and remains the Director. The excerpt concerning Mr. Das was specifically validated by Dr. Vidino and by Das himself in their trial testimony and is attached hereto and incorporated herein by reference. See The Travelers, American Jihadists in Syria and Iraq, February, 2018, Program on Extremism, George Washington University, pp. C1, 55-62, attached hereto as Exhibit D. See Transcript of Cross-Examination of Lorenzo Vidino (DN 279) and Trial Transcript of Trial Testimony of Muhammad Das (DN 281).

### Defendant's Psychological Evaluation
### (Interview and Evaluation, pp. 17-19)

Defendant's traumatic experiences have left him with significant psychological sequelae as detailed on pp. 17-19 of the Interview and Evaluation. His primary diagnosis is Post Traumatic Stress Disorder (PTSD) due to his childhood war trauma in Bosnia, adult war trauma in Syria, and torture and abuse while in Kirikkale Prison in Turkey. This manifests as flashbacks of war trauma and torture, sleeplessness, emotional numbness, extreme hopelessness and depression, hyperarousal, and suicidal ideation.

### Conclusion
### (Interview and Evaluation, pp.19-21)

Counsel's charge to Dr. van Eys was to give his counsel and the Court insight into what motivated Mr. Ramic to leave the United States, travel to Syria, and join the Islamic

---

[12] A false name under which the witness was permitted to testify by the Court on motion of the government and over the objection of the defendant. The Court and the parties were aware of his real name, the jury was not.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

40

State of Iraq and al-Sham, as well as what made him more susceptible than other American Muslims to the siren call of ISIS.

Her conclusions are set out at length in pp. 19-21 of her Interview and Evaluation. Counsel commends the entire report to the Court, but her conclusion summarizes her findings.

> In sum, Mirsad Ramic was susceptible to the siren call of ISIS due to deep empathy stemming from his own experience of slaughter in war-torn Bosnia as a child. He was at the age of exploring identity and finding his place to belong in culture (these are the normal "tasks" of adolescent development) when the extremist propaganda was at its height and he was feeling disenfranchised and harassed in the U.S. culture. Like many young people of that day, Mirsad believed in the "lies" of ISIS propaganda. What is important is that Mirsad quickly discerned that ISIS was corrupt and not what he had "signed up for". He had the courage and integrity to abandon ISIS, knowing that he would likely be killed for it. He spent years being tortured and traumatized in Turkish prison for participating in ISIS that he ultimately abandoned and to whom he has no further allegiance. He disagrees ideologically and theologically with ISIS. He currently suffers from Major Depression and PTSD, yet, stays true to his daily prayer, believing that life is predestined and accepting that God is in control.

Interview and Evaluation, p. 21.

## II.
## Statutory Sentencing Factors

The second pillar upon which federal sentencing stands is the requirement that a sentencing court impose a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in §3553(a)(2), i.e., the need for the sentence to 1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for his offenses; 2) afford adequate deterrence to criminal conduct; 3) protect the public from further crimes of the defendant; and 4) provide needed

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

41

educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2). The recommended sentence does this. A higher custodial sentence will not satisfy to any greater degree the statutory purposes of sentencing set forth in §3553(a)(2). Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. §3553.

### A. The Recommended Sentence Will Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

While punishment is only one of the §3553 factors to be considered by the Court in imposing sentence, it is a factor. However, punishment must be just under the circumstances of the case. A custodial sentence—especially one as harsh as that recommended by the PSR—is excessive for someone with no terms of incarceration prior to the offense conduct, no prior opportunity for treatment to correct his behavior, and no chance to conform his conduct to the requirements of supervised release. And an excessive sentence is not a punishment that is just as required by the statute. Nor does an unjust sentence promote respect for the law. Just the opposite.

Congress specifically contemplated that conduct such as defendant's could be adequately punished by the recommended sentence, otherwise it would have imposed a mandatory minimum term of imprisonment, which it did not. Accordingly, the recommended sentence is within the range of punishment contemplated by Congress and would constitute a just sentence that reflects the seriousness of the crime. Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirement of 18 U.S.C. §3553(a)(2)(A).

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

**B. The Recommended Sentence Will Afford Adequate Deterrence to Criminal Conduct by Others.**

Deterrence is the most difficult of the §3553(a)(2) factors to quantify or assess. The government routinely argues—without empirical support—that longer custodial sentences equate to stronger deterrence. Numerous scientific studies have confirmed that longer sentences do not deter crime to a greater degree than shorter sentences. It is the certainty of detection and conviction that deters crime, not the length of any threatened sentence. Even if we eschew the criminological research, conventional wisdom validates this fact. The threat of high fines or even jail time for speeding or reckless driving deters no one from engaging in such behavior. But, everyone slows down and drives appropriately when they see a police car on the side of the road. It is not the threat of a severe sanction that deters us, it is the certainty of detection and conviction that does.

> Research to date generally indicates that increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits.
> . . . .
> Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment. . . .

Valerie Wright, Ph.D., Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment, pp. 1,4 (found at *http://www.antoniocasella.eu/nume/Wright_2010.pdf*). (Emphasis in the original). The study concluded that

> [e]xisting evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive. Overall, the evidence indicates that the deterrent effect of lengthy prison sentences would not be substantially diminished if punishments were reduced from their current levels.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

Id., at p. 9.

If the so-called traveler prosecutions have proven anything, it is that illegal emigration of citizens to support foreign terrorist organizations cannot be committed with anonymity or impunity. All similarly situated persons know with certainty that such conduct will be aggressively investigated and the perpetrators identified, arrested, tried, and convicted. It is this "certainty" of punishment rather than the potential "severity" of punishment that will serve to deter others from conduct similar to the conduct in this case. For those who are not so deterred because they do not care about the consequences or believe—despite the ample evidence to the contrary—that they will ever be identified, caught, and prosecuted, no sentence, no matter how severe, will have any greater deterrent effect than the one recommended herein. The ease with which defendant's conduct was uncovered by investigators; his very public arrest, prosecution, and conviction; five years and eight months of torture and deprivation in a Turkish maximum security prison, over three years of pre-trial and pre-sentencing detention in isolation in a county jail, loss of naturalized citizenship and deportation, and a life term of supervised release with the attendant strict controls and conditions that it entails, plus the potential of additional terms of imprisonment if ever re-enters the United States or otherwise violates the conditions of supervised release are powerful deterrents and onerous and serious sanctions that will definitely deter like minded individuals from committing similar crimes.

Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirement of 18 U.S.C. §3553(a)(2)(B).

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

**C. The Recommended Sentence Will Protect the Public from Further Crimes of the Defendant.**

A common mantra from the government is that only incarceration can protect the public from further crimes by this or any defendant. This is not true in Mr. Sparks' case.

First, application of the Sentencing Commission's own rationale and validated methodology for assessing the risk of recidivism shows Mr. Ramic to be a low risk of re-offending. As demonstrated above, but for the one-size-fits-all arbitrary assignment of a criminal history category VI to Mr. Ramic, his criminal history category would be I. This criminal history category calculation accurately assess the true seriousness of defendant's criminal history and, more importantly, the likelihood that he will commit other crimes in the future. Applying the factors relied upon by the Commission for the assignment of criminal history points to a particular conviction (i.e., the nature of the offense, the severity of the sentence, and the length of time that has passed since the conviction or release from imprisonment) and the aggregation of those points into a criminal history category for sentencing purposes—as opposed to the arbitrary assignment of a fixed criminal history category in all cases—the Sentencing Commission would deem Mr. Ramic to be at the lowest risk of re-offending.

However, the Court need not rely merely upon "predictions" of Mr. Ramic's low risk of recidivism in order to reasonably insure that the public is protected from future criminal conduct by him. He will no doubt be immediately stripped of his naturalized citizenship pursuant to 8 U.S.C. §§1424 and 1451 and summarily deported to his native Bosnia-Herzegovina with denial of any re-entry into the United States. If for some

Office of the Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

reason—unlikely in the current environment—he is not deported, he will still be subject to a life term of supervised release which will carry stringent requirements, controls, monitoring, and sanctions which will actively serve to prevent any further criminal activity on pain of lengthy terms of imprisonment should he violate any of the terms of that supervised release. U.S.S.G. §§5D1.3, 7B1.1-7B1.5. The Court may and should also impose any additional special conditions of supervised release it deems necessary to further protect the public, such as those recommended by the PSR: never return to the United States if and when he is deported; participation in community-based mental health treatment programs approved by the Probation Office; an initial computer inspection/search of his computer systems and subsequent inspections/searches with retrieval and copying of all contents; installation of computer monitoring to track his computer use and prevent access to particular materials at the discretion of the Probation Office; participation in and compliance with the Computer Restriction & Monitoring Program; and the submission of his "person, property, house, residence, vehicle, papers, computers . . . other electronic communications or data storage devices or media, or office to a search conducted by the United States Probation Officer. PSR ¶105. All of this will protect the public from Mr. Ramic re-offending.

The important thing here is that Mr. Ramic has a track record. For 13 years he has committed no crimes more serious than a single nine year old conviction for minor traffic offenses. He has never been in jail prior to the offense conduct in this case and has never had the remedial benefit of competent treatment and counseling. He has repudiated radical Islam and its adherents and tenets. The Court should not assume—without even trying—that

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

even in the highly unlikely situation were he not to be immediately stripped of his citizenship and deported to Bosnia, a life term of supervised release will fail to protect the public and that further custodial incarceration is necessary. Defendant asks that he at least be given the opportunity to succeed, as supervised release supervision is intended to do.

A further custodial sentence of any length—let alone the 50 year term recommended by the PSR and the United States—will not protect the public to a greater degree than the recommended sentence of time served and a life term of supervised release. Accordingly, the recommended sentence will be sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. §3553(a)(2)(C).

### D. The Recommended Sentence Will Provide Defendant with Needed Correctional Treatment in the Most Effective Manner.

Everyone is familiar with the benefits of the remedial and correctional treatment programs of the Bureau of Prisons. However, Mr. Ramic should not and need not be further incarcerated in order to avail himself of such benefits because all of these benefits are also available in the non-custodial setting of supervised release. In fact, the Sentencing Reform Act specifically prohibits imposing a custodial sentence just for the purpose of availing a defendant of the Bureau of Prisons' custodial remedial and correctional treatment programs.

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

18 U.S.C. §3582(a) (emphasis added). In short, Mr. Ramic should not be incarcerated just so he may benefit from any remedial or correctional treatment or program of the Bureau of

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

Prisons. Indeed, there is no need to do so. Any treatment or rehabilitation the Court feels is indicated in Mr. Ramic's case can be obtained under the auspices and supervision of the United States Probation Office while he serves life term of supervised release. Again, this assumes the highly unlikely scenario where he is not immediately stripped of his citizenship, deported, and barred from ever returning. In that instance, of course, there can be no treatment possible.

Further incarceration of any length—let alone the 50 year term recommended by the PSR and the United States—will provide no greater amount of "needed educational or vocational training, medical care, or other correctional treatment" than the recommended sentence. Accordingly, that recommended sentence is sufficient, but not greater than necessary, to satisfy the requirement of 18 U.S.C. §3553(a)(2)(D).

## Conclusion

Defendant's total offense level should be 28 and his criminal history category I for an advisory guideline sentencing range of 78 to 97 months. The Court should downward vary or depart *at least* 68 months from this range to adjust his sentence for the term of imprisonment he served in Turkey for related offenses. This would result in an effective sentencing range of no more than 10 to 29 months. After crediting defendant for the approximately 40 months (39 months and 29 days) pre-trial and pre-sentencing detention by the United States as of April 14, 2025, the scheduled day of sentencing herein, the Court should sentence defendant to a total term of time served to be followed by a life term of supervised release. Upon his release from custody, the defendant's naturalized citizenship

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

will be revoked pursuant to 8 U.S.C. §§1424 and 1451; and he will be summarily deported to his native Bosnia-Herzegovina with denial of any re-entry into the United States.

This sentence; his discharged term of imprisonment in Turkey served under horrific and barbaric conditions; his revocation of citizenship and deportation; the standard strict controls, conditions, and sanctions attendant to supervised release, including the mandatory and standard conditions imposed by statute and U.S.S.C. §5D1.3, and such other conditions as the Court may deem appropriate, including those recommended by the PSR, will be sufficient, but not greater than necessary, to satisfy the requirements of the Sentencing Reform Act. 18 U.S.C. §3553. It properly takes into consideration the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to 1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for his offenses; 2) afford adequate deterrence to criminal conduct; 3) protect the public from further crimes of the defendant; and 4) provide needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. A higher custodial sentence will not satisfy to any greater degree the statutory purposes of sentencing set forth in 18 U.S.C. §3553(a)(2). Accordingly, the recommended sentence is "sufficient, but not greater than necessary", to satisfy the requirements of 18 U.S.C. §3553.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

/s/ Scott T. Wendelsdorf
Federal Defender
629 Fourth Avenue
200 Theatre Building
Louisville, Kentucky 40202
(502) 584-0525

Counsel for Defendant.

## CERTIFICATE

I hereby certify that on April 2, 2025, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Scott T. Wendelsdorf
Federal Defender
629 Fourth Street
200 Theatre Building
Louisville, Kentucky 40202
(502) 584-0525

Counsel for Defendant.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

50

**Attachments**

Exhibit A        Interview and Evaluation of Mirsad Ramic by Dr. Patti van Eys

Exhibit B        Curriculum Vitae of Dr. Patti van Eys

Exhibit C        Discovery Received from the United States (Filed under Seal)

Exhibit D        Excerpt re Muhammad Das from The Travelers, American Jihadists in Syria and Iraq, February, 2018, Program on Extremism, George Washington University, pp. C1, 55-62

OFFICE OF THE
FEDERAL DEFENDER
200 THEATRE BUILDING
629 FOURTH AVENUE
LOUISVILLE, KY 40202

TEL (502) 584-0525
FAX (502) 584-2808

51

O:\Clients\SentencingMemo\RamicMirsad FINAL.wpd

OFFICE OF THE
FEDERAL DEFENDER
200 THEATRE BUILDING
629 FOURTH AVENUE
LOUISVILLE, KY 40202

TEL (502) 584-0525
FAX (502) 584-2808